```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3   UNITED STATES OF AMERICA,     )
                                   )
 4              Plaintiff,         )  CRIMINAL ACTION FILE
                     v.            )  NO. 1:18-CR-00181-MLB-CMS-1
 5                                 )
     BENJAMIN JENKINS,             )
 6                                 )  EVIDENTIARY HEARING
                Defendant.         )
 7   _____)

 8   ---------------------------------------------------------

 9                   BEFORE THE HONORABLE
           MAGISTRATE JUDGE CATHERINE M. SALINAS
10               TRANSCRIPT OF PROCEEDINGS
                    OCTOBER 25, 2018
11   ---------------------------------------------------------

12   APPEARANCES:

13   For the Plaintiff:       PAUL R. JONES
                              LIBBY S. DAVIS
14                            Office of the U.S. Attorney
                              600 United States Courthouse
15                            75 Ted Turner Drive SW
                              Atlanta, Georgia  30303
16
     For the Defendant:       JAMES W. BRYANT
17                            Federal Defender Program, Inc.
                              Suite 1500, Centennial Tower
18                            101 Marietta Street NW
                              Atlanta, Georgia  30303
19

20          Proceedings recorded by mechanical stenography
              and computer-aided transcript produced by
21

22                   WYNETTE C. BLATHERS, RMR, CRR
                        Official Court Reporter
23                       2314 U.S. Courthouse
                        75 Ted Turner Drive, SW
24                      Atlanta, Georgia  30303
                          (404) 215-1547
25
```

1        **INDEX TO EXAMINATIONS**

2  **WITNESS**                                                        **PAGE**

3  ERIC GREENE

4        Direct Examination By Mr. Jones                              9

5        Cross-Examination By Mr. Bryant                             51

6

7                        **INDEX TO EXHIBITS**

8                **G O V E R N M E N T ' S   E X H I B I T S**

9                                          **IDENTIFIED**    **ADMITTED**

| 10 | 1 | Photograph | 15 | 15 |
|----|---|-----------|----|----|
| 11 | 2 | Photograph | 17 | 17 |
| 12 | 3 | Copy of Consent to Assume the Presence | 37 | 37 |
| 13 | 4 | Copy of Consent to Search | 37 | 37 |
| 14 | 5 | Copy of Apology Letter | 39 | 39 |
| 15 | 6 | Photograph | 40 | 40 |
| 16 | 7 | Copy of Miranda Form | 46 | 46 |
| 17 | 8 | Copy of DVD, Four Recordings | 50 | 50 |

18

19

20

21

22

23

24

25

```
 1                    Thursday Morning Session
 2                       October 25, 2018
 3                          9:45 a.m.
 4                          -  -  -
 5              P R O C E E D I N G S
 6          COURTROOM DEPUTY:  All rise.  Court is now in
 7   session, the Honorable Catherine Salinas presiding.
 8          THE COURT:  Y'all can be seated.  We're here on
 9   1:18-CR-181.  It's United States v. Benjamin Jenkins.  We've
10   got Wes Bryant here at the defense table.  Good morning.
11          MR. BRYANT:  Good morning, Judge.  Good to see you.
12          THE COURT:  And Paul Jones.  Good morning.
13          MR. JONES:  Good morning, your Honor.
14          THE COURT:  And Mr. Jenkins is here.  Good morning,
15   Mr. Jenkins.
16          THE DEFENDANT:  Good morning.
17          THE COURT:  Did you get caught up in the fire drill
18   with the rest of us?
19          THE DEFENDANT:  Yes, ma'am.
20          THE COURT:  Yeah, me too.  I couldn't get in the
21   building either.  It was one of those days.  I apologize to
22   everyone for the inconvenience, but I guess it's an important
23   function for our court to go through this process every now
24   and then.
25          I believe we're just here on -- we have a statements
```

1   motion about statements made on February 13th and then an

2   amended motion.  That's Documents 21 and 28.  Is that all

3   we're doing today?

4           MR. BRYANT:  Yes.

5           MR. JONES:  I believe so, your Honor.

6           THE COURT:  Okay.  And is it the same group of

7   statements?  Are these motions basically the same motion?

8           MR. BRYANT:  There were -- well, go ahead.

9           MR. JONES:  Yeah, it's a little bit complicated, your

10  Honor, and I'll just give you the government's theory of it.

11  We're dealing with four statements.  Well, what happened is

12  back in February 2017 the agents from Homeland Security

13  Investigations got a search warrant for Mr. Jenkins' house,

14  executed the search warrant.  They interviewed him there.  The

15  government's position is that this is a noncustodial

16  interview.  There was a main interview that lasted quite a

17  while, I think about an hour and a half or maybe more, and

18  then they concluded the interview.

19          They went back upstairs, and then Mr. Jenkins

20  approached the agent and said he wanted to talk some more.  So

21  they went back to the basement, continued talking.  And so

22  those are the two interviews that the government contends are

23  noncustodial back in February 2017.

24          Now, they executed a search warrant and an arrest

25  warrant back on May 25th of this year, and at that point the

1   agent advised Mr. Jenkins of his Miranda rights.  He invoked

2   his rights, so there was no interview.  They took Mr. Jenkins

3   back upstairs.  They let him talk to his parents, and then

4   while he was talking to his parents he started to have this

5   long drawn out conversation with his mother.  The agent was

6   there.  They couldn't let him, of course, you know, walk

7   around freely.  The agent was there and so just turned on his

8   recorder and recorded that conversation as well.

9          And again he was not in handcuffs.  The agent was not

10  participating in the interview.  He was just there and

11  recorded that conversation, and so that's something that the

12  government would want to -- possibly want to use at trial as

13  well.

14         THE COURT:  Is there a problem with that when one of

15  the -- did either of the parties know they were being

16  recorded?  That's not an issue?

17         MR. JONES:  I don't think it's an issue.

18         THE COURT:  That's the phone tapping Georgia law.

19         MR. BRYANT:  I think that it's something that goes to

20  the totality of the circumstances.

21         THE COURT:  Okay.  There's something on the phone.

22  As long as one party knows that they're being recorded, you

23  can record the other person.

24         MR. BRYANT:  That's, yeah, Georgia law, consent to

25  record.

```
1              THE COURT:  But that's on the phone?

2              MR. BRYANT:  That's on the phone.

3              MR. JONES:  Yeah.  I think that's correct, your

4    Honor.  And if we're wrong, I'm sure Mr. Bryant will point

5    that out in a brief.

6              THE COURT:  Okay.  So are we going to go into what

7    happened in May of '18 today?  Are we just in February of '17?

8              MR. JONES:  Both, May '18 as well.

9              THE COURT:  Okay.

10             MR. JONES:  Because there's -- I don't want to give

11   up a statement because you never know what's going to happen

12   at trial and in case there's something useful from that

13   then --

14             THE COURT:  Well, what's the challenge on the May of

15   '18 one?  What are we looking for here in terms of

16   constitutional problems?

17             MR. BRYANT:  Well, I guess -- yeah.  So if the

18   statements that the government contends Mr. Jenkins made to

19   the mother were prompted by the government putting him in that

20   situation, it's that whole line of cases where you're talking

21   about -- it's the discovering the bodies of the children line

22   of cases where the christian burial -- that's where it is,

23   christian burial where we just need to just have christian

24   burials for these children.  If we can just find the children,

25   then -- so it's not a direct questioning case, but if the
```

1  agent represents or makes a statement that's not a question

2  with the expectation that the person will provide a statement

3  or say something that could be incriminating, then that's

4  something that could be a constitutional violation, even

5  though there's not direct questioning.

6      THE COURT:  Okay.  So that's what -- you're just

7  looking to see if any of that happened?

8      MR. BRYANT:  That's right.

9      THE COURT:  Okay.  So we're going to just on that one

10 just figure out what was law enforcement's involvement, if

11 any, in the conversation between the mother and your client.

12     MR. BRYANT:  Or putting him kind of in a situation

13 where he ends up making a statement that the government

14 records.

15     THE COURT:  I mean, they've put him in a room with

16 his mother and then recorded him.  We know that.

17     MR. BRYANT:  Right.

18     THE COURT:  You think there might be -- what else

19 could there be?

20     MR. BRYANT:  Well, and it kind of goes to what was

21 said before law enforcement turned on the recording device,

22 and I don't think that we have a recording of what was said

23 before he was put in the room with his mother.

24     THE COURT:  Okay.  Thank you.

25     MR. BRYANT:  And it will also go to the

1   government's -- the statements that the agent made at the

2   time.

3           THE COURT:  Okay.

4           MR. JONES:  That's it, your Honor.  We just have one

5   witness, Agent Eric Greene, who's the case agent.  And so

6   that's giving you our position, that the main statement from

7   February 2017 is noncustodial.  And, you know, obviously when

8   he invoked his rights, there were no statements.  He made no

9   statements, and so there's nothing to use there.  But then the

10  subsequent conversation with his mother, we contend that

11  that's -- that would be admissible because there's no

12  constitutional violation there.

13          THE COURT:  Okay.  Thanks.  I appreciate you giving

14  me the overview.  You can go ahead and call him.

15          MR. JONES:  Yes, your Honor.

16          THE COURT:  Just can just come right up here.

17          THE WITNESS:  Sure.

18          THE COURT:  And just raise your right hand.

19                          ERIC GREENE,

20          herein, having been first duly sworn, was examined

21  and testified as follows:

22          COURTROOM DEPUTY:  If you would, please have a seat

23  and state your full name for the record for us.

24          THE WITNESS:  My name is Eric Greene, G-r-e-e-n-e.

25                      DIRECT EXAMINATION

1   BY MR. JONES:

2   Q    How are you employed?

3   A    I'm a special agent with the Department of Homeland

4   Security Investigations.

5   Q    And within Homeland Security, was it -- Department of

6   Homeland Security; right?

7   A    Department of Homeland Security, Immigration and Customs

8   Enforcement, Homeland Security Investigations.

9   Q    Okay.  And that's referred to as HSI?

10  A    Correct.

11  Q    Okay.  How long have you been a special agent with HSI?

12  A    Since 2006.

13  Q    What office are you currently assigned to?

14  A    The Atlanta Field Office.

15  Q    How long have you been in the Atlanta Field Office?

16  A    I transferred there in early 2015.

17  Q    What unit are you assigned to?

18  A    I work for the Child Exploitation Investigations Group.

19  Q    What are your duties working for the Child Exploitation --

20  Child --

21  A    Exploitation Investigations Group.

22  Q    -- Exploitation Investigations Group?

23  A    Investigate crimes against children.

24  Q    And what does that mean to investigate crimes against

25  children?  Specifically like what types of crimes?

