IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES | : |
| | : |
| v. | : CRIMINAL ACTION NO. |
| | : |
| BENJAMIN JENKINS | : 1:18-CR-181-MLB-CMS |

---

## MR. JENKINS' POST-HEARING BRIEF IN SUPPORT OF THE MOTION TO SUPPRESS STATEMENTS

---

The Defendant, BENJAMIN JENKINS, hereby offers this post-hearing brief on the pending motion to suppress statements. (Doc. 21, 28). Federal and local law enforcement entered Mr. Jenkins' house two different times to execute two different search warrants and to obtain statements from Mr. Jenkins. During the execution of the first search warrant in February 2017, agents chose *not* to advise Mr. Jenkins of his rights pursuant to *Miranda,* despite Mr. Jenkins being their sole suspect and despite the agents entering Mr. Jenkins house with a tremendous show of force and detaining his entire family. As a result, the admissibility of Mr. Jenkins' statement in February rises and falls upon a single legal question: *Was Mr. Jenkins in the custody of the agents during the interrogation?*

During the execution of the second search warrant, more than a year later, in May 2018, the agents advised Mr. Jenkins of his rights under *Miranda* because they had an arrest warrant for him. Mr. Jenkins invoked his right to counsel and did not make a statement. However, agents placed him in a room with his family and recorded the conversation. As a result, the question the Court will address is: *Did the agent perform the functional equivalent of an interrogation by placing Mr. Jenkins in a room with his parents to discuss him going to jail after Mr. Jenkins invoked his right to counsel?*

In this brief, counsel will first describe the factual background of Mr. Jenkins' statements and, second, compare those facts to the legal standards and case law on this topic. In the end, this Court should conclude that Mr. Jenkins was in custody during the first interrogation and that the officer placed Mr. Jenkins in the room with his mom in an effort to obtain an incriminating statement after he invoked his right to counsel. Therefore, the motion to suppress must be granted.

## Statement of Facts

The investigation of Mr. Jenkins was led by Special Agent Eric Greene of the Department of Homeland Security. (Transcript from Motion to Suppress Hearing on October 25, 2018, filed as Docket Entry 34, hereinafter, "Tr. 9"). Agent Greene received information from law enforcement in Oklahoma City, Oklahoma and Highland, Illinois about Benjamin Jenkins in Mableton, Georgia sending and receiving sexually explicit photographs to minors. (T. 11-12). Based on the IP (internet protocol) address being used, Agent Greene acquired a federal search warrant authorizing him enter Mr. Jenkins' home in pursuit of evidence of these images. (Tr. 14). At the time Agent Greene executed the search warrant in February 2017, Benjamin Jenkins was his suspect. (T. 54).

## I.   February 2017 Search Warrant

On February 13, 2017, armed with the warrant, Agent Greene led a team of federal and state law enforcement agents to Mr. Jenkins' home in Mableton, Georgia. (Tr. 15). Before 6:30 in the morning, a dozen agents arrived at the house to execute the search warrant. (T. 54) The operation team totaled approximately 12 members and included ten Homeland Security agents and at least two Cobb County Police

Department officers. With agents surrounding the house, two federal agents and one local officer approached the front door armed with firearms and a search warrant. (T. 48).

## A.    *The Agents' Arrival*

In response to Agent Greene's knock on the front door at 6:30 am, Ms. Jenkins, Benjamin Jenkins' mom, answered the door in her sleep attire. (T. 19).  The agents directed Ms. Jenkins inside the house into the dining room of the house, just inside the door. (T. 19). Shortly after securing Mrs. Jenkins in the dining room, Mr. Jenkins, Benjamin Jenkins' father comes downstairs to see who is at the door. (T. 19). Mr. and Mrs. Jenkins told the agents that their two sons, Benjamin and Jared, were upstairs asleep, and the agents asked Mr. Jenkins to ask the boys to come downstairs. (T. 19). However, Mr. Jenkins was not able to wake them. (T. 19-20). To wake them, Mr. Jenkins – the father – followed by two to three agents walk upstairs to wake the two brothers. Benjamin Jenkins – the son – is the first to answer the door. He is in nothing more than his underwear. (T. 21). After the boys are awakened, the agents put everyone in the dining room while they perform a security sweep of the rest of the house.

