IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION NO. |
| BENJAMIN JENKINS, | 1:18-CR-181-MLB-CMS |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION

On May 23, 2018, a grand jury sitting in the Northern District of Georgia returned an eighteen-count indictment against Defendant Benjamin Jenkins, charging him with thirteen counts of producing child pornography, in violation of 18 U.S.C. § 2251(a), and five counts of distributing child pornography, in violation of 18 U.S.C. § 2252(a)(2).  [Doc. 1].  Defendant has filed pre-trial motions seeking to exclude (1) fruit of the poisonous tree evidence based on the Supreme Court's recent decision in Carpenter [Doc. 29] and (2) statements made during the execution of two search warrants at his home—one on February 13, 2017 and the other on May 25, 2018 [Docs. 21, 28].  For the reasons that follow, I recommend that all these motions be denied.

## I.        __Carpenter__ Motion [Doc. 29]

In his Second Amended Motion to Suppress Evidence, Defendant argues that the Court should suppress all evidence obtained during the February 13, 2017 execution of a search warrant at Defendant's house and the subsequent search of certain devices seized during that search.  [Doc. 29].  He argues that the factual basis for the probable cause supporting the warrant was illegally obtained via summonses authorized by 19 U.S.C. § 1509 that were issued in March 2016 to Kik, Comcast, and Sprint.  [Id. at 3–5; Doc. 29-1 at 2–5 (Kik), 7–9 (Comcast), 11–13 (Sprint)].   According to Defendant, in response to these summonses, law enforcement obtained an "incredible amount of data," including Internet Protocol ("IP") addresses, user names, dates and times the accounts were used, dates of birth, and information about phone calls placed and received.  [Doc. 29-1 at 5, 15]. This information, which was obtained without a warrant, was then included in affidavits in support of two search warrants issued in March and April 2016 for information regarding an Apple iCloud account.[1]  [Doc. 29 at 6–7; Doc. 29-1 at

_____

[1] In Defendant's brief, he refers to the "Magistrate Court" in connection with a warrant issued by United States Magistrate Judge Barnard M. Jones, in the United States District Court for the Western District of Oklahoma.  [Docs. 13, 14]. I note here that there is no federal "magistrate court."  There is only the district court, where U.S. district judges and U.S. magistrate judges preside. To the extent that Defendant used the words "Magistrate Court" to refer to the federal judge who signed the warrant, the correct description is "magistrate judge" or simply "judge."

55–92]. Information from the iCloud account was then used to support the search warrant for Defendant's house signed by United States Magistrate Judge Linda T. Walker on February 6, 2017. [Doc. 29 at 8; Doc. 29-1 at 15–53]. According to Defendant, another warrant was thereafter obtained to search the devices seized from the house, and the application in support of that warrant used the same language as the application in support of the warrant to search his house. [Doc. 29 at 2]. Defendant argues that the warrants for his house and his devices were not valid because the probable cause to support them came from tainted information illegally obtained without a warrant and that the resulting evidence—including statements Defendant made when law enforcement was searching his house—should be suppressed. [Id. at 8].

Defendant's argument is based on the recent decision in Carpenter v. United States, in which the Supreme Court concluded that the acquisition of historical cell site records amounts to a search within the meaning of the Fourth Amendment and that, generally speaking, law enforcement must obtain a warrant supported by probable cause before acquiring such records. See 138 S. Ct. 2206, 2220–21 (2018). Defendant argues that his IP address and the other information obtained from the summonses is akin to historical cell site information, and therefore, law

enforcement should be required to obtain a search warrant prior to acquiring it. [Doc. 29 at 15].

The Government responds that Defendant has no expectation of privacy in his internet subscriber records and the other information obtained via the summonses, and that proceeding via a summons to obtain information from Kik, Comcast, and Sprint was appropriate, even after Carpenter. [Doc. 42 at 8, 10–12].