1   A   Child pornography crimes are most likely what -- are most

2   what we deal with.

3   Q   Okay.

4   A   So cases that are involving violations of the child

5   pornography statutes.

6   Q   So have you been there the whole time you've been in

7   Atlanta?

8   A   I have.

9   Q   And prior to being in Atlanta, where were you located?

10  A   I was assigned to the Nogales, Arizona office.

11  Q   And when you were there, did you also investigate child

12  exploitation cases?

13  A   I did.

14  Q   Okay.  So pretty much since around 2006 you've been --

15  A   No.  It's been about five years.  This is about my fifth

16  year doing exploitation.  In Nogales I did a bunch of

17  different program areas.

18  Q   Okay.  That was a smaller office; right?

19  A   It is.

20  Q   So agents had to cover a lot of things?

21  A   Correct.  I think there was 20, 20 agents for us.

22  Q   Okay.  And you are the case agent involved in the

23  investigation of Benjamin Jenkins; right?

24  A   I am.  Correct.

25  Q   How did this case come about?  How did it get on your

1  desk?

2  A   Our office in Oklahoma City sent an investigative referral

3  regarding a person they had identified living in the Mableton

4  area of Georgia.  They had identified a man named Benjamin

5  Jenkins that had been sending and receiving pictures from a

6  child that was living in Oklahoma City.

7  Q   And the pictures we're talking about would --

8  A   Sexually explicit pictures of kids under the age of 18.

9  For this case, particular case, was a female.  I believe she

10  was -- at that particular time, I believe she was 14.

11  Q   All right.  And was that the only lead you had from

12  Oklahoma City?

13  A   No.

14  Q   What other leads did you have?

15  A   Later we received a case lead from the Highlands Police

16  Department.  He was a detective in Highlands, Illinois that

17  was also investigating a case that was very, very similar to

18  the first one.  That detective had identified Mr. Jenkins as

19  well.

20  Q   Yeah, but it was a different girl involved in Highlands.

21  A   It was a different girl.  That detective actually

22  identified the first girl from the Oklahoma City lead as well

23  as four additional girls on the eastern seaboard.

24  Q   Okay.  And did the information that he gave you, did it

25  also result back to Mableton?

1   A    It did.

2   Q    How did they zero in on Mableton?

3   A    Through the IP address.

4   Q    Internet protocol?

5   A    Correct, internet protocol address that came back to that

6   residence.

7   Q    What is internet protocol address?

8   A    It's a series of numbers that are usually separated by

9   dots that indicate from the internet service provider which

10  home or router device is receiving that internet signal.

11  Q    Okay.  And when you generally as law enforcement send a

12  subpoena or summons, you're asking for the relevant time

13  period?

14  A    Correct.  We provide a specific date and time period so

15  that if there are different types of services, that we know

16  specifically when that IP address was at that specific

17  residence.

18  Q    Okay.  So it helps you get to the location of wherever --

19  whatever is under investigation, wherever that might have

20  occurred; right?

21  A    That is correct.

22  Q    And so why were they sending it to you?  Because we

23  already have Oklahoma and Illinois investigating it.

24  A    Illinois was a local department, and they didn't have

25  jurisdiction in this area and the same with Oklahoma City.

1  Since he lived in the area of responsibility that my office

2  covers, it came to me.

3  Q    Okay.  And Mableton is within that area of responsibility?

4  A    That's correct.

5  Q    Okay.  Now, as part of your investigation, did you

6  either -- information that you learned from the leads passed

7  on to you and investigation that you did on your own, did you

8  learn where Mr. Jenkins lived?

9  A    I did.

10  Q    Where was that?

11  A    In Mableton, Georgia.

12  Q    Okay.  And was that 5175 Silhouette Lane?

13  A    That's correct.

14  Q    Did you do any surveillance upon -- did you obtain

15  anything?  What was the next step in the investigation,

16  actually, for you?

17  A    After receiving the leads?

18  Q    Right.

19  A    The first thing was to start doing surveillance on the

20  home and identifying that it's an actual home and confirming

21  the information that was received on leads, as far as where

22  they lived and who lived there, having the public available

23  information and finding out who's living there, what residents

24  are there, what vehicles belong at that residence, to see if

25  it's the same as the information that we received.

1  Q    All right.  And then once you did all of that what did you

2  do?  What was the next step in the investigation?

3  A    Once we had all that we got a search warrant, federal

4  search warrant.

5  Q    Okay.  And prior to that, though, you said you did do the

6  surveillance?

7  A    I did do surveillance, correct.

8  Q    Let me show you what's been marked for identification as

9  Government Exhibit 1.

10            May I approach, your Honor?

11            THE COURT:  Yes.

12            MR. JONES:  And, your Honor, defense counsel has been

13  provided a copy of all the exhibits.

14            THE COURT:  Okay.

15            THE WITNESS:  Thank you.

16  BY MR. JONES:

17  Q    Do you recognize Government Exhibit 1?

18  A    I do.

19  Q    What is Government Exhibit 1?

20  A    That's Mr. Jenkins's residence.

21  Q    And is that a fair and accurate representation of the way

22  it looked when you -- you've actually been there; right?

23  A    I have.

24  Q    Okay.  Is that a fair and accurate representation of the

25  residence you did surveillance on?

1   A    That is correct.

2          MR. JONES:  Your Honor, the government moves for the

3   admission of Government Exhibit 1.

4          MR. BRYANT:  No objection.

5          THE COURT:  Okay.  It's admitted.

6          (Whereupon, Government's Exhibit 1 was marked for

7   purposes of identification and admitted into evidence.)

8   BY MR. JONES:

9   Q   All right.  You said you got a federal search warrant.

10  And what did the search warrant authorize you to do?  What

11  for?

12  A   Any type of electronic devices inside the home, anything

13  that would be utilized to receive or send any files of child

14  exploitation material, collections.

15  Q   Okay.  And do you recall when you executed the search

16  warrant?

17  A    February 13.

18  Q   Of last year?

19  A   Correct, last year.

20  Q   Around what time did this happen?

21  A   We executed the warrant just before 6:30, so a little

22  after 6:00 a.m., somewhere between 6:00 and 6:30.

23  Q   Okay.  And let me show you what's been marked for

24  identification as Government Exhibit 2.  Is that also standard

25  practice, Agent, to do search warrants very early in the

1   morning?

2   A   I don't know if it's considered standard practice, but for

3   this case, based upon the surveillance, I felt that that was

4   the best time to ensure all residents would be home.

5   Q   So you had talked about how you looked at some public

6   databases, I think.  So did you have an idea of how many

7   people you'd probably find there?

8   A   I did.

9   Q   And how many did you expect to find?

10  A   I had a feeling that it would be four people there, so

11  Mr. Jenkins, Mr. Jenkins's mother and father, as well as

12  brother.

13  Q   Okay.  Let me show you Government Exhibit 2.  Do you

14  recognize Government Exhibit 2?

15  A   I do.

16  Q   And what is shown in Government Exhibit 2?

17  A   That's a picture of Mr. Jenkins's house as well.  I

18  believe that was taken that morning of the search warrant.

19  Q   All right.  So that's just another angle of the house?

20  A   Just another angle.  It shows the driveway and the

21  garages, as well as the pedestrian door of the garage.

22          MR. JONES:  Your Honor, the government moves for the

23  admission of Government Exhibit 2.

24          MR. BRYANT:  No objection.

25          THE COURT:  It's admitted.

1          (Whereupon, Government's Exhibit 2 was marked for

2    purposes of identification and admitted into evidence.)

3    BY MR. JONES:

4    Q    Who went out to execute the search warrant?

5    A    On 2017?

6    Q    Right.

7    A    So we had ten agents from HSI as well as we had the Cobb

8    County marked units with us.

9    Q    Why did you have Cobb County marked units?

10   A    Cobb County had a part of this investigation as well.

11   Prior to the search warrant -- I believe it was August of

12   2016 -- Cobb County received a referral, investigative lead,

13   through the Georgia ICAC, Internet Crimes Against Children,

14   it's a task force -- regarding Mr. Jenkins's home for the same

15   type of crimes that I was investigating.  Cobb County did what

16   is considered a knock and talk on the residence where they

17   knock on the house and ask to have conversation with the

18   occupants.  They talked to Mr. Jenkins.  They talked to his

19   mother, and I spoke to that detective.

20          So out of law enforcement cooperation we invited Cobb

21   County out there as well.  In addition, we always like to have

22   marked units with us.  Since we are an investigative branch,

23   we don't have marked units.  In case anybody looks out the

24   window, they know it's the police.  If the neighbors look out

25   there, they know it's the police, there's no home invasion

1  type things, concerns.  So we like to have a uniform presence

2  as well.

3  Q    Okay.  So you have Cobb County out there in marked units,

4  and you have ten HSI agents?

5  A    Correct.

6  Q    How many agents actually went to the door?

7  A    Myself, one other HSI agent, and one marked unit, so a

8  uniform presence as well.  So there's three of us on their

9  front kind of stoop porch stairs.

10 Q    All right.  And what happened when you got to the front

11 porch?

12 A    I knocked on the door and rang the doorbell.

13 Q    And at that point did you have any -- did you have a

14 weapon on you?

15 A    I did.

16 Q    Was your weapon drawn?

17 A    It was not.

18 Q    What about the other persons?  You had another agent with

19 you and a uniformed officer you said?

20 A    Correct, at the front door.  All of them were holstered.

21 Q    Okay.  Who answered the door?

22 A    Mrs. Jenkins.

23 Q    Was it pretty prompt answering the door?

24 A    It was a reasonable amount of time for that time in the

25 morning.  It was 30 seconds maybe.  It was a reasonable amount

1   of time.

2   Q   Okay.   What happened after -- once Mrs. Jenkins got to the

3   door?

4   A   I introduced myself.   I told her that we had a federal

5   search warrant for the home.   I believe at that moment or

6   shortly thereafter, I told her that it was a continuation of

7   when Cobb County was out there in August, so she would have

8   the understanding of why we were there.   Since it was first

9   thing in the morning and I think she was still in her sleep

10  attire, I asked her to step into the -- I believe it's

11  considered their dining room, which is off to the right, and

12  we kind of had that as a quasi controlled area.   So we had her

13  step to the right.