With the four members of the house corralled in the dining room, the other 10 agents fanned through the house with guns drawn, including rifles, to do a security sweep of the house. (T. 22). During the entire time the agents perform the security sweep of the house, guns are drawn. (T. 55).

### B.    *Agent Greene Isolates & Interrogates Benjamin Jenkins*

Following the security sweep, the agents started the search of the house and the interrogation of the family members. Mr. and Mrs. Jenkins and Jared were interviewed at the kitchen table on the main floor of the house while Benjamin Jenkins, alone, was removed to the basement of the house to be interrogated. (T. 25-26). Agent Greene and Homeland Security Special Agent Baldridge escorted Mr. Jenkins downstairs for the interrogation. (T. 27).

Agent Greene interrogated Mr. Jenkins, and he quickly realized that Mr. Jenkins suffers from mental health problems. (T. 29-30). When Agent Greene asked Mr. Jenkins about one of his usernames – Reithe8th – Mr. Jenkins told him "the person that we know is the vessel for different personalities that he feels that he has, and so he started listing some of the personalities. And that's what the 8th is, eight

different variances of who we were." (T. 30-31). The interrogation did not go smoothly, as Mr. Jenkins did not provide the answers Agent Greene expected. As a result, Agent Greene asked Mr. Jenkins' other personalities the same question. "[I]n the very beginning," Agent Greene said, "it became apparent that I needed to change my questioning to ask if it was one of these different names that he was providing me." (T. 31). Agent Greene's alternative method of asking questions seemed to work more effectively. He said, "[a]nd that seemed to work where if I asked did Sara do this or did this person do this, which are different parts of the names of the 8th, and he would think about it and then say yes." (T. 31). This interview lasted about 90 minutes (T. 28).

Mr. Jenkins' mental health problems were evident even in the letter he wrote. In the first sentence of the hand-written apology note that Mr. Jenkins wrote, he referred to himself as "my selves," referring to multiple selves. (Gov't Ex. 5, T. 58).

Mr. Jenkins also told Agent Greene about trauma he suffered as a child. (T. 56-7). Agent Greene showed compassion towards Mr. Jenkins by asking questions about the trauma he suffered and the affect that

6

this trauma had on Mr. Jenkins' mental and emotional well-being. (T.

57). Agent Greene even believed that Mr. Jenkins would benefit from

mental health counseling and offered places to Mrs. Jenkins where Mr.

Jenkins could seek counseling or therapy after the interrogation. (T. 57,

59).

### C.    *Consent to Assume Online Identity*

Agent Greene also convinced Mr. Jenkins to consent to assume his

online identity. (T. 33-34, Govt Ex. 3, 4). During the interview Agent

Greene de-emphasized Mr. Jenkins' culpability and magnified the

culpability of others in an effort to get Mr. Jenkins to give the agents

permission to assume his online identity. (T. 60). Agent Greene told Mr.

Jenkins that he was trying to catch people who were "much more evil"

than he was (T. 60). However, he does not recall telling Mr. Jenkins

that he would log into Mr. Jenkins' account and use the information he

learned to prosecute Mr. Jenkins. (T. 60-1).

### D.    *Second Interrogation in February 2017.*

After completing the first 90 minute interview, Mr. Jenkins

expressed concern for a friend of his on-line, Meghan. (T. 37). Meghan,

he told the agents, had attempted suicide before, she may be distraught

if she lost contact with Mr. Jenkins. The two agents take Mr. Jenkins back downstairs to the basement, where he writes a letter of apology. (T. 40, Gov't Ex. 5). In this letter, he refers to his "selves." (*Id.*)

## II.    Second Search in May 2018

Agent Greene and his team of "searchers" returned to Mr. Jenkins' house on May 25, 2018, to execute a search warrant and an arrest warrant. During this second search, eleven law enforcement officers joined Agent Greene, which included federal and local law enforcement, to execute the warrants in the early morning hours. (T. 42). Similar to the search in February the year before, the agents went upstairs to locate Mr. Jenkins. The agents approached his bedroom with a shield that had lights attached, and the agents had firearms drawn. (T. 65). This time, Mr. Jenkins was not wearing any clothes when he came to the door. (T. 43). However, after stepping out of his room, he was directed to get on his knees on the ground. (T. 67, 72). After getting some clothes for him, the agents took everyone outside while performing the security sweep and before executing the search warrant. (T. 44).