The statute at issue, 18 U.S.C. § 2703(c)(2), allows a provider of electronic communication services to disclose basic account information to the government "when the governmental entity uses an administrative subpoena authorized by a Federal . . . statute . . . ." The summonses at issue state that they were authorized by 19 U.S.C. § 1509, which allows the United States Customs Service to issue a summons "in any investigation . . . conducted for the purpose of . . . insuring compliance with the laws of the United States administered by the United States Customs Service." 19 U.S.C. § 1509.[2] According to the Government, nothing in the Carpenter decision changed the application of these statutes. I agree.

_____

[2] According to the Government, the U.S. Customs Service enforces the child pornography laws, in part, because child pornography was historically manufactured in foreign countries and then imported into the United States. Since the advent of the Internet, however, the distribution of child pornography has no geographic limitations, and the Customs Service has regularly used its summons

As a district judge in Rhode Island recently put it, IP addresses and other subscriber data that law enforcement routinely obtains via summonses "do not reveal the kind of minutely detailed, historical portrait of 'the whole of [a person's] physical movements' that concerned the Supreme Court in Carpenter." See United States v. Monroe, No. 16-00055-WES, 2018 WL 5717367, at *5 (D.R.I. 2018). The subscriber information at issue in this case is more akin to the records of dialed numbers kept by a telephone company. See id.; United States v. Tolbert, 326 F. Supp. 3d 1211, 1225 (D.N.M. 2018) (comparing the identifying data in IP addresses to telephone and bank records and concluding that such data did not fall within the Supreme Court's decision in Carpenter). The Supreme Court has held that individuals have no reasonable expectation of privacy in such records. See Smith v. Maryland, 442 U.S. 735, 745–46 (1979) (finding no protected privacy interest in telephone records of numbers dialed); United States v. Miller, 425 U.S. 435, 440–41 (1976) (finding no protected privacy interest in bank records). In Carpenter, the Supreme Court expressly declined to disturb those rulings and noted that its holding was limited solely to cell site location information. See Carpenter v. United States, 138 S. Ct. 2206, 2220 (2018) ("Our decision today is a narrow

authority under 19 U.S.C. § 1509 to obtain subscriber information on Internet accounts. [Doc. 42 at 9 n.3]. Defendant has not challenged this point.

one.  We do not express a view on matters not before us . . . .  We do not disturb the application of <u>Smith</u> (telephone records of numbers dialed) and <u>Miller</u> (bank records).").  I agree with the Government that this Court should not extend the holding in <u>Carpenter</u> to subscriber information that is not invasive, does not track the defendant's whereabouts for extended periods, and does not create a reasonable expectation of privacy.

Moreover, even if <u>Carpenter</u> were held to apply to the summonses at issue in this case, suppression still would not be appropriate because the <u>Leon</u> good faith exception to the exclusionary rule would apply.  Shortly after <u>Carpenter</u> was decided, the Eleventh Circuit ruled that if, before the <u>Carpenter</u> decision was issued, the prosecutors and officers complied with the procedures that the Eleventh Circuit had previously sanctioned for obtaining cell site data without a warrant, then the good faith exception to the exclusionary rule articulated in <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984) may apply.  <u>See</u> <u>United States v. Joyner</u>, 899 F.3d 1199, 1204–05 (11th Cir. 2018) (relying on <u>Leon</u> to conclude that the district court's denial of a motion to suppress based on the Government's failure to obtain a search warrant for cell site data did not constitute reversible error).

Here, the same reasoning applies.  It appears that the agents fully complied with the requirements of both 18 U.S.C. § 2703(c)(2) and 19 U.S.C. § 1509 in

6

obtaining the summonses, and thereafter the agents relied in good faith on the information obtained therefrom.  There is no evidence of any bad faith, and there is no federal case holding that persons have a reasonable expectation of privacy in the information that was obtained through the summonses.  It is evident that all the agents involved acted in good faith in issuing the summonses and thereafter relied in good faith on the information obtained.  Thus, the motion to suppress should be denied on this basis as well.