14          Shortly thereafter, Mr. Jenkins, Mr. Jenkins Sr. --

15  Q   Her husband?

16  A   -- her husband, came down the stairs to investigate what

17  was going on.   I told him the same thing, it was a federal

18  search warrant, and asked both of them who was in the

19  residence.   And they both said that their son, Benjamin, and

20  Jared, the other son, were upstairs sleeping.

21  Q   All right.   And so did you get them to come down?

22  A   We did.   So I had asked Mr. Jenkins, Sr., to call up to

23  wake up the boys.   Right now the four of us are kind of

24  standing in their front right inside the door.   He called up a

25  few times, but it wasn't loud enough.   So I asked Mr. Jenkins

1  to go up with us to wake up the boys.  So Mr. Jenkins,

2  myself -- I believe there were two or three other guys behind

3  me of agents coming upstairs because of the top of the stairs

4  there were multiple rooms and multiple concerned areas as far

5  as who may be upstairs.

6          Mr. Jenkins then went to the top of the stairs -- the

7  boys' rooms are kind of at a V inside the hall -- and he

8  called and woke up the boys and said, hey, Benjamin, it's the

9  police.  Hey, Jared, please wake up.  Get dressed on -- get

10 dressed.  Come out.

11 Q   And I think you've alluded to this.  You said there were

12 multiple rooms of concern.  What type of concern?

13 A   Well, just we don't know definitively who's there or what

14 their intentions are, so until the house has been secured and

15 safety checked, we don't really know who's there except for

16 who we think is there.  So at that time the parents had told

17 us that there were two males upstairs, so we had Mr. Jenkins

18 come up and help us wake them up.  So I try to do it as gently

19 as possible so it's not, you know, banging down doors and

20 waking people up.  It's their own parents waking them up.

21 Q   Okay.  So did both Benjamin and Jared, the defendant here,

22 come downstairs?

23 A   They opened the doors and we made sure everything -- that

24 there were no weapons in the rooms.  I believe I stepped into

25 Mr. Jenkins' room for that case or that particular time.

1  Q    And you say Mr. Jenkins.   Now we've got three.

2  A    I'm sorry.

3  Q    So the one here?

4  A    Yes, Benjamin.   I think I stepped into his room.   I

5  believe his brother, Jared, took a little bit more -- he slept

6  a little more soundly, so dad got him up.   And then we just

7  said, hey, there's a search warrant, and we brought everybody

8  back down to where mom is, into that dining room area.

9  Q    Okay.   And once you had everybody in the dining room area

10 what did you all do?

11 A    Prior to going down Mr. Jenkins was still in his

12 underwear.   So since his room had been cleared, since he slept

13 differently, we got some clothes for him so he could put some

14 pants on and a shirt on.   We all went down into the dining

15 room where I addressed the four of them as a unit and told

16 them that nobody is under arrest, this is a search warrant,

17 federal search warrant for the home, and we'd like to speak to

18 them.   But we need to first make sure that there's nobody else

19 in the house, there's no weapons.

20 Q    So at some point then did more agents come into the house?

21 A    Correct.   So as we were upstairs dealing with the Jenkins

22 males, people were clearing the downstairs at that time as

23 well as I believe -- I wasn't there, but at that time the

24 people would have been moving to the basement as well to make

25 sure people aren't in the home.

```
1  Q    Okay.  And is this what's sometimes referred to as a
2  protective or safety sweep or security sweep?
3  A    Correct, yes, security sweep.  So once we kind of had
4  everybody and corralled them into an area where we were safe,
5  the rest of the agents that were there, the ten people, were
6  fanning through the house making sure that there was nobody
7  hiding anywhere.
8  Q    Okay.  And did the agents have guns on them?
9  A    They did.
10 Q    Firearms?
11 A    They did.
12 Q    And did anybody have any rifles?
13 A    I'm sure there were one or two rifles there, yes.
14 Q    And what happened to the rifles after the security sweep
15 was done?
16 A    Once the house is safe and secure the rifles are locked up
17 in the cars.
18 Q    All right.  And what about the other people's firearms,
19 like something smaller, like a revolver?
20 A    Other sidearms.  Once the house is secured then we start
21 initiating the search procedures and protocol.  So people
22 usually take off their harder ballistic plates, lock up that
23 kind of stuff, if they're wearing that, and then we just start
24 getting the search kit out and photographs and letter -- room
25 letters.  And so everything, all the weapons, would have been
```

1  holstered as soon as the protective sweep would have been done

2  because the family was very cooperative, and it was a very low

3  key situation.

4  Q   All right.  And you said something that -- I'm sorry.  I

5  thought there was something you said that I was going to

6  follow-up on, but I've already forgotten.  And how long did

7  the security sweep last in this case?

8  A   Five, seven -- five, seven minutes probably.

9  Q   Now, as far as you were concerned or as far as you --

10 regarding you, you said you never took your weapon out?

11 A   No.

12 Q   Was it visible?

13 A   I was wearing a softshell jacket, so I don't think it

14 would have been noticeably visible.  My jacket was unzipped.

15 I was wearing a police polo shirt overtop of my soft body

16 armor, so I don't think that I had it out or exposed.  But, I

17 mean, if my jacket moved they may have seen it, but it wasn't

18 in a normal police duty rig.

19 Q   Okay.  And from what you recall, did anybody else have

20 their weapon exposed or drawn at any point after the security

21 sweep?

22 A   No.  I can't imagine that anything was drawn after the

23 searching of bodies was complete.  I imagine everything would

24 have been in a holster at all times.  Some of the guys and

25 gals have overt holsters, but it would have been secured in a

1   holster.

2   Q   Okay.  You said once the security sweep was done then more

3   agents -- the remaining agents came in.  Were all ten agents

4   involved in the security sweep?

5   A   I would imagine all the agents would have been involved in

6   the security sweep, correct.

7   Q   Because we're dealing with three floors, I think you said?

8   A   Three floors, yep.  And I believe -- I would imagine at

9   least one other agent would have been with me in the dining

10  room with the family.  So that leaves eight people to search

11  three floors, so I would imagine all would have been involved,

12  correct.

13  Q   Okay.  And so you finished that, and you said everything

14  was fine.  Were any weapons found?

15  A   I know that a pellet gun was found in the basement.  There

16  may have been an older kind of rusty .22, but I don't really

17  recall.  I don't think I documented any known weapons or any

18  gun cases or anything like that, no.

19  Q   Okay.  And you said the family was cooperative?

20  A   Very cooperative.

21  Q   Did they tell you what they had, if they had --

22  A   Absolutely.

23  Q   -- anything?

24  A   Absolutely.

25  Q   Okay.  All right.  So you finished the security sweep.

1    Agents are now starting to go about their business to do the

2    search -- oh.  That was what I wanted to ask you.  I think you

3    said there were lettered rooms?

4    A    Correct.

5    Q    What are lettered -- what do you mean by that?

6    A    We place room labels for -- to identify what room is what.

7    So Benjamin's room would have been assigned a letter.  Mom and

8    dad's room would have been assigned a letter, the family room

9    assigned a letter, so that if things are seized, we know where

10   they've come from.

11   Q    Okay.  All right.  So the search begins.  People go about

12   their assigned duties doing the search.  What did you do?

13   A    I had assigned particular people to do other supplemental

14   interviews, so mom and dad as well as Jared.  And then myself

15   and my colleague, Special Agent Dan Baldridge, conducted an

16   interview with Benjamin.

17   Q    Where did the interview occur?

18   A    So throughout the house we were trying to provide some

19   type of privacy.  Mom and -- so Jared was interviewed at the

20   kitchen table.  There's kind of a family room, slash, living

21   room where one of my colleagues interviewed his parents.  So

22   we were trying to get a little bit of privacy.  And I saw that

23   there was a basement, so I suggested to go to the basement.

24   Q    All right.  And at this point Benjamin Jenkins, the one

25   here -- the father is named Benjamin also; right?

1  A    Correct, senior.

2  Q    Was he your target?

3  A    He was.

4  Q    Okay.  So you suggested the basement, and I think you said

5  Agent Baldridge was also involved in this?

6  A    Correct.

7  Q    How did that -- how did y'all get to the basement?

8  A    We just walked.  So from the living room we went through

9  the kitchen, and I was looking for a place to privately speak

10  to.  Normally in these cases it's not much fun to talk about

11  crimes involving a sexual nature around mom and dad, so we try

12  to find a place that's a little bit more private.  So that's

13  where I saw the basement stairs and I said hey -- I knew there

14  was a basement, so I said can we go down into the basement.

15  And Benjamin told us how to get there.

16  Q    Okay.  How big was the basement?

17  A    The same foundational size of the home itself, so of that

18  picture, it would be the same basement type size.

19  Q    Was it finished or unfinished?

20  A    Unfinished.  Lived in but unfinished.  I mean, there's TVs

21  and couches, but it wasn't sheetrock or finished in that

22  manner.

23  Q    Okay.  Where was Mr. Jenkins seated?

24  A    Benjamin?

25  Q    Yes.

1  A   Right at the bottom of the stairs there's a couch and a TV

2  and a desk, so he sat at the desk.

3  Q   And where was the desk located next to?

4  A   It was right around the corner from the bottom of the

5  stairs.  So when you come off the stairs, you hang a hard

6  right, and there would have been kind of the couch, TV, desk

7  area.

8  Q   Where were you seated?

9  A   I was seated in a seat farther away from the stairs.  So

10  deeper into the basement there's some gym equipment and stuff

11  like that, so my back was towards that part where I was

12  facing -- so I was facing the stairs, and Benjamin was in

13  between.