After searching the house, Agent Greene brought Mr. Jenkins back to the basement for an interrogation. Before beginning the

interrogation, Agent Greene advised Mr. Jenkins of his rights pursuant to *Miranda* and told Mr. Jenkins that he had an arrest warrant for him. (T. 46). This time, Mr. Jenkins invoked his right to counsel. (T. 47).

After invoking his right to counsel, Agent Greene brought Mr. Jenkins upstairs to the dining room table where he joined his father. (T. 47). His mother was upstairs getting ready for work, and he asked her to join her husband and son at the dining room table because they were taking Mr. Jenkins to jail. (T. 48). When Mrs. Jenkins joined her husband and son in the dining room, "[t]hey talked about regular stuff, and then the conversation started to change as far as why this is happening and why he's continuing this activity." (T. 48). As the family was talking, Agent Greene was standing in the threshold between the dining room and the halfway, and he started recording the conversation. (T. 48).

## Argument & Citation of Authority

In *Miranda v. Arizona*, 384 U.S. 436 (1996), the Supreme Court held that a suspect who is in custody must be advised of the right to remain silent and the right to the assistance of counsel prior to any interrogation. Whether a person is "in custody" and entitled to *Miranda*

warnings is a mixed question of fact and law. *United States v. Moya*, 74 F.3d 1117 (11th Cir. 1996). The issue is whether "under a totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). Further, the Supreme Court has defined "interrogation" as express questioning or its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291 (1980). The "functional equivalent" of interrogation includes "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*.

In Mr. Jenkins case, he was in custody for *Miranda* purposes during both the February 13, 2017 interrogation and the arrest on May 25, 2018. Because he was not advised of his rights pursuant to *Miranda* during the interrogation on February 13, the statement must be suppressed. Likewise, because he was subjected to the "functional equivalent" of questioning after invoking the right to counsel in May 2018, this statement must also be suppressed.

10

I.    **Agent Greene Interrogated Mr. Jenkins in a Setting So Dominated by the Dozen Armed Agents that Mr. Jenkins was Restrained to a Degree Associated With A Formal Arrest and Was In Custody in February 2017.**

The central question for the February 2017 interrogation is whether Mr. Jenkins was in fact in custody – whether there was a restraint on his freedom of movement of a degree associated with a formal arrest – pursuant to *Miranda*. The remaining *Miranda* issues are not in dispute for the February 2017 interrogation. Surely, the government will agree that the agents conducted an interrogation and that they chose not to advise Mr. Jenkins of his *Miranda* rights. The sole issue for the Court to resolve is the question of custody.

For that reason, counsel will jump directly to whether Mr. Jenkins was in custody during the February 2017 interrogation.

A.    ***Agent Greene Interrogated Mr. Jenkins In a Setting So Dominated by Law Enforcement Officers That Mr. Jenkins Found Himself In Custody Within His Own Home***

A law enforcement agent must give a suspect *Miranda* warnings once there is "such a restriction on [the] person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 321 (1994). *Miranda* applies to any interrogation in any setting, including a

11

suspect's own home, where the atmosphere is "police dominated."

*Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). In the absence of an

arrest, a person is nonetheless in custody for *Miranda* purposes when

there has been a "restraint on freedom of movement of the degree

associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121,

1125 (1983); *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir.

2006). The Court must apply an objective test to this inquiry: "The only

relevant inquiry is how a reasonable man in the suspect's position

would have understood his situation." *United States v. Muegge*, 225

F.3d 1267, 1270 (11th Cir. 2000) (quoting *Berkemer*, 468 U.S. at 442). A

court must determine whether "a reasonable person would have felt

that he or she was not at liberty to terminate the interrogation and

leave." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). In other words,

how would a "reasonable person in the position of the individual being

questioned . . . gauge the breadth of his or her freedom of action"?

*United States v. Lall*, 607 F.3d 1277, 1284 (11th Cir. 2010). In short, a

court must determine whether or not the totality of the circumstances

"involve the type of 'highly intrusive' coercive atmosphere that may

require *Miranda* warnings even before a formal arrest is made." *United*

*States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004). *See United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008) (suspect is in custody even in his own home if he endures a "police-dominated atmosphere").