## II.   Motion to Suppress Statements [Docs. 21, 28]

Defendant has also moved to suppress statements made during the two searches of his home—one on February 13, 2017 and the other on May 25, 2018. [Docs. 21, 28].  On October 25, 2018, I held an evidentiary hearing at which only one witness testified, Department of Homeland Security Investigations ("HSI") Special Agent Eric Greene.  [Doc. 34, Transcript ("Tr.")].

### A. **Facts Presented at the Evidentiary Hearing**

Special Agent Greene testified that he is assigned to the Child Exploitation Investigations Group at HSI, and that at some point before February 2017, he received information from law enforcement officers in Oklahoma and Illinois that Defendant had been exchanging pornographic pictures with children through the Internet, text messaging, and social media.  [Tr. at 11, 52–53].  Law enforcement

had obtained the IP address for the suspect, which was associated with a residence in Mableton, Georgia where Defendant lived with his parents and brother. [Id. at 12–14, 53]. Following a period of surveillance, HSI agents obtained a federal search warrant for the residence that authorized them to search and seize electronic devices that could be used to transmit child pornography. [Id. at 15; Doc. 29-1 at 15–53].

In the early morning hours of February 13, 2017, HSI agents executed the search warrant at Defendant's address. [Tr. at 15]. Agents had chosen to execute the warrant in the early morning because they had expected, based on their prior surveillance work, that this would be the best time to ensure all residents would be home. [Id. at 16]. At least twelve law enforcement officers—ten HSI agents and at least two Cobb County uniformed officers—were present to execute the warrant. [Id. at 17, 54].

Special Agent Greene testified that three law enforcement officers approached the front door and rang the doorbell (two HSI agents and one Cobb County uniformed officer) and that Defendant's mother answered the door. [Tr. at 18]. According to Special Agent Greene, he first introduced himself, explained that they had a federal search warrant for the home, and that this was all related to Cobb County's previous investigation from the year before during which officers

8

had spoken with Defendant's parents about their investigation.  [Id. at 17, 19].

Special Agent Greene testified that he then asked Defendant's mother to move

inside the home into the dining room, which he classified as a "quasi controlled

area."  [Id. at 19].  At this time, according to Special Agent Greene, none of the

officers' weapons were drawn.  [Id. at 18].

Special Agent Greene then asked Defendant's father—who had come down

the stairs to investigate what was going on—to wake up his sons who were

sleeping in separate rooms upstairs.  [Tr. at 20].  Defendant's father then went to

the top of the stairs—followed by three or four HSI agents—and woke up the boys.

[Id.].  Special Agent Greene testified that that he proceeded in this manner to

announce the law enforcement presence "as gently as possible."  [Id.].  The goal,

according to Special Agent Greene, was to ensure that HSI agents would not be

"banging down doors and waking people up."  [Id.].

Special Agent Greene testified that after Defendant and his brother were

awake and dressed, he and other HSI agents entered the boys' bedrooms and

checked them for weapons to ensure the safety of the law enforcement officers; he

then moved the family into the dining room so that he could address the family as a

group.  [Tr. at 21].  Special Agent Greene testified that at this point, he told

Defendant and his family that "nobody is under arrest," that "this [was] a search

warrant," and that "we'd like to speak to them.  But we need to first make sure that there's nobody else in the house, there's no weapons."  [Id.].  Meanwhile, according to Special Agent Greene, the other agents were "fanning through the house" to ensure there was nobody else hiding in any other rooms.  [Id. at 22, 24]. Special Agent Greene testified that while conducting this "security sweep," the officers had their firearms drawn and that at least one or two were carrying rifles. [Id. at 22, 55].  Special Agent Greene testified that after the agents completed their "security sweep," they locked up their rifles and heavier protective gear in their cars.  [Id.].  Agents' sidearms, Special Agent Greene testified, were holstered—but still present—during the rest of the execution of the warrant.  [Id. at 22–23]. Special Agent Greene testified that he never drew his own sidearm, that he thought it was not noticeably visible, but that it was possible Defendant could have seen it if his jacket had moved and exposed his weapon.  [Id. at 23].  According to Special Agent Greene, the entire "security sweep" lasted between five and seven minutes. [Id.].  Special Agent Greene testified that apart from a pellet gun found in the basement, agents discovered no weapons and described the scene as a "very low key situation" and the family as "very cooperative."  [Id. at 23–24].