14  Q   What about Agent Baldridge?

15  A   He was behind Benjamin sitting on a couch next to the TV.

16  Q   All right.  Who had closest access to the stairs?

17  A   Benjamin did.

18  Q   And at any point was his access to the stairs blocked?

19  A   It was not.

20  Q   Did you advise Mr. Jenkins of his Miranda rights that day?

21  A   I did not.

22  Q   Why not?

23  A   Because I had made it clear that nobody was under arrest.

24  And I specifically said there were questions I'd like to ask

25  him, but nobody was under arrest.  And then throughout the

```
 1   interview I'd even mentioned, you know, that once this is done
 2   we will be leaving your home.  You will not be going with us.
 3   Q   All right.  And so did you actually interview him then?
 4   A   I did interview him, yes.
 5   Q   And how long did that last?
 6   A   Probably about 90 minutes, maybe a little bit more than
 7   that.
 8   Q   What happened at the conclusion of that interview?
 9   A   I thanked him.  We walked upstairs, and we joined his
10   family upstairs.
11   Q   Anything happen once you got back upstairs relevant to
12   this hearing?
13   A   I was directed by one of the agents that had been sitting
14   with the family or observing the family that Benjamin would
15   like to speak to me again.
16   Q   How much later was this once you go back upstairs?
17   A   I don't know the actual delay time.  I know that our
18   office was almost done with the search.  We were concluding
19   and, you know, kind of heading to the final stages.  So I
20   don't know the delay time as far as when the first interview
21   ended to when we started again.
22   Q   Are we talking like -- talking more in the five- to
23   ten-minute range or versus the -- more like the half hour or
24   more range?
25   A   I think it was probably around that 15-minute kind of time
```

1   frame.

2   Q   All right.  So you were approached by another agent who

3   said that Benjamin Jenkins, this defendant, wanted to talk to

4   you again?

5   A   Correct.

6   Q   What did you do?

7   A   I said okay.  So I went and got Ben and -- Ben, Dan, SA

8   Baldridge, went back downstairs, back to the basement right

9   where we were.  As we were walking down the stairs, I turned

10  on my recorder again and started talking again.

11  Q   Where were y'all seated?

12  A   Exact same positions.

13  Q   Now, at any point was agent -- excuse me.  Was Mr. Jenkins

14  ever placed in handcuffs that day?

15  A   He was not.

16  Q   Did you restrain him in any way?

17  A   No.

18  Q   And did you make it -- did you or Agent Baldridge or any

19  other agent on scene make any threats to Mr. Jenkins to get

20  him to interview?

21  A   Absolutely not.

22  Q   Did you make any promises?

23  A   No.

24  Q   During the interview did Mr. Jenkins talk to you about any

25  type of mental issues that he claimed to have?

1   A    He did.

2   Q    What did he tell you?

3   A    Very early on in the interview, the initial interview,

4   because of one of the usernames or one of the -- the main

5   iCloud account had a particular username, and it was

6   Reithe8th.

7   Q    Is that R-e-i --

8   A    R-e-i.  During the interview --

9   Q    -- for the court reporter?

10  A    Yes, R-e-i- the 8th.

11  Q    And that all ran together?  Again for the court reporter.

12  A    Correct.

13  Q    No spaces.

14  A    Yes, R-e-i the 8th, 8-t-h.  During the interview I kept

15  calling him Rei because that's what I thought it was during

16  the investigation, but it was actually Reithe8th.  So when we

17  were talking about Reithe8th, Benjamin explained to me what

18  that meant.  Prior to the warrant I had information from the

19  local department in Illinois that had sent me information.

20  And one of them was this kind of map with names, and it had

21  his image in the middle.  So that's one of the things I was

22  addressing with Benjamin.

23          And so he started telling me about how he feels that

24  Benjamin, the person that we know is the vessel for different

25  personalities that he feels that he has, and so he started

1  listing some of the personalities.  And that's what the 8th

2  is, eight different variances of who we were.

3       So when I started talking to him about these

4  different questions, I would ask him something.  Did you do

5  this or did you do that or did you submit this or send that,

6  and he would say no.  And so in the very beginning it became

7  apparent that I needed to change my questioning to ask if it

8  was one of these different names that he was providing me.

9  And that seemed to work where if I asked did Sara do this or

10 did this person do this, which are different parts of the

11 names of the 8th, and he would think about it and then say

12 yes.

13      So during the interview I would come back to it and

14 say, hey, well, I'm talking to Rei here or I'm talking to

15 Benjamin here.  That's you, you know.  At one time I talked

16 about the sexual gratification of some of these files, and I

17 asked, you know, who would become aroused.  It would be

18 Benjamin becomes aroused.  So we would bring it back as far as

19 who we're talking about.

20 Q    Okay.  But throughout the interview, though, did -- well,

21 did he appear to manifest other personalities or was he -- I'm

22 not quite sure.  We he consulting them?

23 A    He would just get quiet and answer.  There was no change.

24 There was no overt change.  There was no physical change.

25 There was nothing that I would see.  I would just ask a

1   question, and he would get quiet and he'd say Sara says yes or

2   Sara says no or Rei says yes.  So there was nothing that

3   overtly was changing.  It was just him being quiet, almost

4   like he's processing the question and how is he going to

5   answer it.  It would be no different than if I asked somebody

6   a question, and they just hesitated and answered it.  But he

7   would answer it in a manner for that particular name.

8   Q   So were all of his answers, though, were they appropriate

9   to the context of the questions you were asking?

10  A   Absolutely.  Absolutely.

11  Q   Okay.  And from what you could tell, did he appear to be

12  under the influence of alcohol or drugs?

13  A   No, not at all.

14  Q   Did he appear to be on any type of medication?

15  A   No.

16  Q   And I know you said he's -- there were these pauses, and

17  he would say Sara says yes.  Apart from that, though, did

18  there appear to you to be any type of other cognitive or

19  mental impairment that was overtly displayed?

20  A   Absolutely not.

21  Q   Did he appear to have any difficulty understanding your

22  questions?

23  A   No.

24  Q   Now, did you ask him about -- during the interview did you

25  ask him about Kik?

```
1   A    I did.

2   Q    What is Kik?

3   A    Kik is a -- generally it's defined as a social media app.

4   It is an application that is -- it originated on mobile

5   devices.  It has now moved to desktops and such, but it's an

6   ability to send messages, communicate with people, create

7   groups, send pictures and files and videos between its users.

8   Q    It's a lot like text messaging, isn't it?

9   A    It's a lot like text messaging, but it's done over the

10  internet versus done over the phone lines or through a phone

11  company.

12  Q    Okay.  And then if it's through an app, you can just

13  bounce from say phone to tablet to -- and you said now there's

14  a desktop version?

15  A    Correct.  And you can uninstall, install it on different

16  devices or sign in different locations.

17  Q    All right.  And this is -- Kik, for the court reporter

18  it's K-i-k; right?

19  A    Correct.  It's Kik Interactive, is the company name.

20  Q    From what you knew about the investigation at that point,

21  did you believe that Kik was being used to commit the offense?

22  A    It was one of the -- yes, absolutely it's one of them that

23  was being used.

24  Q    Did you ask Mr. Jenkins for consent to take over any of

25  his social media accounts, Kik or -- and he had more than Kik,
```

1  didn't he?

2  A    Correct.  He had -- Mr. Jenkins had numerous social media

3  accounts, Twitter and Kik, Instagram.  I believe he had a

4  Snapchat, Facebook.  So during our conversation, the initial

5  conversation --

6  Q    And were those actually, from what you knew about the

7  investigation at that point, did you believe that those social

8  media sites were involved, possibly involved, in committing

9  the offense?

10  A    Correct.  That was my understanding, is that they were

11  involved.

12  Q    Okay.  So you asked for consent to take over the accounts?

13  A    I did.

14  Q    What did he say?

15  A    He agreed.

16  Q    And do you have forms that you all complete when somebody

17  agrees to do this?

18  A    Correct.  We have a Consent to Assume Online Identify

19  Form.  I explained the form to him, and you provide the

20  username and password.  And then he signed it.

21  Q    All right.  Let me show you what's been marked for

22  identification as Government Exhibits 3 and 4.

23  A    Okay.  Thank you.

24  Q    Do you recognize those two exhibits?

25  A    I do.

```
 1   Q    What are they?

 2   A    So No. 3 is the Consent to Assume Online Presence, which

 3   is utilized for social media or the accounts like I spoke of,

 4   Twitter, Instagram, Snapchat, Kik, things like that.  And that

 5   is the form that I provided to him.

 6   Q    And does it have any signatures on it?

 7   A    It does.

 8   Q    Whose signatures do you see?

 9   A    Benjamin Jenkins.

10   Q    Anybody else?  Is there a witness?

11   A    SA Baldridge.

12   Q    All right.  And what is Government Exhibit 4?

13   A    Government Exhibit 4 is a consent form that we utilize for

14   cloud-based remote storages.  So it's different than a social

15   media app.  It's more designed for iCloud accounts, Google

16   drive accounts, things like that that are larger containers of

17   information that are on a cloud storage somewhere.

18   Q    All right.  And did he consent to that as well?

19   A    He did.

20   Q    And does that contain signatures?

21   A    It does.

22   Q    And whose signatures do you see?

23   A    My signature is on there as well as I see Baldridge's, and

24   that's B-a-l-d-r-i-d-g-e.

25   Q    You said that your signature is on as well as --
```

```
 1   A    Correct.

 2   Q    And Mr. Jenkins' signature also?

 3   A    It is as well, correct.

 4   Q    Those are copies of the forms actually?

 5   A    That is correct.

 6            MR. JONES:  Your Honor, the government moves for the

 7   admission of Exhibits 3 and 4.

 8            MR. BRYANT:  No objection.

 9   BY MR. JONES:

10   Q    And what is up with 4, by the way?  This is the scanned

11   copy that we got.

12   A    I believe it has, I believe, underneath the post-it --

13   you're talking about the post-it note?

14   Q    Yeah.  There's a yellow --

15   A    I believe underneath the post-it note was the changed pass

16   code.  So what happens is once the person provides me a pass

17   code for whatever application or on cloud or cloud-based

18   storage, I go in and adjust it so that afterwards they can't

19   go in and delete everything.

20   Q    Okay.

21   A    So I believe I scribbled -- I believe that I scribbled the

22   new pass code on it so when I copied it for discovery, I just

23   put a post-it note over it so the updated pass code was not

24   there.

25            THE COURT:  All right.  They're admitted.
```

1           (Whereupon, Government's Exhibits 3 and 4 were marked

2  for purposes of identification and admitted into evidence.)

3  BY MR. JONES:

4  Q    And I should have asked.  Did you do it during the, the

5  consent, during the first interview or the second one where

6  you went back downstairs?

7  A    First interview.

8  Q    Okay.  All right.  In the second interview did he tell you

9  why he wanted to go back downstairs?  Once you got back

10  downstairs did he tell you why he wanted to talk to you again?