In measuring the question of custody, a court must evaluate the totality of the circumstances of the interrogation. *Howes,* 132 S. Ct. at 1189; *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006). A court must measure a wide-ranging list of factors under this test. The list of possible circumstances is limited only by one's imagination, but the Supreme Court, the Eleventh Circuit, and other circuit courts have provided a lengthy list of non-exhaustive factors. A court must begin by considering the location of the questioning, as well as the duration of questioning, statements made during the interview, the presence of physical restraints during questioning, and the release of the suspect at the end of the interrogation. *Howes*, 132 S. Ct. at 1189. A reviewing court shall ask whether law enforcement officers unambiguously told the suspect he was free to leave and that he was not in custody. *Brown*, 441 F.3d at 1348. The Eleventh Circuit also asks lower courts to evaluate "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicted that compliance with

13

the officers could by compelled." *Street*, 472 F.3d at 1309. Yet the universe of relevant circumstances is wider still. Other circuit courts have identified many other factors that apply to a given interrogation, including the number of law enforcement personnel and whether they were armed; whether the suspect was at any point restrained, either by physical force or by threats; and whether the suspect was isolated from others. *See, e.g., Craighead*, 539 F.3d at 1084 & n.3.

As the Court evaluates the interrogation of Mr. Jenkins, this Court should weave each of these factors into the fabric of Mr. Jenkins' case. In the end, the tapestry will reveal that although Mr. Jenkins was within the walls of his own home, that home was overrun with agents who thoroughly dominated him and his family. Therefore, Mr. Jenkins was in the custody of those federal agents at the time Agent Greene interrogated him about his on-line contact with minors.

### 1.   *How Important Is It That the Interrogation Occurred Inside Mr. Jenkins' Home?*

The Eleventh Circuit has noted that "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's own

home," a site which is "on his own turf." *Brown*, 441 F.3d at 1348.[1]

However, the home setting alone does not absolve an agent's sins of

coercion. The Supreme Court itself has found an interrogation within  a

man's own bedroom — on his very own bed no less — to be custodial.

*Orozco v. Texas*, 394 U.S. 324, 326 (1969). In many ways, an invasion by

law enforcement agents into a man's home is the most personal of

violations. A man's home can hardly be seen as a place of comfort and

familiarity when it has been overrun by armed strangers who order and

direct a man's every move within his own walls.

The circumstances in a given interrogation may "turn[] the

otherwise comfortable and familiar surroundings of the home into a

'police-dominated atmosphere.'" *Craighead*, 539 F.3d at 1083. Even in a

suspect's own home, he may be "deprived of his freedom of action in [a]

significant way," similar to an interview at a police station, where a

---

[1] Although Brown himself was interrogated in the familiar setting of his
girlfriend's home, the Eleventh Circuit's conclusion that he was not in
custody was based more heavily upon other factors which differ greatly
from those of Mr. Jenkins' case. For example, Brown answered the
agents' questions in an open dining room and living room until he asked
to move to a more private space, the interviewing officers were not
armed, Brown was never physically restrained at all, he was permitted
to use the phone, he moved freely about the house, and most
importantly, the agents did not have a search warrant. 441F.3d at 1349.

suspect is presumably held "incommunicado" and "cut off from the outside world." *Id.* (quoting *Miranda* and applying its central tenet to the in-home interrogation).[2]

"The home occupies a special place in the pantheon of constitutional rights." *Craighead*, 539 F.3d at 1077. The authors of the Constitution and the justices of the Supreme Court have time and again trumpeted the sacred nature of that space that is a man's home. "The maxim that 'every man's house is his castle' is made a part of our constitutional law in the clauses prohibiting unreasonable searches and seizures, and has always been looked upon as of high value to the citizen." *Weeks v. United States*, 232 U.S. 383, 390 (1914) (citation omitted). In *Weeks*, the Supreme Court also noted the following:

> The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all

---

[2] The invasion of a man's home at 6:00 in the morning — with the interrogation 20 minutes later — is all the more likely to be custodial because it occurs at that extraordinarily early hour. *See, e.g., Cavazos*, 668 F.3d at 192 (raid and interview at 6:30 AM is indicative of custody); *Hallock*, 2009 WL 1090697 *6 (Hallock's first contact with law enforcement was in the darkness of an early October morning); *Mittel-Carey*, 493 F.3d at 40 (6:25 AM interview); *Revels*, 510 F.3d at 1275 (6:00 AM interrogation); *Savoy*, 889 F. Supp. 2d at 109 (same).