Following the protective sweep, some of the officers began searching, while others conducted interviews with Defendants' parents and brother; the brother was

interviewed at the kitchen table, while the parents were interviewed together in the family room.  [Tr. at 25, 55–56].  Meanwhile, Special Agent Greene and his colleague Special Agent Dan Baldridge conducted an interview with Defendant in the basement.  Special Agent Greene testified that they went to the basement for some privacy, stating, "Normally in these cases it's not much fun to talk about crimes involving a sexual nature around mom and dad, so we try to find a place that's a little bit more private."  [Id. at 25–26].  Special Agent Greene described the basement as "lived in but unfinished," with a couch and a TV, but no sheetrock walls.  [Id. at 26–27].  Special Agent Greene testified that the three of them sat down in the basement, with Defendant at a desk, right at the bottom of the stairs, and that Defendant's access to the stairs was never blocked.  [Id. at 27].  According to Special Agent Greene, the entire interview lasted about ninety minutes.  [Id. at 28].  A recording of this interview was admitted into evidence.  [Gov. Ex. 8].

Special Agent Greene testified that after the interview in the basement had finished, he thanked Defendant and walked with him back upstairs.  [Tr. at 28].  Fifteen minutes later, however, another HSI agent told Special Agent Greene that Defendant wished to speak with him again.  [Id.].  At that point, Special Agent Greene, Special Agent Baldridge, and Defendant walked downstairs to the basement again.  [Id. at 29, 37].  According to Special Agent Greene, during this

second interview, Defendant expressed concern for the safety of one of the girls with whom he had allegedly been communicating.  [Id. at 37].  Special Agent Greene testified that Defendant said he was concerned that this girl had been "abused by her family," that "he was [her] confidant," and that he was worried that she would become upset if he was not able to contact her.  [Id.].  Furthermore, Special Agent Greene testified that Defendant expressed an interest in helping the investigation.  [Id.].

In response, Special Agent Greene told Defendant that "it appears that you're very sorry for what happened," to which Defendant apparently responded to in the affirmative.  [Tr. at 38].  Special Agent Greene testified that he then asked Defendant if he wanted a piece of paper.  [Id.].  According to Special Agent Greene, Defendant responded by asking "so I can write an apology?" and Greene said "Yes."  [Id.].  At this point, Defendant was sitting at the desk and wrote out an apology letter.  [Id.].  Both the letter and a photograph of Defendant writing the letter were admitted into evidence.  [Id. at 38–40; Gov. Exs. 5, 6].  Special Agent Greene stated that this second interview lasted approximately thirty minutes and that most of the time was spent writing the letter.  [Tr. at 40].  This interaction was recorded, and a copy of the recording was admitted into evidence.  [Gov. Ex. 8].  According to Special Agent Greene, law enforcement officers departed the

12

residence shortly after the conclusion of the second interview, leaving Defendant with his family.  [Id. at 41].  As the officers were leaving, Special Agent Greene talked with Defendant's mother about Defendant's mental health and possible counseling and treatment options for him.  [Id. at 58–59].

Special Agent Greene testified that he did not advise Defendant of his Miranda rights "because I had made clear that nobody was under arrest.  And I specifically said that there were questions I'd like to ask him, but nobody was under arrest.  And then throughout the interview I'd even mentioned, you know, that once this is done we will be leaving your home. You will not be going with us."  [Tr. at 27–28].  He testified on cross-examination that if Defendant had asked to leave, his response would have been "absolutely . . . you would not be able to walk about the house just due to officer safety, but you're not under arrest" and that if Defendant had wanted to leave or go sit with his parents, he could have done so.  [Id. at 56].  Special Agent Greene also testified that he never put Defendant in handcuffs, nor did he physically restrain him in any way.  [Id. at 29].  Special Agent Greene also denied making any threats or promises to Defendant.  [Id.].