11  A    He did.

12  Q    What did he tell you?

13  A    So initially he spoke of the concern of one of the females

14  that he had been communicating with and the fact of her safety

15  and if he didn't respond.  He spoke of a young female by the

16  name of Meghan and was afraid that this child had been the

17  victim of a crime by her family, abused by her family, and

18  there had been claims of suicide in the past and wanted to

19  just let us know that essentially he was the confidant and if

20  he didn't have access to these devices, she may become upset.

21  Q    Okay.  And then while you were back downstairs did you ask

22  him if he wanted to write out anything?

23  A    I did.

24  Q    How did that come about?

25  A    During the conversation -- because it was a very frank

1   conversation as far as he was trying to help and additional

2   things -- he'd provide information of other people that may be

3   involved.  He provided names.  He said that we'd find contacts

4   for people that may have narcotics sales and that if there

5   were any questions, that I should call his mom because I had

6   his mom's phone number, and he would be able to decipher what

7   contact or who if I had questions.

8           When that came about, I had made a comment and said

9   you know, it appears that you're very sorry for what happened,

10  and he said that he was.  And I said, well, I can give you a

11  piece of paper.  And he said, so I can write an apology?

12  Something along those lines.  And I said, yes.  And so I gave

13  him a piece of paper and a pencil.  And he was sitting at the

14  desk, and he wrote out an apology letter.

15  Q   Okay.  Let me show you what's been marked for

16  identification as Government Exhibit 5.  Do you recognize

17  Government Exhibit 5?

18  A   I do.

19  Q   And what is Government Exhibit 5?

20  A   This is the apology letter that he wrote.

21  Q   Okay.  And did you actually witness it being -- while he

22  was writing it?

23  A   I did.  This was, I think, the base -- the main time of

24  that second interview.  It was him writing this letter.

25  Q   Okay.  And that's a copy of what he wrote out; right?

1   A    That is correct.

2           MR. JONES:  Your Honor, at this time the government

3   moves for the admission of Government Exhibit 5.

4           MR. BRYANT:  No objection.

5           THE COURT:  It's admitted.

6           (Whereupon, Government's Exhibit 5 was marked for

7   purposes of identification and admitted into evidence.)

8   BY MR. JONES:

9   Q    And let me show you Government Exhibit 6.  Do you

10  recognize Government Exhibit 6?

11  A    I do.

12  Q    And what is shown in Government Exhibit 6?

13  A    This is a picture of when Mr. Benjamin Jenkins here was

14  actually writing the apology letter to the girls.

15  Q    It shows Mr. Jenkins?

16  A    It does.

17  Q    And who else is seen in that?

18  A    That's me.  I'm sitting there.  That's the jacket and the

19  outfit that I was wearing.

20  Q    Okay.  So who took the photo?

21  A    SA Baldridge took the photo.

22  Q    Okay.  And from what you're wearing are you able to see

23  your weapon in that photo?

24  A    No.

25  Q    And are you able to see the staircase there?

1    A    You can.

2    Q    What part of the photo was it in?

3    A    So the upper -- Mr. Jenkins essentially is looking at the

4    unfinished stairs.  To his right would be the bottom of the

5    stairs, so just to the edge of that table.  So as far as the

6    picture is concerned, the top upper right corner of the

7    picture is the actual stairs.

8              MR. JONES:  Your Honor, the government moves for the

9    admission of Government Exhibit 6.

10             MR. BRYANT:  No objection.

11             THE COURT:  It's admitted.

12             (Whereupon, Government's Exhibit 6 was marked for

13   purposes of identification and admitted into evidence.)

14   BY MR. JONES:

15   Q    How long was that interview?

16   A    I believe that was about 30 minutes.

17   Q    Okay.  And a good chunk of it, though, was just writing?

18   A    Correct.

19   Q    All right.  What happened when you all finished talking

20   that second time?

21   A    We took him upstairs and left him with dad.  Mom had to

22   leave for work during I believe -- I believe in between the

23   first and second interview mom had to leave for work because I

24   remember I was in the basement, and that's where the garage

25   access was.  So she said good-bye and went to work.  So I

1  believe dad and brother were upstairs and sitting up there,
2  and we left him with dad and brother.
3  Q    All right.  And how much longer did the search last after
4  that?
5  A    Not long at all.  I remember actually during the second
6  interview making sure that the search team leader knew that we
7  were down there still so they didn't leave us so, I mean,
8  very, very shortly after that second interview concluded did
9  we actually depart the residence.
10 Q    Okay.  And on the recording did you know what time you
11 were leaving the residence?
12 A    I don't recall if I provided an end time stamp on that
13 recording.  I don't recall.
14 Q    But if you did, that would have been an accurate time when
15 you actually --
16 A    If I would have documented it on the recording, what time
17 I was turning it off, then that would have been accurate, yes.
18 Q    All right.  Did you ever go back to the house on
19 Silhouette Lane?
20 A    I did.
21 Q    When did you go back?
22 A    On May 25 of 2018.
23 Q    And why did you go back?
24 A    We had an additional search warrant as well as an arrest
25 warrant.

```
1   Q    How many agents went this time?

2   A    I believe this time we had 11.

3   Q    And was there local as well?

4   A    Exact same.  Cobb County was there as well.

5   Q    How many agents approached the door?

6   A    Same situation.  We had three, two agents and a uniformed

7   officer.

8   Q    And approximately what time was this?

9   A    It was morning.  I don't know if it was as early.  I

10  remember -- I don't recall exactly.

11  Q    But it's still going to be morning?

12  A    It was a morning warrant, yes.

13  Q    All right.  So what happened when you got to the door?

14  A    I knocked on the door again, rang the doorbell.

15  Mrs. Jenkins opened the -- looked out the little window next

16  to the door.  She saw it was me.  Her and I had been

17  communicating on the phone during that time frame regarding

18  updates on the case and as well as evidence, so we had a

19  pretty good relationship.  I said, hey, I'm back, we have

20  another warrant for the home, an arrest warrant.  And she

21  opened the door.  And this time we did not ask them to go into

22  the family room -- the dining room.  This time I asked her to

23  step out of the house.

24  Q    Why is that?

25  A    Just so it wasn't the exact same tactical procedures as we
```

1   did last time.  Because we were coming back now a second time,

2   we didn't want to do the exact same footprint as we did the

3   first time, so I asked Ms. Jenkins to step out.  Mr. Jenkins

4   shortly came down again.  I asked him to call for the boys.  I

5   think he called for the boys that time and I asked him to --

6   actually, I did not.  The second time I just asked him to step

7   out of the house because he was going to call, and I told him

8   that we would not do the same procedure.  So they stepped out

9   onto the front little grass area by the bottom of the stairs,

10  and a few of us went up the stairs to call for Benjamin.

11  Q   As well as -- was the other son still --

12  A   I don't believe Jared was there that day.

13  Q   Okay.

14  A   I'm almost positive Jared just happened to be out of the

15  home that day, so it was Benjamin just sleeping upstairs.

16  Q   Okay.  And what happened when you went to look for

17  Benjamin?

18  A   He was sleeping in the door.  We were in that same hall

19  area.  We called him out, told him to wake up.  He verbally

20  confirmed that he heard us.  He told us the door was locked.

21  We told him to unlock the door.  He came out -- or he opened

22  the door.  I believe for this particular time he did not have

23  any clothes on.  So I stepped into the room, and he got

24  dressed.  He had some like, I think, some shorts or just

25  something that was laying around.  Got him dressed and walked

1  him down to his parents into that same dining room table area

2  that they were at the last time.

3  Q   When you were getting --

4  A   Actually, I'm sorry.  That's not right.  First we went

5  outside the house.  We took everybody outside the house where

6  he joined his parents out front.

7  Q   And what was happening while they were outside?

8  A   The safety sweep was happening while we were all outside

9  the house this time.

10  Q   All right.  And you went upstairs to look for Mr. Jenkins,

11  the defendant here.  And did anybody -- how many agents went

12  with you?

13  A   I don't know the exact number of who went up there.  I

14  believe we had probably four of us.

15  Q   Did you have any weapons drawn at this point?

16  A   I'm sure that there was weapons out.

17  Q   Okay.  And was there a rifle do you know?

18  A   I would imagine there probably was at least one rifle

19  there.

20  Q   Okay.  The safety -- so you've got all three of them

21  outside the house on the front porch?

22  A   I believe specifically on this time we moved to the

23  sidewalk driveway corner by the -- where the cars were parked

24  away from the home.  I believe that's when we got Benjamin

25  down there.  That's where mom and dad were.  I remember

1  speaking to the three of them kind of on the bumper of one of

2  the cars right there by the sidewalk.

3  Q   All right.  And what were you speaking to them about?

4  A   I was just saying hey, just kind of deescalating the

5  situation, why we're here, search warrant, you know.  I don't

6  know if specifically at that moment I said there was an arrest

7  warrant at this time.  I don't know if I did or not.  I was

8  trying to deescalate as much as possible, but no questions

9  were asked, just kind of making small talk.

10         And from our first encounters we had -- I had a very

11  good relationship with mom and dad, so just trying to make it

12  as painless as possible until that safety sweep was done.  And

13  then once I got the all clear we walked back into the dining

14  room, and that's where we sat down at that same dining room

15  table area.

16  Q   Okay.  And how long did that safety sweep last?

17  A   I'm not sure, but it wasn't long.  It wasn't very long.

18  Q   Same as like before?

19  A   Yeah, I would imagine it would be comparable to the time

20  before.

21  Q   Okay.  All right.  So you get back inside.  You're in the

22  dining room area.  Did you try to interview Mr. Jenkins at

23  that point?

24  A   I did.

25  Q   Where did this occur?

1  A    Back to the basement.

2  Q    All right.  And did you advise him of his Miranda rights

3  at this point?

4  A    I did.  So I do believe that that was the first time that

5  I'd mentioned that we had an arrest warrant was when we were

6  downstairs, and I told him that it was different this time.

7  And I did read him his Miranda rights.  I utilized our agency

8  preprinted Miranda form.

9  Q    Okay.  Let me show you what's been marked for

10  identification as Government Exhibit 7.  Do you recognize

11  Government Exhibit 7?

12  A    I do.

13  Q    And what is it?

14  A    This is our preprinted Miranda form that we read.

15  Q    And what decision did Mr. Jenkins make regarding his

16  Miranda rights?

17  A    He asked for an attorney, so he invoked.

18  Q    Okay.  And did you make a notation and all that?

19  A    I did.  I wrote that he invoked at 07:03.

20        MR. JONES:  Your Honor, the government moves for the

21  admission of Government Exhibit 7.