16

invasions on the part of the government and its employees of
the sanctity of a man's home and the privacies of life. It is
not the breaking of his doors and the rummaging of his
drawers that constitutes the essence of the offense; but it is
the invasion of his indefeasible right of personal security,
personal liberty, and private property, where that right has
never been forfeited by his conviction of some public offense.

*Id.* at 391 (quoting *Boyd v. United States*, 116 U.S. 616 (1886)). A man's

shield of constitutional security is at its stoutest inside his own home.

Under the First Amendment, the government "has no business telling a

man, sitting alone in his house, what books he may read or what films

he may watch." *Stanley v. Georgia*, 394 U.S. 557, 565 (1969). The

Second Amendment prohibits a federal "ban on handgun possession in

the home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The

Third Amendment forbids quartering soldiers "in any house" in

peacetime "without the consent of the [o]wner." U.S. CONST. amend.

III. In the end, "[m]ore important than the familiarity of the

surroundings where [a suspect is] being held is the degree to which the

police dominated the scene." *Sprosty v. Buchler*, 79 F.3d 635, 642 (7th

Cir. 1996) (interrogation in suspect's home was custodial). A man whose

home has been invaded by a dozen law enforcement officers has no

17

other place to go; his final place of refuge is despoiled and, in the end, is no refuge at all.

### 2.   *Did Agents Tell Mr. Jenkins That He Was Free to Leave His Own Home?*

The act of advising a suspect that he is free to leave and is not in custody is a "powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody." *Brown*, 441 F.3d at 1347. However, such notice is not a panacea for all ills. "[E]ven having been told by the officers that he was not in custody and was free to leave does not inexorably lead to the conclusion that [a suspect] was not in custody." *Id.* at 1349. The notice — if merely lip service — cannot whitewash the other circumstances of control and coercion. "A court must consider the delivery of these statements within the context of the scene as a whole." *United States v. Lee*, 699 F.2d 466, 467-468 (9th Cir. 1982). Indeed, "[t]here may be situations where the restraints placed on a suspect's freedom are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview." *Muegge*, 225 F.3d at 1271. *See also United States v. Hallock*, 2009 WL 1090697 *7-8 (D. Nev. 2009) (unpublished) ("[T]his was a confrontation with law enforcement officers which began with a show of force and was followed

by isolation from family and close monitoring by armed guards. The coercive nature of the confrontation created a custodial atmosphere that was not easily undone by the agents' statements that [the suspect] would not be arrested that day and was free to go."). This is just such a case.

Agent Greene may have told Mr. Jenkins that he was free to leave his home. However, in the atmosphere of the Jenkins home, flooded as it was with uninvited agents, this promise was meaningless lip service and was belied by the many agents' actions.

It also must be noted that Mr. Jenkins had no opportunity to insist that agents leave his home because they were executing a search warrant for hours. *See United States v. Williams*, 2013 WL 2318144 *9 (D. Minn. 2013) (unpublished) ("A reasonable person may have a different understanding of his 'freedom to leave' an interrogation in his home during the execution of a search warrant.").[3] In the end, an

---

[3] In *United States v. Asher*, this Court found it to be "somewhat troubling" that the agents entered the house not only to execute a search warrant, but also in order to interview Asher about the child pornography and "to gain more information than normally obtained through the search." Case No. 1:09-CR-414-WSD-AJB, Doc. 33 at 26. Like the agent in *Asher*, Agent Greene here entered the home with the twin goals of searching the home and of interrogating Mr. Jenkins.

agent's instruction to a suspect within his own home that he is "free to leave" is a hollow claim indeed, for where can a suspect reasonably retreat? As the Ninth Circuit has noted: "If a reasonable person is interrogated inside his own home and is told he is 'free to leave,' where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." C*raighead*, 539 F.3d at 1083.