On May 25, 2018, HSI agents returned to Defendant's home, this time with both a search warrant and a warrant for Defendant's arrest.  [Tr. at 41–42].  Again, a group of federal agents, accompanied by uniformed Cobb County officers,

arrived at the house. [Id. at 42]. Defendant's mother answered the door, and Special Agent Greene asked her and her husband to step out of the house; Defendant's brother was not at home. [Id. at 42–43]. Several HSI agents then went upstairs to Defendant's room with their guns drawn and "told [Defendant] to wake up." [Id. at 43–44, 66]. The officers approached Defendant from behind a shield and Defendant, who was not dressed, was ordered to his knees while the officers checked the room for other people. [Id. at 43, 67–68, 70–71]. After Defendant's room was secured, he was allowed to get dressed, and Special Agent Greene took him outside with his parents while the agents finished their security sweep. [Id. at 44]. Special Agent Greene testified that after he got the all clear from the other agents, he took Defendant and his parents back to the same dining room area where they were the previous time. [Id. at 45].

At that point, Special Agent Greene took Defendant down to the basement, advised him that he had an arrest warrant, read Defendant the Miranda warnings, and tried to interview Defendant again. [Tr. at 45–46]. Defendant, however, declined to be interviewed and requested counsel. [Id. at 46; Gov. Ex. 7]. This interaction was also recorded, and a copy was admitted into evidence. [Gov. Ex. 8].

Defendant was then taken back upstairs where he joined his father at the dining room table, his mother having gone upstairs to get ready for work. [Tr. at

14

47].   The search of Defendant's home went more quickly than the previous search because the agents were looking only for new devices that had been obtained since the execution of the first warrant.   [Id.].   Special Agent Greene called up to Defendant's mother stating "hey, there's an arrest warrant.   If you'd like to get dressed, we still have some time.   If you want to go down and talk with . . . him, you can because he's going to be arrested today."   [Id. at 48, 63].   Defendant's mother got dressed and came downstairs and sat with her husband and Defendant at the table, talking as the agents finished conducting the search.   [Id.].   According to Special Agent Greene:

> They talked about regular stuff, and then the conversation started to change as far as why this is happening and why he's continuing this activity.   And then when they started talking about that, that's when I turned the recorder on.

[Id.].   Special Agent Greene recorded the family's conversation while standing in an open threshold near where Defendant was sitting.   [Id. at 49].   At the time that Special Agent Greene made the recording, there were law enforcement officers moving around the house who were visible from the dining room.   [Id.].

Although Special Agent Greene recorded all of the interviews with Defendant, he kept the recording device concealed and never advised Defendant that he was recording him.   [Tr. at 61–62].

15

**B. <u>Discussion</u>**

Defendant argues that his statements and apology letter made during the February search of his home should be suppressed because he was not read his <u>Miranda</u> rights.  [Doc. 38 at 1, 11–26].  As for the conversation between Defendant and his family during the May search that Special Agent Greene secretly recorded, Defendant argues that the statement should be excluded because the agents placed Defendant in a room with his parents for the specific purpose of obtaining an incriminating statement after Defendant had clearly invoked his right to counsel, in violation of <u>Miranda</u>.  [<u>Id.</u> at 2, 26–30].

*1.     February Statements*

According to Defendant, the admissibility of his February statements "rises and falls upon a single legal question: *Was [Defendant] in the custody of the agents during the interrogation?*" [Doc. 38 at 1].  Defendant argues that if he was in custody, law enforcement should have read him his <u>Miranda</u> rights before questioning him.