22        MR. BRYANT:  No objection.

23        THE COURT:  It's admitted.

24        (Whereupon, Government's Exhibit 7 was marked for

25  purposes of identification and admitted into evidence.)

1  BY MR. JONES:

2  Q   All right.  So he says he wants an attorney.  But you got

3  an arrest warrant for him; right?

4  A   We do.

5  Q   What did you do at that point?

6  A   We walked back upstairs where he joined his father at the

7  dining room table.  I believe --

8  Q   Was he in handcuffs at that point?

9  A   He was not in handcuffs, no.  He was not handcuffed until

10  the very end.

11  Q   And what's the -- by very end what do you mean?

12  A   When we left the residence.

13  Q   Okay.  So he joined his father at the dining room table

14  did you say?

15  A   I believe at that moment his mother had gone upstairs to

16  get ready for work, I believe, and I believe it was just his

17  father who was down there at the dining room table.  So he sat

18  at the dining room table, the same dining room table as before

19  while the agents did a -- we did a much more targeted search

20  this time.  There was no need to go throughout the entire home

21  and seize a bunch of electronic devices that didn't -- that

22  belonged to the parents or a sibling.

23        So we were just searching Benjamin's room and some of

24  the main common areas just for any new devices that had been

25  obtained since the last warrant.  So it was much quicker.  I

1  recall going upstairs when mom had kind of started getting

2  dressed, and I said, hey, there's an arrest warrant.  If you'd

3  like to get dressed, we still have some time.  If you want to

4  go down and talk with -- her husband was down there -- and

5  talk to him, you can because he's going to be arrested today.

6  Q   All right.  And did she come downstairs?

7  A   She did.  She got dressed, and she came downstairs.  And

8  she was very appreciative of the opportunity, and they sat and

9  talked as we did the search warrant.

10 Q   All right.  And what were they talking about?

11 A   They talked about regular stuff, and then the conversation

12 started to change as far as why this is happening and why he's

13 continuing this activity.  And then when they started talking

14 about that, that's when I turned the recorder on.

15         So the way that the dining room is set up is that if

16 you come into the front of the door, you have a small landing,

17 or where the stairs are, and there's multiple hallways.  And

18 the dining room is off to your right, and the dining room has

19 a threshold to go into it which is adjoined to a hallway that

20 goes to a bathroom to a kitchen.  On the other side of the

21 dining room is another threshold that goes to the kitchen.

22 The kitchen runs the back of the residence.

23         So I was standing kind of in the hallway threshold

24 area trying to provide them somewhat of privacy, but once they

25 started talking about why he has these conversations -- and I

1   don't know if the personalities particularly were coming up --

2   but the things that we had addressed and talked about before

3   is when I kicked the recorder on.

4   Q   Okay.  And did they see you turning the recorder on, as

5   far as you know?

6   A   I don't think they did.

7   Q   Were you a part of any conversation with him at this

8   point?

9   A   At that point, no, there was just the family talking.

10  Q   Okay.  And did you -- so you turned the recorder on for

11  that?

12  A   Correct.  I mean, we had -- I mean, all the agents were in

13  the home, so people were moving about throughout the house.

14  Like I said, there's two giant open thresholds.  I believe

15  there were people in the kitchen still searching there, so it

16  was just the family in that area because we're still in the

17  home.  Both times I had let them know that they weren't --

18  they couldn't walk around the house, but we can get them what

19  they need just due to officer safety.  So people are around,

20  and I was just kind of standing there.

21  Q   Okay.  And did you record the -- your attempt to interview

22  Mr. Jenkins before -- when he invoked his Miranda rights

23  that --

24  A   Absolutely.

25  Q   And the interviews, the two interviews that occurred on

1  February 13th, 2017, were those recorded as well?

2  A   Absolutely.

3  Q   Let me show you what's been marked for identification as

4  Government Exhibit 8.  Might need to take this out of the

5  sleeve.  Do you recognize Government Exhibit 8?

6  A   I do.

7  Q   And what is Government Exhibit 8?

8  A   It is a DVD of the recordings.

9  Q   All four?

10  A   All four recordings.

11  Q   Okay.  And do you recognize anybody's -- any writing on

12  that disk?

13  A   Correct.  I initialed the bottom after I listened and

14  confirmed that that was my voice on the four recordings for

15  this case.

16          MR. JONES:  Okay.  Your Honor, the government moves

17  for the admission of Government Exhibit 8.

18          MR. BRYANT:  No objection, Judge.

19          THE COURT:  It's admitted.

20          (Whereupon, Government's Exhibit 8 was marked for

21  purposes of identification and admitted into evidence.)

22          MR. JONES:  And I just want to let the Court know --

23  and I think I told Mr. Bryant also -- the way the files are

24  numbered and they copied over to the disk the -- it starts out

25  the second interview on February 13th, 2017, appears at the

1   top.  Then the first interview appears below that.  Then it's

2   the arrest warrant in May this year where he invoked his

3   rights, and then the final on the fourth one is the

4   conversation between Mr. Jenkins and his mother.  So the --

5        THE COURT:  Just the first two are --

6        MR. JONES:  The first two are flipped, yeah, one of

7   them in chronological order.  But the way the files are

8   numbered it just copied over that way.

9        If I could have just a second, your Honor?

10        THE COURT:  Sure.

11        (Brief Pause.)

12        MR. JONES:  I have no further questions at this time,

13   your Honor.

14        THE COURT:  All right.  Do you have any

15   cross-examination?

16        MR. BRYANT:  Yes, Judge.

17        THE WITNESS:  Mr. Jones, could I get my water before

18   Mr. Bryant starts?  Thank you.

19        THE COURT:  Are you good?  Do you need a break?

20        THE WITNESS:  Oh, I'm fine.  Thank you.  I appreciate

21   it.

22                        CROSS-EXAMINATION

23   BY MR. BRYANT:

24   Q   Good morning --

25   A   Good morning.

1  Q   -- again.

2  A   Yes.

3  Q   We've had some time to spend together this morning,

4  haven't we?

5  A   We absolutely have.

6  Q   All right.  So let's start with -- actually, I want to

7  start with a little bit of information about you.  Did I

8  understand you correct to say that you have worked for

9  Homeland Security since 2006?

10 A   Correct.  So technically I was U.S. Customs.  Then after

11 911, the merger happened.  I became U.S. Customs and Border

12 Protection, which is under DHS.

13 Q   And can you tell me just briefly about your educational

14 background.

15 A   Sure.  I have a degree from George Mason University out of

16 Fairfax, Virginia.

17 Q   And that degree is in?

18 A   Integrated studies as well as history.

19 Q   Okay.  Any other degrees?

20 A   I do not.

21 Q   Now, you received information, I think you mentioned, from

22 Oklahoma City as well as Highland or Highland Park?

23 A   It's Highland Police Department in Highland, Illinois.

24 Q   In Illinois, right.

25 A   Yes.

1  Q   And as a result of receiving that information, you were

2  interested in Mr. Benjamin Jenkins as a suspect in those two

3  reports; right?

4  A   Correct.

5  Q   And that was -- the basis of the allegation was or the

6  summary of the allegation was that an individual from Georgia

7  had contacted young girls out of state in Highland and in

8  Oklahoma City?

9  A   That is correct.

10 Q   And that was through the internet or text messaging or

11 some sort of social media?

12 A   That is correct.

13 Q   Now, you mentioned that it was connected to Mr. Jenkins

14 through the IP address; correct?

15 A   Correct.

16 Q   And there was also some information, I believe, that

17 Highland and Oklahoma City had sent to you about an iCloud

18 account?

19 A   That is correct.

20 Q   And you had that information by the time that you went and

21 executed the search warrant?

22 A   The first, yes, absolutely.

23 Q   And I should say, to be specific, the search warrant in

24 February of 2017?

25 A   That is correct.  That was the basis of the warrant.

1  Q   All right.  And it is pretty clear that at that time that

2  you searched the house in February of 2017, Benjamin Jenkins

3  was your suspect?

4  A   That is correct.

5  Q   Now, when you go to the house, you mentioned that there

6  were ten agents from Homeland Security?

7  A   Correct.

8  Q   And then you mentioned some marked Cobb County Police

9  Department officers there as well?

10  A   Correct.

11  Q   Do you recall how many Cobb County officers were there?

12  A   I believe that there were two uniformed marked police cars

13  that were kind of at the front perimeter, and then I believe

14  we had two detectives, if I recall correctly.

15  Q   So for a total of 12 law enforcement?

16  A   That is correct, I mean, as an estimate but yes.

17  Q   Yes.  Now, once you made contact with Mrs. Jenkins and

18  y'all stepped inside of the house; right?

19  A   Correct.

20  Q   The first -- your primary focus is to make sure that the

21  house is secure?

22  A   Officer safety, yes, making sure that nobody hurts us and

23  then the house is secure, correct.

24  Q   Right.  So y'all ask questions about any guns in the

25  house, that sort of stuff?

1  A   Correct.

2  Q   Now, as you're entering the house and as you approach the

3  house, as you enter the house, as you get into the house, you

4  mentioned that weapons were put away after the house was

5  secure, which leads me to believe that at the time you're

6  approaching the house, going into the house and securing the

7  house, that some weapons were drawn.

8  A   Correct.  The way it was set up for this particular case

9  is that the three of us were at the front door, and then the

10  the remaining of the agents and their weapons are, if you were

11  to look at the first picture, are on the very far left corner

12  of the home so that when someone looks out, they just see me

13  and the female agent in the marked unit.  And nobody else is

14  seen as far as for safety and just overt appearance but yes.

15  Q   Okay.  But at the time you're in the house clearing the

16  house, there are folks with weapons drawn?

17  A   Absolutely.

18  Q   Let's talk a moment about the actual interview, and I

19  should say the first interview that was conducted on February

20  the 13th of last year.  I think you've already mentioned that

21  this interview was done with Mr. Jenkins in the basement of

22  the house?

23  A   That is correct.

24  Q   And that Mr. Jenkins, Sr., and Mrs. Jenkins, they were

25  interviewed together in a separate part of the house?

1  A    Correct.

2  Q    And then Mr. Jenkins' brother, Junior's brother, was

3  interviewed in a bedroom of the house?