### 3.     *How Many Agents Flooded Mr. Jenkins' Home and Were the Agents Armed?*

"When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation." *Craighead*, 539 F.3d at 1084. Moreover, "[v]isibly armed law enforcement officers who vastly outnumber a suspect . . . go a long way to making a suspect's home a police dominated atmosphere." *Id.* at 1085. *See United States v. Panak*, 552 F.3d 462, 466 (6th Cir. 2009); *Sprosty*, 79 F.3d at 643 (suspect in custody where agents insisted he have an armed escort at all times within his own home); *United States v. Savoy*, 889 F. Supp. 2d 78, 109-

20

110 (D.D.C. 2012) (questioning by armed agents whose weapons were visible suggest custody). The agents in this case numbered a dozen and not only were they armed, but many also brandished firearms at the outset of the encounter as Mr. Jenkins opened his bedroom door. This fact alone strongly suggests a custodial setting. *See, e.g., Cavazos*, 668 F.3d at 192 (14 law enforcement officers indicates custody); *Craighead*, 539 F.3d at 1085 (eight agents from three agencies suggests custody); *Mittel-Carey*, 493 F.3d at 40 (same); *Revels*, 510 F.3d at 1274 (seven officers weighs toward custody).

### 4.   *Did the Agents Exercise Physical Control or Restraint Over Mr. Jenkins In Any Way?*

When agents restrain a suspect or restrict his movement, the suspect may reasonably feel he is subject to police domination even within his own home. *See Orozco*, 394 U.S. at 325, 327 (finding custody where four officers entered suspect's bedroom and without physically handling the suspect, behaved in a way that made clear the suspect was not free to leave). It matters a great deal when the agents "touch[] the suspect." *United States v. Schulz*, 486 Fed. Appx. 838, 840 (11th Cir. 2012). *See also Mittel-Carey*, 493 F.3d at 40 ("the level of physical control the agents exercised over [the defendant] in this case weighs

21

heavily in the opposite direction, despite the fact that the control was exercised inside defendant's home.") The agents in Mr. Jenkins' home applied each and every form of restraint upon him: physical, verbal, and emotional. Agent Greene physically restrained Mr. Jenkins for the first ten to fifteen minutes of the confrontation in the dining room — arguably the most important time interval of the event — a restraint which set a controlling tone for the remainder of the morning. The agents later used non-physical intimidation in order to induce Mr. Jenkins to participate in the interrogation. *See United States v. Colonna*, 511 F.3d 431, 435-436 (4th Cir. 2007) (custody exists, in part, where agents instruct the suspect and other occupants where to sit, restrict his access to his own home, and direct him to travel to an isolated corner of the home for the interrogation).

By the conclusion of the interrogation, about two hours after his arrival at the house, Agent Greene and the others had checked off each and every box on the restraint checklist — physical, verbal, and emotional — and, in this way, transformed Mr. Jenkins's home into a sphere of police domination.

In addition, Mr. Jenkins had no freedom of movement whatsoever from the very moment the agents grabbed him at the front door until they left the home hours later. *See United States v. Griffin*, 922 F.2d 1343, 1354 (8th Cir. 1990) ("freedom of action restrained to a degree commonly associated with formal arrest . . . when he was accompanied by an officer when he retrieved cigarettes from other rooms in the house and was told to remain in view of the agents at all times"); *Sprosty*, 79 F.3d at 641. *Compare United States v. Okakpu*, 210 Fed. Appx. 848, 852 (11th Cir. 2006) (unpublished) (defendant permitted to move freely within his home during the interview, albeit under the agents' supervision as a safety precaution). Agent Greene held Mr. Jenkins in the dining rooming during the first ten to fifteen minutes of the encounter. The agents then directed the family members, including Mr. Jenkins, where to go. He directed Mr. Jenkins, the father, Mrs. Jenkins, and Jared Jenkins to the kitchen table, and isolated Mr. Jenkins, the suspect, in the basement for the interrogation.  The agents forbade Mr. Jenkins any freedom of choice of movement. Unlike *Okakpu*, where the agents escorted the suspect to rooms of his own choosing, Mr. Jenkins was only allowed to go to the basement, the site of the interrogation. In

the end, the agents carried out a complete takeover of the home, inside and out, upstairs and downstairs. Mr. Jenkins was no more autonomous and had little more freedom of movement than a pawn on a chess board.