I begin with the well-settled premise that <u>Miranda</u> warnings are required only when there is a custodial interrogation.  <u>See</u> <u>Stansbury v. California</u>, 511 U.S. 311, 322 (1994).  The Eleventh Circuit has set forth the following standard for determining whether a person is in custody:

16

It is by now undisputed that the right to <u>Miranda</u> warnings attaches when custodial interrogation begins. A defendant is in custody for the purposes of <u>Miranda</u> when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. Whether [a defendant] was in custody . . . depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave. The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant. Under the objective standard, the reasonable person from whose perspective "custody" is defined is a reasonable innocent person.

<u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006) (citations, quotations, and alterations omitted).   Courts must examine "all of the circumstances surrounding the interrogation." <u>Stansbury</u>, 511 U.S. at 322. Factors that courts use to determine whether an interview was custodial include: whether the defendant was told he was free to leave; the tone of voice the officers used in conducting the interview; the location of the questioning; the duration of the questioning; the statements made during the interview; the presence or absence of physical restraints during the questioning; whether the interviewee was released at the end of the questioning; and whether the officers brandished their weapons or touched the suspect during the interview.  See <u>Howes v. Fields</u>, 132 S. Ct. 1181, 1189–90 (2012); <u>United States v. Street</u>, 472 F.3d 1298, 1309 (11th Cir. 2006).  It is the defendant's burden to establish that he was in custody.  See <u>United States v. de la Fuente</u>, 548 F.2d 528, 533 (5th Cir. 1978).

As applied to the facts presented at the evidentiary hearing, these factors weigh heavily in favor of a conclusion that the February interviews were non-custodial. The recording of the interviews shows that both Special Agent Greene and Defendant used a conversational tone throughout the interview. [Gov. Ex. 8]. The interviews took place at Defendant's home, which courts have found to be a less coercive atmosphere than other places because the person is in familiar surroundings. See, e.g., United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006) ("[C]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home."). Although Defendant argues that the agents intentionally isolated him by taking him to the basement away from the family and the open living room, Special Agent Greene testified credibly that the reason they took Defendant to the basement was to give Defendant privacy. The evidence was that Defendant was seated right at the bottom of the stairs where he could have easily left the basement and joined his family upstairs, had he chosen to do so. [Tr. at 27]. There is no evidence that the agents used any physical restraints during the interviews, and Defendant was released at the end of the questioning.

Finally, there is no evidence that the officers brandished their weapons or touched Defendant during the interviews. Special Agent Greene testified—and a

18

photograph taken while Defendant was writing his apology letter on February 13, 2017 confirms—that although he had a weapon during the interview, it most likely was not visible under his polo shirt and softshell jacket.  [Tr. at 23; Gov. Ex. 6]. Perhaps most importantly, Special Agent Greene testified that he told Defendant that he was not under arrest, that if Defendant wanted to leave and sit with his parents he could have left, and that he and the other agents would leave as soon as the search was completed.  [Tr. at 21, 27–28, 56].  There is nothing in the record to show that any of these statements were untrue.  These factors weigh in favor of finding that the Defendant was not in custody.  See United States v. Barry, 479 F. App'x 297, 299 (11th Cir. 2012) (concluding that the interview was not custodial where the defendant was not threatened or physically detained, the agents never brandished their weapons, and the defendant was interviewed calmly in a private area, even though a search warrant was being executed at the time of the interview).

Moreover, the duration of the questioning—ninety minutes for the first interview plus an additional thirty minutes for the second—was not so long as to convert the interview into custodial questioning mandating Miranda warnings.  See United States v. Muegge, 225 F.3d 1267, 1269–71 (11th Cir. 2001) (holding that the suspect was not in custody where he was directed by supervisor to speak with

investigators at a secure site in an interview room with the door closed and was interviewed for approximately two and a half hours); United States v. McDowell, 250 F.3d at 1354, 1363 (11th Cir. 2001) (holding that a four-hour interview was not custodial); United States v. Manta-Carillo, No. 11-00103-CB, 2011 WL 3235757, at *2, 4 (S.D. Ala. July 28, 2011) (finding that the suspect was not in custody for Miranda purposes where, among other things, the interview lasted about an hour and a half).   But even if the first ninety-minute interview was considered lengthy, the fact that Defendant asked for a second interview after ninety minutes of questioning weighs against a finding that the atmosphere was unduly coercive.