4  A    He was in the kitchen table (sic).

5  Q    Kitchen table.

6  A    And then just to the left in the living room, which was an

7  open area, on a couch or love seat was mom and dad.  So they

8  were within the line of sight of each other.

9  Q    And that's on the main level of the house?

10  A    Correct.

11  Q    Now, when you started interviewing Benjamin Jenkins in the

12  basement of the house, you did not read him his Miranda

13  rights; right?

14  A    I did not.

15  Q    Now, if he had said, you know, can I leave, can I get out

16  of here, what would your response have been?

17  A    I would have said absolutely.  I said you would not be

18  able to walk about the house just due to officer safety, but

19  you're not under arrest.  If you want to leave or go sit with

20  mom and dad, absolutely could have.

21  Q    You learned very early on during the investigation that

22  Mr. Jenkins suffered some trauma as a child?

23  A    I did.

24  Q    And he told you about a couple of events that occurred in

25  his life when he was pretty young; right?

```
 1   A    Absolutely.

 2   Q    And you were interested in those events and how it

 3   affected him.  Is that fair to say?

 4   A    Yes.  That's fair.

 5   Q    You asked him a fair number of questions about that trauma

 6   that he suffered as a child?

 7   A    I did.

 8   Q    And you also learned during the course of your interview

 9   that it had affect -- that that trauma had affected him

10   mentally?

11   A    Yes.

12   Q    And emotionally?

13   A    I agree.

14   Q    And you showed some compassion during that interview

15   encouraging Ben, Mr. Jenkins, to get some treatment?

16   A    I did.

17   Q    You showed some concern about his mental health at the

18   time that you were conducting the interview?

19   A    Yes.

20   Q    And you knew, based on that interview, based on your

21   interaction with Ben, that there were some other personalities

22   that he was referring to?

23   A    Correct.

24   Q    Okay.  There were some other names that he was saying were

25   involved in contacting these girls?
```

1  A    I did.  That's correct.

2          MR. BRYANT:  Judge, do you have No. 5?

3          If I could approach --

4          THE WITNESS:  Yes.

5  BY MR. BRYANT:

6  Q    Just showing you Exhibit No. 5, that's the statement that

7  Mr. Jenkins hand wrote; is that right?

8  A    That is correct.

9  Q    Okay.  And the first sentence of that statement refers to

10  actions by my selves, and selves is in quotation marks.  Is

11  that fair?

12  A    Yes, absolutely.

13  Q    Now, after you interviewed Mr. Jenkins and as y'all were

14  leaving the house, you talked to mom about his mental health?

15  A    I did.

16  Q    And you suggested that he -- you suggested to mom that he

17  receive some treatment?

18  A    I don't know if I suggested, but I definitely offered

19  information or told her about the state provided information,

20  yes.  So absolutely I talked to her about it, and she had

21  shared that there were some previous -- I don't know if

22  counseling is the right word -- but there was previous

23  speaking to professionals, and I thought that should continue,

24  yes.

25  Q    Okay.  Were you aware that Mr. Jenkins between the

1   February interview and the May of '17 interview and arrest --

2   or not interview but arrest, that he did receive treatment?

3   A   I don't know definitively if I knew, but it wouldn't

4   surprise me if after that, they got back into talking to

5   somebody.

6   Q   You mentioned during the course of your interview, you and

7   Mr. Jenkins were talking about the contact with the underage

8   girls?

9   A   Okay, yes.

10  Q   That was the main focus of your -- the main interest of

11  your interview.  Is that fair?

12  A   That is fair.

13  Q   And you were kind of -- I guess one way of putting it is

14  you were kind of putting his, the alleged conduct -- his

15  alleged conduct in comparison to other people, other people's

16  illegal conduct by comparison.  Do you recall that during the

17  interview?

18  A   I don't specifically recall.  But, I mean, as far as

19  de-emphasizing what he's done, that kind of comparison?

20  Q   That's a fair way of putting it and you were actually -- I

21  think you and him were talking about a specific individual who

22  had actually had physical contact with another -- with a

23  minor?

24  A   I don't specifically remember for Benjamin, but it's

25  something that I've spoken to other people about.  So it's

1   fair to say, yes.

2   Q    Okay.  And if I remember correctly from the interview, it

3   was during that part of the conversation where you were

4   talking about his conduct relative to what other people have

5   done, that you wanted his help to locate other girls to catch

6   other people who were doing stuff that was, I think the way

7   you put it is evil?

8   A    Correct.

9   Q    Does that sound fair?

10  A    That sounds fair.

11  Q    Okay.  And so during the course of your conversation about

12  gaining access to his online identities and his online

13  information, you were telling him or representing to him that

14  you were going to use that information to try to catch other

15  people --

16  A    Correct.

17  Q    -- who were doing stuff that was much more evil?

18  A    Correct.

19  Q    Do you recall during your conversation with Mr. Jenkins

20  about signing the consent to assume online identity or the

21  consent to search cloud based and remote devices, I think is

22  what it should refer to, Government's Exhibit 3 and 4, the two

23  consent forms, did you ever tell Ben that you were going to

24  search those devices or search the content of those devices to

25  be used in the prosecution against him?

1   A    I don't know if I did.

2   Q    At the time that you conducted the interview, the two

3   interviews on February the 13th of 2017, you recorded those

4   interviews -- we've talked about that.  The recordings have

5   been submitted and tendered to the Court.  Did you tell

6   Mr. Jenkins that those interviews were being recorded?

7   A    I did not.

8   Q    Was the recording device visible while y'all were

9   speaking?

10  A    Probably not.  I don't specifically remember for that

11  particular warrant if I had it underneath my polo around my

12  neck or if I had it in my portfolio.  But I don't think it was

13  overtly visible.

14  Q    It wasn't sitting on the desk where --

15  A    It was not sitting on the desk.

16  Q    -- he was sitting?

17  A    It was not.

18  Q    Just referring to Government's Exhibit No. 6, I think --

19  did you say that that photograph was taken during the second

20  portion of the interview?

21  A    That is correct.

22  Q    And do you see -- having looked at that picture, does that

23  refresh your recollection of where that recording device may

24  have been?

25  A    Without hearing it -- I don't know where my portfolio is,

1  but, I mean, if the audio is clear, then it's around my neck.

2  If it's echoed, then it's probably in the portfolio, but

3  looking at this without the portfolio next to me I would guess

4  it's around my neck.

5  Q   All right.  And if your voice is stronger in that

6  interview than the person you're interviewing, does that --

7  would that lead you to believe that it was around your neck?

8  A   If my voice was strong, yeah, it would probably be around.

9  Q   Okay.

10  A   It would have been in one of the two spots that's where I

11  put it.  It's either around my neck or it's in the front flap

12  of the portfolio.

13  Q   Okay.  But it wasn't visible to --

14  A   It was not visible, no.  Absolutely not.

15  Q   And you didn't tell him that --

16  A   Absolutely not.

17  Q   -- you were recording?

18  A   I did not.

19  Q   And I think we've already discussed the interview on the

20  25th that -- that recording was made without telling anyone

21  that you were recording?

22  A   I did not tell anybody that I recorded anybody.

23  Q   The conversation that you -- I'm sorry.  The conversation

24  that Ben and his -- I'm sorry.  Let me take you to the 25th of

25  May on the day that Ben is arrested.  He is, I think you've

1  said, in the dining room area sitting with father?

2  A   Correct.  I believe the dad was there first or stayed

3  there, and then mom joined once she was showered and dressed.

4  Q   Okay.  And you actually go upstairs to tell mom that he's

5  about to be taken to the --

6  A   I did.

7  Q   -- to the jail and offered an opportunity for her to say

8  final, you know, good-bye or whatever it is?

9  A   I did.

10  Q   Okay.  And she takes you up on that opportunity.  And she

11  comes downstairs and meets with Mr. Jenkins, and they share

12  some words?

13  A   The three of them spoke.

14  Q   What did they talk about before you started recording?

15  A   I don't recall definitively what they were speaking of.  I

16  would just be guessing as to what it was.  It was the -- I

17  like to try to provide the family an opportunity to talk just

18  like if it was -- this was happening to me or my family.  So

19  just like after we took Benjamin out, I stayed back, and I

20  talked to mom and dad at the kitchen table and answered

21  questions that they had.  I don't remember what we spoke

22  about.  It wasn't -- I believe I just escorted her to the

23  dining room area and let them start their conversation.

24  Q   But you just don't recall what they were talking about?

25  A   Absolutely not, because it wasn't anything intended to --

```
1   I just --

2   Q   And at the time that you -- where was your recorder at the

3   time?

4   A   If it was around my neck, I'm sure it was around my neck

5   under my polo again.

6           MR. BRYANT:  Okay.  Judge, if I could have just a

7   moment?

8           THE COURT:  Sure.

9           (Brief Pause.)

10          THE COURT:  Why don't we take a five-minute break,

11  and then you guys can have a chance to talk a little bit.

12          MR. BRYANT:  Sure.  Thank you, Judge.

13          THE COURT:  Sir, you can step down.  If he has more

14  questions, you can come back up.

15          (Brief recess.)

16          THE COURT:  All right.  Mr. Jones, are you guys

17  ready?

18          MR. JONES:  I'm not sure if Mr. Bryant was finished.

19          THE COURT:  He is.  He just gave me the nod.

20          MR. JONES:  We have no recross, your Honor.

21          THE COURT:  Do y'all have any other questions for our

22  witness?

23          MR. BRYANT:  Just one.

24          THE COURT:  Oh, of course you do.

25          MR. BRYANT:  Just one, really just one.
```

1          THE COURT:  All right.  Let's go back on the record.

2     BY MR. BRYANT:

3     Q    All right.  May 25th, 2018, you go to execute the search

4     warrant, arrest Mr. Jenkins.  There are rifles during the

5     execution of that arrest and search?

6     A    I'm sure.

7     Q    Were you upstairs -- I said one, Judge.  I'm sorry.  It's

8     just a few.  Were you upstairs when Mr. Jenkins was brought

9     out of the bedroom?

10    A    I was.

11    Q    Do you recall one of the rifles being pointed at

12    Mr. Jenkins?

13    A    The door was shut.  I don't know particularly if it was

14    pointed at him or if it was a pistol or what we had.  I know

15    we had a shield up there as well in case we had some type of

16    barricaded situation, so I don't know.  I don't know because I

17    think I was No. 2, so I don't know what was behind me.