### 5. Was Mr. Jenkins Isolated In a Closed Room During the Interrogation?

The flavor of an interrogation often depends heavily upon a simple question: Was the door open or closed? *See Craighead*, 539 F.3d at 1085 (one agent interrogated suspect in a closed storage room while another guarded the door); *Revels*, 510 F.3d at 1274 (isolation of suspect in a rear bedroom strongly points toward custody). In this case, agents successfully isolated Mr. Jenkins from his family; Agent Greene directed Mr. Jenkins to speak and then led him away from the open living room, away from his family, to the unfinished basement. The separation of a suspect from his family is "is one of the distinguishing features" of a custodial interrogation, *Miranda*, 384 U.S. at 445-446, because by exercising this dominion over a suspect, the police isolate him from persons "who might lend moral support during the questioning and deter the suspect from making inculpatory statements." *Craighead*, 539 F.3d at 1086-87.

24

Agent Greene marched downstairs with Mr. Jenkins and Agent Baldridge in tow, and led the trio into the unfinished basement of the house. Like Michael Corleone's henchman in the final scene of the film *The Godfather*, an armed Agent Baldridge closed the door to the outside world, concealing Mr. Jenkins from the rest of the world and concealing the rest of the world from Mr. Jenkins. *See* THE GODFATHER (Paramount Pictures 1972) (found at http://www.youtube.com/watch?v=_tmKRk2AIJI, last visited September 13, 2013). The agents then sat across the unfinished room from Mr. Jenkins and his inquisitor, a stairs-length from the closed door. *See Griffin*, 922 F.2d at 1350-1351 ("We realize that the likely effect on a suspect of being placed under guard during questioning . . . is to associate these restraints with a formal arrest.); *United States v. Cook*, 824 F. Supp. 2d 776, 780 (N.D. Ohio 2011) ("By placing himself by the office front door while the defendant was in the restroom, [the agent] communicated, at least implicitly if not deliberately, that the defendant could not exit."). Meanwhile, upstairs, in the main part of the house, beyond the closed door, Mr. Jenkins's parents and brother were held in the kitchen and countless agents searched the home. An interview in

25

another part of the house, a part of the house that may have been more familiar to Mr. Jenkins may not have isolated Mr. Jenkins the way the unfinished basement did. Instead, the interrogation in the basement enhanced what the Ninth Circuit calls the "sensation of being isolated in a police-dominated atmosphere." *Craighead*, 539 F.3d at 1088-1089. As the Ninth Circuit concluded in *Craighead*, "it is difficult to see how [a suspect] was free to leave if he was, apparently, not free to invite others into the room of his own house." 539 F.3d at 1087. *See also Cavazos*, 668 F.3d at 194 (although interrogation occurred inside suspect's home and agents told him the interrogation was "non-custodial," it was indeed custodial because defendant awakened in bed, handcuffed, separated from his family, interrogated by two agents for one hour, and was followed around the house during execution of search warrant).

## II.   By Placing Mr. Jenkins in a Room with his Mother and Father Immediately After His Arrest and Invoking His Right to Counsel, Knowing that they Would Talk about the Arrest, was the Functional Equivalent of Questioning.

The second inquiry in a *Miranda* analysis is whether Mr. Jenkins was questioned or interrogated while in custody after invoking his right to counsel. Agent Greene and his team returned to Mr. Jenkins house

26

on May 25, 2018, more than a year after their initial search of the house, with an arrest warrant. When Agent Greene notified Mr. Jenkins of the arrest warrant and advised him of his rights under *Miranda*, Mr. Jenkins invoked his right to counsel. What should have been a simple trip to the courthouse turned into additional evidence for the government when Agent Greene put Mr. Jenkins in a room with his family right after being told he was going to jail.

In *Miranda*, the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of the right to the assistance of counsel prior to any interrogation. 384 U.S. 436, 444-45 (1966). When a person who has been advised of his or her rights during custodial interrogation requests a lawyer or invokes the right to remain silent, all questioning must cease. *Arizona v. Roberson*, 486 U.S. 675 (1988).

Furthermore, interrogation can be either express or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291 (1980). The "functional equivalent" of interrogation, the Court concludes, includes "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."

27

*Id.* at 301. In *Innis*, the defendant was arrested robbery and murder involving a shotgun. *Id.* at 295. He was advised of his rights under *Miranda* and invoked his right to counsel. *Id.* at 298. On his way to the police station, the two transporting officers commented to each other – not the defendant – that they were searching for the shotgun near a school and how tragic it would be if a young school girl discovered the shotgun and somehow killed herself. *Id.* at 294-95. After this comment, the defendant told the officers to turn around the car and showed them where the shotgun could be found. *Id.* at 295.