Defendant argues that the number of agents present who were conducting the search created a highly intrusive coercive atmosphere that required Miranda warnings.  [Doc. 38 at 20].  Neither the facts nor the law support this assertion as a valid basis for suppressing the statements.  The evidence presented was that only two agents interviewed Defendant, and that the agents told Defendant truthfully that he was not under arrest and that they were going to leave as soon as the search was concluded.  Moreover, the Eleventh Circuit and many district courts in this circuit have held that statements made during the execution of a search warrant may be non-custodial, notwithstanding a large law enforcement presence as part of

20

the search team and/or an initial period during which the person's freedom is temporarily curtailed while the officers secure the premises via a protective sweep. See United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 1991) (noting that even if a person feels constrained not to leave the scene of a police encounter at a particular moment does not necessarily render the person "in custody" for Miranda purposes; the person must understand that his freedom to leave is being curtailed to a degree associated with formal arrest); United States v. Opoku, 210 F. App'x 848, 852 (11th Cir. 2006); United States v. Otoupal, No. 3:16-cr-0010-TCB-RGV, 2016 WL 8668491, at *6 (N.D. Ga. Nov. 18, 2016) (rejecting an argument that an interview given during a search of a residence was custodial because the atmosphere was "police-dominated"); United States v. Giovanni, 313 F. Supp. 3d 1278, 1288 (N.D. Fla. 2018); United States v. Rogers, No. 1:09-CR-544-TWT-ECS, 2010 WL 2721883, at *2 (N.D. Ga. June 9, 2010) (noting that even where a defendant is detained during the execution of a valid search warrant, courts generally decline to find the defendant "in custody" in the absence of other factors indicating a coercive atmosphere).  The evidence in this case simply does not support Defendant's contention that the questioning environment was so coercive that a reasonable innocent person would have believed that his freedom to leave was curtailed to a degree associated with formal arrest.

Having considered the totality of the circumstances presented in this case, I conclude that the interviews of Defendant that occurred during the execution of the February search warrant were non-custodial and that Defendant voluntarily made statements and admissions during those interviews. As such, Defendant's statements are admissible, and the motion to suppress should be denied.

### 2.    May Statements

It is well settled that when a person who has been advised of his or her rights during custodial interrogation requests a lawyer or invokes the right to remain silent, all questioning must cease.  See Arizona v. Roberson, 486 U.S. 675 (1988). The parties agree that the statement that Special Agent Greene recorded of Defendant talking with his parents in May occurred while Defendant was in custody (he had been advised that the officers were executing an arrest warrant and that he was going to be arrested) and after Defendant had invoked his right to counsel.  Thus, the only issue is whether his statements were the product of interrogation. The Supreme Court has defined "interrogation" as encompassing "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Miranda, however, was never meant to apply to all statements taken

by the police after a person has been taken into custody, but only to those statements that result from "express questioning or its functional equivalent." Id. at 300–01. The protections of Miranda, therefore, do not extend to spontaneous, unprompted statements made after a suspect has been taken into custody. Miranda, 384 U.S. at 478; Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous comments by an accused, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government questioning."). Defendant bears the burden of showing that his statement was made in response to law enforcement questioning. See de la Fuente, 548 F.2d at 533 ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.").

Here, during the search of Defendant's home in May, Defendant invoked his right to counsel immediately after being advised of his rights. [Tr. at 34, 46–47]. The evidence shows that the agents did not continue to question Defendant after Defendant invoked his rights. [Id.]. In his post-hearing brief, Defendant argues that by placing Defendant—who was under arrest but not yet in handcuffs—with his parents, the agents did the "functional equivalent" of an interrogation. [Doc. 38 at 26–30].