18    Q    Okay.  So you just don't remember?

19    A    I don't know.

20    Q    What weapons were involved during the execution of the

21    warrant?

22    A    Sure.  Don't know.

23          MR. BRYANT:  Okay.  Thank you.

24          THE WITNESS:  Thank you.

25          THE COURT:  What time -- in the timeline of that,

1  when were the guns out and when were they -- because he wasn't

2  actually handcuffed until later.

3        THE WITNESS:  Correct.

4        THE COURT:  When were the guns out?  At the very

5  beginning when he was in his room?

6        THE WITNESS:  The very beginning.  So when we made

7  our way up the stairs to his room, I know there was a shield.

8  I think I was No. 2 behind -- I was giving some commands as

9  well so once the -- he was down it would have deescalated,

10  brought him outside.  They would have safety swept the rooms

11  of the house, which guns are out when you're checking the

12  house.  And then the guns would have been locked up and the

13  same situation as before.

14        THE COURT:  And when do you consider he was under

15  arrest?

16        THE WITNESS:  Once I told him he was under arrest.

17        THE COURT:  When was that?

18        THE WITNESS:  Downstairs.

19        THE COURT:  After he came out of his room?

20        THE WITNESS:  Well, I knew I was going to arrest him,

21  yes, but I didn't want to handcuff him at that point.

22        THE COURT:  So was he free to go ever?

23        THE WITNESS:  At that point, no.

24        THE COURT:  That whole day?

25        THE WITNESS:  No, not that day.

1        MR. BRYANT:  Just one additional question.

2        Do you recall once you got him out of the bedroom

3   either you or someone else directing Mr. Jenkins to go to his

4   knees?

5        THE WITNESS:  That may have happened.  I don't know

6   if I did specifically, but that may have happened.

7   BY MR. BRYANT:

8   Q   Thanks.  Do you remember him going to his knees?

9   A   I believe that we -- I believe I do have a mental image of

10  him going to his knees because I believe I stepped past him to

11  make sure that nothing else was in the room because he was at

12  the threshold when he opened up the door.  So he wasn't just

13  standing there blocking the door.  I believe he was asked to

14  go to his knees, so then I stepped past him to make sure the

15  room was -- no one heard us go into the room.

16  Q   Okay.  And then after the room is cleared, he is able to

17  get up from -- and then walk downstairs --

18  A   After he stood himself up and -- I'm pretty sure he was

19  undressed, and we got him some clothes.

20  Q   Thanks.

21       THE COURT:  Just in comparison to the first time you

22  went up to his room and got him, were there weapons drawn the

23  previous time that you were at his house?

24       THE WITNESS:  They were not as much because the

25  father was in front of us.  So if guns would have been out,

1  they wouldn't have been pointed at anybody's back or my back.

2  The guns would have been out or hand on the holster, but the

3  father was in front of us.  And so if we were standing here,

4  there would have been a -- the door to the master bedroom was

5  behind us, and the two kids' rooms were kind of at a V.  So

6  Mr. Senior was in front of us, I was behind him, and we had

7  people making sure nobody popped out of the other bedrooms.

8  So guns --

9        THE COURT:  Would you use guns differently when

10  you're doing an arrest warrant than when you're doing a search

11  warrant in terms of that initial wake-up-the-guy-in-the-

12  bedroom moment?

13        THE WITNESS:  Not really.  It's all based upon the

14  officer's observation of the totality of the circumstances and

15  threats.  So pointing or not pointing at him, I don't think

16  anything was directly pointed at him.  It would have been in

17  his direction, yes.  A pistol could have been at a low area.

18  I don't think anything was aimed in on him, especially when he

19  opens the door and he's compliant and we've met him and he has

20  no clothes on.  But I don't -- that's just a general speaking.

21  So it's not something that's in the back of a dark alley;

22  you're pointing a gun at somebody.  It's not the same type of

23  guns are out.

24        THE COURT:  Okay.  That's all my questions.  Do you

25  have any follow-up questions?

1          MR. JONES:  Just a little bit of clarification, your

2   Honor.

3          At first after the break, we went back on, first of

4   all, you were talking about -- I think the circumstances we

5   were talking about was May 25th this year; right?

6          THE WITNESS:  I missed --

7   BY MR. JONES:

8   Q   With the arrest warrant and all that, is that -- you said

9   the weapons -- once Mr. Jenkins, the defendant here, came out

10  of his room, got some clothes on, taken outside, you said

11  after that point the weapons would have been put away.  Are we

12  talking about the rifles at that point would have been put

13  away?

14  A   As soon as the house is searched.  And I don't mean

15  evidentiary searched, for people or guns.

16  Q   The security sweep?

17  A   Security sweep.  Once we have cleared those rooms for

18  bodies or bombs or guns, the guns are holstered, and then we

19  just make sure that nobody is in there, called the hundred

20  percent.  They do initial check, make sure nobody is in plain

21  view and nobody is going to hurt us or hurt anybody else.  The

22  guns are put away.  If an agent would have had a rifle, they

23  would then have locked it in their lockbox in their car, and

24  they would have just had their duty holster on.  But if a

25  person has a rifle or doesn't have a rifle, like if a person

1   isn't issued one, their pistol would have been out.

2          And when you're searching a house or searching a

3   room, the gun is out.  It doesn't mean you're aimed in on the

4   gun, doesn't mean you're on your sites, doesn't mean the gun

5   is off of safety or not.  The gun is out because action is

6   faster than reaction, so it's just standard procedure in law

7   enforcement to clear a room if your weapon system is out in

8   case there's a threat and so you are ready to deal with it.

9   Obviously in the Jenkins family there's not -- there was no

10  issues, so it was done quickly, efficiently, and the guns were

11  put away.

12  Q    Okay.  And so that means holstered and rifles would have

13  been locked up?

14  A    Absolutely.

15  Q    What about things like you said there was a shield?

16  A    For the second, for the arrest warrant we did bring a

17  shield because we knew the layout of the home.  We knew

18  that -- I knew because I was in charge of that.  We knew that

19  we'd be going to the room.  We figured he'd still be asleep,

20  and so in case that there was any issues or during that time

21  frame he would have bought a weapon or didn't want to be

22  arrested by the police or taken, we wanted to make sure we had

23  some ballistic protection between us in case there were shots

24  fired from a closed door, from the bedroom out.  So we wanted

25  to make sure we weren't just standing in the hallway.  We had

1  a ballistic shield.  It's marking.  It has lights in case

2  there was some type of issue.

3  Q   And that was put away once --

4  A   Absolutely.  The shield is only for that action of going

5  to make sure that Mr. Jenkins and nobody else is in the house

6  which is --

7  Q   Okay.  And then, also, I think for the first time y'all

8  went there back in February, February 13, 2017, I think you

9  said that people who were wearing a certain type of vest took

10 those off?

11 A   Yeah.  I'm sure.  And I was just generally speaking.  So

12 it's up to whatever the agent or officer wants to wear,

13 whatever protection they have been issued regarding rifle

14 rated plates versus soft body armor because a rifle will go

15 right through our regular soft body armor, the undercover.  So

16 it really is -- it's nonexistent, if you get shot with a

17 rifle, to have just ballistic protection on, so you have rifle

18 plates.  Some of them have them, and they're a little bit more

19 bulky.  So when we start searching a home, those are taken

20 off.  And they then just have their soft body armor on.

21         We always bring shields as a standard protocol that

22 we bring.  They're usually staged at the site of the house in

23 case we have an officer down or there's some type of issue

24 when you do an officer rescue.  We can deploy them.  So it's a

25 standard action, standard piece of equipment.  Just the second

1  time for the arrest we utilized it to go up the stairs because

2  we already knew we'd be in a corridor.  We knew we'd be in a

3  very confined area, and if shots unfortunately did ring out

4  coming towards us, we would have just that much more

5  protection.  And that's why, you know, when he opened the

6  door, hey, unlock the door which is, you know, what we did,

7  give commands, he opened the door.

8        As I was asked -- he probably was asked or put on his

9  knees so that I could push past to make sure nobody else or no

10 guns were in the room you couldn't grab for real quick.  But

11 once I saw that it was the same room that I'd been in once

12 before, it was just -- Mr. Jenkins has always been very

13 polite, so it's been a very cordial relationship between me

14 and the families even given the circumstances.

15 Q    Okay.  And you were very clear that day, on May 25th,

16 2018, from the beginning that you had an arrest warrant for

17 him also?

18 A    I believe I told mom in the beginning.  But as soon as I

19 talked to him I definitely told him as soon as we got

20 downstairs I did want to talk to him because there were a lot

21 of questions from our first interview.  So I did want to talk

22 to him, and I was trying to provide him some bit of not

23 protection from his parents but privacy of his parents to try

24 to deescalate as far as possible.  But I knew that I wouldn't

25 interview him without Miranda, especially knowing that we had

1  an arrest warrant from an indictment.

2         MR. JONES:  Okay.  I have nothing further, your

3  Honor.

4         THE COURT:  Okay.

5         MR. BRYANT:  Nothing further, Judge.  Thank you.

6         THE COURT:  All right.  You can step down.  Thank

7  you.

8         MR. JONES:  We have no other witnesses, your Honor.

9         THE COURT:  Okay.  Is there anything from the defense

10 that you want to offer?

11        MR. BRYANT:  No, your Honor.

12        THE COURT:  All right.  Can we get the transcript in

13 two weeks?  Why don't we go off the record at this time.

14     (Whereupon, there was an off-the-record discussion and the

15 proceedings concluded at 11:21 a.m.)

16                            -  -  -

17

18

19

20

21

22

23

24

25

1                    REPORTERS CERTIFICATE

2

3

4         I, Wynette C. Blathers, Official Court Reporter for

5  the United States District Court for the Northern District of

6  Georgia, with offices at Atlanta, do hereby certify:

7         That I reported on the Stenograph machine the

8  proceedings held in open court on October 25, 2018, in the

9  matter of UNITED STATES OF AMERICA v. BENJAMIN JENKINS, Case

10  No. 1:18-CR-00181-MLB-CMS-1; that said proceedings in

11  connection with the hearing were reduced to typewritten form

12  by me; and that the foregoing transcript (Pages 1 through 73)

13  is a true and accurate record of the proceedings.

14         This the 8th day of November, 2018.

15

16

17

18                      _____

                        /s/ Wynette C. Blathers, RMR, CRR
19                          Official Court Reporter

20

21

22

23

24

25