The Court concluded that the statements from the officers were not the functional equivalent of express questions. The Court said, "given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond." *Id.* at 303. "The case" the Court said, "thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response." *Id.*

28

The Eleventh Circuit has faced similar situations before. In *United States v. Gomez*, after being advised of his rights under *Miranda* and invoking his right to counsel, the agents told the defendant that he should talk to his attorney about cooperation because cooperation was the only way to reduce his sentence. 927 F.2d 1530, 1536 (11th Cir. 1991). Citing *Innis*, the Eleventh Circuit said, "[t]he law in this area is clear: once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation." *Id*. at 1539. Because the officer explained the benefits of cooperation after the defendant invoked his right to counsel, the statement was inadmissible. Similarly, in *United States v. Johnson*, the Eleventh Circuit held that an FBI agent asking a suspect if he would like the federal criminal justice process explained after the suspect invoked his right to counsel was the functional equivalent of questioning. 812 F.2d 1329, 1331 (11th Cir. 1986). As a result, any statement derived from that interrogation should have been suppressed. Similarly, in *United States v. Ramsey*, after the defendant invoked his right to remain silent, the DEA agent responded that the defendant should consider the length of the sentence

he was facing if he did not cooperate. 992 F.2d 301, 303 (11th Cir. 1993). This was an interrogation in violation of *Miranda*. *Id*. at 305.

The statement Agent Greene harvested from Mr. Jenkins on May 25, 2018, after the arrest warranted was executed and Mr. Jenkins invoked his right to counsel was in violation of *Miranda* and must be suppressed. Similar to *Gomez* and *Johnson*, placing Mr. Jenkins at the kitchen table with his mother and father after explaining the legal process was the functional equivalent of questioning him. He must have known that the family would talk about the case as well as the court process in the moments before he was taken to jail.

## Conclusion

Like a chemist in a laboratory, this Court must measure and mix these various ingredients into a cohesive solution. In the end, the combination of factors in Mr. Jenkins' case inexorably lead to the conclusion that he was "subjected to restraints comparable to those associated with a formal arrest." *Berkemer*, 468 U.S. at 441. Asleep in his home, he was awakened by armed agents, directed  downstairs while his home is searched by a dozen armed agents, then isolated in the unfinished basement to be questioned about threats to minors.  *See*

30

*Revels*, 510 F.3d at 1276 ("[T]he facts belie any conclusion that Revels' home, on the morning of the questioning at issue, was the traditional comfortable environment that we normally would consider a neutral location . . .").

The totality of the circumstances in this case "involve the type of 'highly intrusive' coercive atmosphere that require[d] *Miranda* warnings even before a formal arrest [was] made." *Acosta*, 363 F.3d at 1150. In the end, Mr. Jenkins was in the custody of the federal agents as they interrogated him behind the closed door of the unfinished basement. Agent Greene's calculated failure to advise Mr. Jenkins of his *Miranda* warnings was fatal to his cause.

On the other side of the interrogation coin, in May 2018, Agent Greene knew that Mr. Jenkins was likely to discuss his arrest with his family after he invoked his right to counsel with Agent Greene. Therefore, placing Mr. Jenkins with his family immediately before being taken to jail was the functional equivalent of questioning.

For all these reasons, Mr. Jenkins respectfully requests that this Court grant the motion to suppress statements.

Dated: This the 29th day of November, 2018.

Respectfully submitted,

*J. Wesley Bryant*

J. Wesley Bryant
Attorney for Benjamin Jenkins
Georgia State Bar No. 091621

Federal Defender Program, Inc.
101 Marietta Street, N.W., Suite 1500
Atlanta, Georgia 30303
(404) 688-7530 Fax (404) 688-0768
Wes_Bryant@FD.org

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing motion was formatted in Century Schoolbook14 pt., in accordance with Local Rule 5.1C, and was electronically filed this day with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to Paul Jones and Skye Davis, Assistant United States Attorney, 600 Richard B. Russell Building, 75 Ted Turner Drive, S.W., Atlanta, Georgia, 30303.

Dated: This the 29th day of November 2018.

*J. Wesley Bryant*

J. Wesley Bryant