In Rhode Island v. Innis, the United States Supreme Court held that certain "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect" may amount to the "functional equivalent" of an interrogation.  446 U.S. at 301 (concluding that even though a conversation between two police officers in the defendant's presence resulted in the defendant offering to lead the officers to a buried shotgun, the officers' conversation was not the functional equivalent of an interrogation because there was nothing in the record to suggest that the officers knew that the defendant would make a statement).  Defendant cites to several cases citing to Innis, arguing that that agents should not have placed Defendant at the table with his mother and father after Defendant invoked his right to counsel.  Defendant argues that the agents orchestrated a setting where they knew that the family would talk about the case in the moments before Defendant was taken to jail.  The cases that Defendant cites, however, are all distinguishable because the officers in those cases said something to the suspect (or in the suspect's presence) that led the suspect to make an incriminating statement. See United States v. Ramsey, 992 F.2d 301, 303 (11th Cir. 1993) (holding a statement inadmissible where it was made after the defendant first indicated that he did not wish to answer questions, and thereafter a federal agent continued to encourage the defendant to cooperate);

United States v. Gomez, 927 F.2d 1530, 1536 (11th Cir. 1991) (holding a statement inadmissible because the officer continued to talk to the defendant after the defendant invoked his right to counsel); United States v. Johnson, 812 F.2d 1329, 1331 (11th Cir. 1986) (holding a statement inadmissible where an FBI agent asked a suspect if he would like the federal criminal justice process explained after the suspect invoked his right to counsel).  Here, on the other hand, the conversation appears to have turned to inculpatory topics without any law enforcement help or direction.  The evidence shows that Special Agent Greene did not make any statements to Defendant or his parents after Defendant invoked his right to counsel, other than to give the family an opportunity to speak before Defendant was placed in handcuffs and taken to jail.  There is no evidence that Special Agent Greene knew what they would talk about or that he directed or encouraged any particular topic of discussion.  Special Agent Greene testified that the family initially "talked about regular stuff" and only later did their conversation turn to the Defendant's allegedly criminal online behavior.  There is nothing in the record to suggest that Special Agent Greene knew that Defendant would confess to his family, especially where law enforcement officers were in such close proximity to him.  While there is some evidence in the record to show that Defendant may suffer from a mental

illness,[3] there is no evidence in the record to support an inference that Defendant was more susceptible to making an incriminating statement than any other person might have been.  Defendant has failed to carry his burden of establishing that his statements were the product of the functional equivalent of law enforcement interrogation.  As such, Defendant's statement made during his conversation with his family is admissible, and the motion to suppress it should be denied.

## III.   CONCLUSION

For the reasons stated, I **RECOMMEND** that all the motions discussed herein [Docs. 21, 28, 29] be **DENIED**.  I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

---

[3] Special Agent Greene testified that early in the investigation, he learned that Defendant had suffered some trauma as a child that had affected him mentally and emotionally.  [Tr. at 57].  During the first ninety-minute interview in February, Defendant spoke to Special Agent Green about mental issues that he felt he suffered from, including that Defendant feels that he is a "vessel for different personalities."  [Id. at 30–31, 57].  Special Agent Greene testified that he did not believe that these other personalities "manifested"; rather, when asked direct questions Defendant would simply "get quiet and . . . say Sara says yes[,] Sara says no[,] or Rei says yes."  [Id. at 31–32].  Otherwise, according to Special Agent Greene, the answers were "no different than if I asked somebody a question, and they just hesitated and answered it."  [Id. at 32].  Furthermore, Special Agent Greene stated that Defendant did not seem to be under the influence of alcohol, drugs, or any other medication, nor did Defendant display any other cognitive or mental impairments or difficulty understanding his questions.  [Id.].

**SO REPORTED AND RECOMMENDED**, this 5th day of February, 2019.

CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE