# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

United States of America,

v.                                          Case No. 1:18-cr-00181

Benjamin Jenkins,                           Michael L. Brown
                                            United States District Judge
                    Defendant.

_____/

## OPINION & ORDER

A grand jury indicted Defendant Benjamin Jenkins with thirteen counts of producing child pornography in violation of 18 U.S.C. § 2251(a) and five counts of distributing child pornography in violation of 18 U.S.C. § 2252(a)(2). (Dkt. 1.) Defendant Jenkins filed pretrial motions to exclude (1) records the United States obtained from private companies during the investigation, (2) statements Defendant Jenkins made during the execution of a February 2017 search warrant, and (3) statements he made during the execution of search and arrest warrants in May 2018. (Dkts. 21, 28, 29.) The Magistrate Judge recommended denying each, and Defendant Jenkins filed objections. (Dkts. 44, 47.) The Court agrees with the Magistrate Judge and denies Defendant Jenkins's motions.

## I. Legal Standard

A district judge has a duty to conduct a "careful and complete" review of a magistrate judge's report and recommendation ("R&R"). *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (per curium). When a party files objections to an R&R, the district court must review de novo any part of the disposition that is the subject of a proper objection. 28 U.S.C. § 636(b); FED. R. CIV. P. 72(b). A court reviews all other portions of the R&R for clear error. *See United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curium).

In filing objections to an R&R, "parties . . . must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009). Without proper objections, the Court "may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## II. Factual Background

In February 2016, a military servicemember in Ft. Sill, Oklahoma, told military police that an unknown 21-year-old male had exchanged

pornographic pictures with his 13-year-old daughter and extorted her into sending more pornographic images. (Dkt. 47 at 2.) Military investigators transferred the case to Homeland Security Investigations ("HSI"). (*Id.*)

Agent Browning, an investigator with HSI, requested records from Kik Interactive, Inc., a messaging application the suspect had used to communicate with the girl. (*Id.*) With a subpoena authorized by 18 U.S.C. § 1509, Browning sought "user/subscriber information, device related information, Kik account information, country setting and any user location information, as well as connection records and IP address records/logs from August 1, 2015 at 0001 hours to February 29, 2016 at 1700 hours" for various screennames used in the "sextortion." (*Id.*) Kik provided internet protocol ("IP") address information and the user's address, date of birth, and device. (*Id.* at 4.)

Agent Browning then obtained records from Comcast Cable and Sprint Corporation, including the subscriber and billing information and IP logs for the relevant IP addresses. (*Id.* at 3.) Agent Browning next obtained a search warrant for the Apple iCloud account — reithe8th@icloud.com — to which the young girl had sent nude images

and videos of herself.  (*Id.* at 5.)  The search warrant sought information constituting contraband, fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 2251(a), 2252, and 2252A.  (*Id.*)

While all this was going on, a woman in Illinois called police to report that someone was threatening to distribute nude photographs of her 15-year-old daughter.  (*Id.* at 6.)  The daughter provided law enforcement the same iCloud account that the Oklahoma investigator had identified.  An Illinois judge also issued a search warrant for the account. (*Id.* at 7.)

Special Agent ("SA") Greene works for the Atlanta-based Child Exploitation Investigations Group at HSI.  (Dkt. 44 at 7.)  At some point before February 2017, he received investigative leads from law enforcement officers in both Oklahoma and Illinois about their investigations, specifically that Defendant Jenkins had been exchanging pornographic photographs with children through the internet, text messaging, and social media from his home at 5175 Silhouette Lane in Mableton, Georgia.  (*Id.* at 7–8.)  SA Greene obtained a search warrant for Defendant Jenkins's house.

In February 2017, SA Greene and other officers executed the search warrant. They knocked on the door between 6:00 a.m. and 6:30 a.m. (Dkts. 34-15, 34-17.) Mrs. Jenkins, Defendant's mother, answered the door, and SA Greene explained they had a search warrant. (Dkt. 34 at 18–19.) Mr. Jenkins, Defendant's father, joined the officers and Mrs. Jenkins downstairs. SA Greene asked Mr. Jenkins to wake up his sons who were sleeping upstairs. (Dkt. 34-19.) When they did not respond to their father, SA Greene, two or three other agents, and Mr. Jenkins went upstairs. (Dkts. 34-19, 34-20.) Agents went into the sons' bedrooms, woke them up, searched for weapons, and escorted them downstairs. (Dkt. 34-20.) Back in the dining room, SA Greene told the family that no one was under arrest, that they had a search warrant for the house, and wanted to talk with them. (Dkt. 34-21.)

He also explained that agents were going to make a safety sweep of the house to ensure there were no weapons present. (*Id.*) Other agents conducted the sweep, which lasted no more than ten minutes. (Dkts. 34-21, 34-23, 34-24.) Agents had their weapons drawn during the search but holstered them or placed them in their cars immediately afterwards. (Dkt. 47 at 8.)

SA Greene told the family he wanted to interview Defendant Jenkins and suggested they go to the basement away from the family since the discussion would concern topics of a sexual nature. (Dkt. 34-26.) Defendant Jenkins sat at a desk near the bottom of the stairs, closest to the stairway. Since he did not intend to arrest Defendant Jenkins and had already told him that, SA Greene did not advise Defendant Jenkins of his *Miranda* rights. During the interview, SA Greene again said he was not going to arrest Defendant Jenkins that day. (Dkt. 44 at 13.) Neither SA Greene nor anyone else handcuffed Defendant Jenkins or restrained him in any way. (Dkt. 42 at 6.)

The interview lasted about ninety minutes. (Dkt. 34-28.) SA Greene realized Defendant Jenkins has mental health issues — including a belief he is the "vessel" for several personalities — but also found Defendant Jenkins's answers appropriate to the questions asked. (Dkt. 42 at 6.) SA Greene sometimes changed his questions to ask which personality was answering. SA Greene also provided Defendant Jenkins with a Consent to Assume Online Identity Form, which Defendant

Jenkins signed after Greene explained it to him.[1]  After the interview, Defendant Jenkins returned to his family while agents continued searching the house.

Sometime later, another agent told SA Greene that Defendant Jenkins wanted to speak with him again.  When SA Greene and Defendant Jenkins returned to the basement, Defendant Jenkins explained that he was concerned for a friend and was worried she may become distraught if she lost contact with him.  (Dkt. 47 at 11.)  While in the basement, Defendant Jenkins wrote out an apology letter, referencing "my selves."  (Dkt. 34-38.)  The second interview lasted about thirty minutes.  (Dkt. 34-40.)

Then in May 2018, SA Greene returned to the Mableton house to execute another search and arrest Defendant Jenkins.  (Dkt. 34-41.)  Mrs. Jenkins answered the door again and agents asked her and her husband to step outside.  (Dkt. 34-43.)  Agents went upstairs to arrest Defendant Jenkins with weapons drawn and a lighted shield.  (*Id.*)  Agents woke

---

[1] Apart from contesting the custodial nature of the entire interview, Defendant Jenkins does not contest the voluntariness of his consent on this form.

him up, allowed him to dress, and escorted him from the house. (Dkt. 47 at 12.)

Following a security sweep, SA Greene again took Defendant Jenkins to the basement for an interview. (*Id.* at 13.) This time, SA Greene advised him of his *Miranda* rights. (*Id.*) Defendant Jenkins invoked his right to counsel, and SA Greene stopped trying to interview him. (*Id.* at 12–13.) They went back upstairs, and Defendant Jenkins joined his father at the dining room table.

At that point, Mrs. Jenkins was upstairs getting ready for work. (*Id.* at 13.) SA Greene told her that he was going to arrest her son and allowed her to speak with him before doing so. (*Id.*) She came downstairs to speak with him. (*Id.*) Several law enforcement officers were in the area, visible to Defendant Jenkins as they conducted the search. (Dkt. 44 at 15.) SA Greene, who had been standing in the threshold between the dining room and the hallway, turned on his recorder and recorded Defendant Jenkins's conversation with his mother before handcuffing Defendant Jenkins and taking him into custody. (Dkt. 47 at 13.)

## III. Discussion

### A. *Carpenter* Motion

Defendant Jenkins moved to suppress records produced by Kik, Comcast, and Sprint based on the Supreme Court's recent opinion in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). (Dkt. 29 at 1.) Defendant Jenkins argues that he had a reasonable expectation of privacy in the IP address and other subscriber information maintained by those companies. Because Agent Browning sought no search warrant before obtaining that information, Defendant Jenkins claims the later search warrants based on that information (specifically the warrants for the iCloud account, the Mableton home, and cellular devices in the home) were invalid. The Magistrate Judge recommended denial of Defendant Jenkins's motion, finding *Carpenter* inapplicable. (Dkt. 44 at 7.) Defendant Jenkins objected. (Dkt. 47 at 1.) This Court agrees with the Magistrate Judge.

In *Carpenter*, the Supreme Court held an individual maintains a legitimate expectation of privacy under the Fourth Amendment in cell-site location information ("CSLI") maintained by a cell phone service provider. 138 S. Ct. at 2218. The Court noted that, as people move about,

their cell phones bounce signals off cell sites with or without their knowledge or even use of the phone. *Id.* at 2211. This technology tracks an individual's movement with near GPS-level precision. *Id.* at 2218 (noting that CSLI "tracks nearly exactly the movements of its owner"). The Court explained that "[a] cell phone faithfully follows its owner beyond public thoroughfares and into private residents, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* The Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movement as captured through CSLI." *Id.* at 2217. The Court then held that the government's acquisition of cell site records was a search under the Fourth Amendment and thus typically requires a search warrant. *Id.* at 2220–22. The Supreme Court explicitly limited its holding to CSLI records because they track an individual's movements — a decision the Supreme Court described as "narrow." *Id.* at 2220.

Defendant Jenkins does not claim the government obtained CSLI records without a warrant. Instead, he claims the government needed a warrant for other records Kik, Sprint, and Comcast provided law enforcement, specifically user and subscriber information for specific Kik

accounts, user and subscriber information for accounts using specific IP addresses, location information, device information, IP address records and logs over a six month period, records of session times and durations, and telephone numbers associated with IP addresses on specific dates and times. (Dkt. 29 at 3–4.)

Defendant Jenkins has not shown that these records contained the type of precise location information the Supreme Court held subject to an individual's legitimate expectation of privacy. He has not shown, for example, that this information tracks a person's movement with near "GPS-level precision" like the CSLI in *Carpenter*. *See* 138 S. Ct. at 2219. He has not shown that it tracks a person's movements from a public thoroughfare "into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* at 2218. He has not shown that it enables the government to obtain "near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.*

Some records at issue merely provide the subscriber (and possible user) of a cell phone or Kik account. Law enforcement needs no warrant to obtain that information. *See Rehberg v. Paulk*, 611 F.3d 828, 843 (11th

Cir. 2010) (collecting cases concluding that individuals lack legitimate privacy expectation in internet subscriber information and IP addresses). Other records provide an IP address for different internet sessions. IP address information merely shows the location at which a device accesses the internet during a specific session. It does not follow that person around. Indeed, it does not even identify the user, just the location of internet access. *In re BitTorrent Adult Film Copyright Infringement Cases*, 296 F.R.D. 80, 84 (E.D.N.Y. 2012) ("An IP address provides only the location at which one of any number of computer devices may be deployed, much like a telephone number can be used for any number of telephones.").

Obtaining information from Kik, Sprint, and Comcast did not allow law enforcement to track Defendant Jenkins's physical location over an extended period. At most, it allowed them a lead in identifying him — giving possible usernames or addresses at which someone communicated with the two young girls. SA Greene testified that the information gleaned from the third-party information merely suggests which home or router is receiving that internet signal during the specified date and time. (Dkt. 34 at 12:2–10.) The agents then need to conduct more thorough

surveillance on the address, cross-referencing the information from the surveillance with publicly available information to see if there is a match. (*Id.* at 13:19–25.) This case does not implicate the sort of location surveillance that concerned the Supreme Court in *Carpenter*.

Since *Carpenter*, other courts have almost unanimously concluded that the Supreme Court's rationale does not require agents to obtain a warrant when seeking IP address information. *See, e.g.*, *United States v. Monroe*, 350 F. Supp. 3d 43, 47 (D.R.I. 2018) (holding *Carpenter* inapplicable to defendant's motion to suppress his IP address and fruits of search); *United States v. McCutchin*, No. CR-17-01417-001-TUC-JAS (BPV), 2019 WL 1075544, at *4 (D. Ariz. Mar. 7, 2019) (adopting R&R recommending denial of motion to suppress information from IP addresses); *United States v. Felton*, No. 6:18-185-1, 2019 WL 659238, at *5 (W.D. La. Feb. 15, 2019) (denying defendant's motion to suppress and holding no reasonable expectation of privacy in IP address and related information). In *Carpenter*, Justice Kennedy even clarified that the Court's opinion should not be interpreted to require a warrant for IP address information. *Carpenter*, 138 S. Ct. at 2234 (Kennedy, J., dissenting) ("[N]othing in its opinion even alludes to the considerations

that should determine whether greater or lesser thresholds should apply to information like IP addresses or website browsing history.").

In support of its recommendation, the Magistrate Judge cited *United States v. Monroe*, 350 F. Supp. 3d 43 (D.R.I. 2018). As noted above, the court in *Monroe* concluded that *Carpenter* did not require agents to get a warrant when seeking IP address information. Defendant Jenkins claims that case is irrelevant because the "information sought and obtained in [his] case is significantly different than the [information] obtained in" *Monroe*. (Dkt. 47 at 16.) His distinction is irrelevant. In *Monroe*, the defendant objected to the production of his IP address — the same information Defendant Jenkins identified here. Although the government admittedly received "an incredible amount of information" from its summonses here, the IP address was merely one link held by a third party in a chain of information that may lead to a particular person. As the *Monroe* court noted, "it [did] not reveal the kind of minutely detailed, historical portrait of 'the whole of a person's physical movement'

that concerned the Supreme court in *Carpenter*." 350 F. Supp. 3d at 49 (citing *Carpenter*, 138 S. Ct. at 2219).[2]

Defendant Jenkins had no reasonable expectation of privacy in an IP address assigned by the Internet Service Provider or any of the other information acquired from Kik, Comcast, or Sprint. The government thus needed no warrant to obtain the information. Because the Court finds Defendant Jenkins had no reasonable expectation of privacy, it need not consider whether the good-faith exception to the exclusionary rule applies. Even so, for the reasons set forth by the Magistrate Judge, this Court also concludes that — if the agents needed a warrant — they acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment. So the United States would be entitled to the benefit of the good-faith exception to the exclusionary rule set forth

---

[2] In both his initial brief and his objections, Defendant Jenkins references Agent Browning's statement in the summonses that he was seeking the information as part of investigations about duties, taxes, fines, "and/or to ensure compliance with the laws or regulations administered by CPB or ICE." (Dkt. 47 at 3.) The R&R noted that the U.S. Customs Service routinely investigates the possession or distribution of child pornography and Defendant Jenkins did not challenge the summonses as beyond U.S. Customs Service's jurisdiction and authority. He also raises no such claim in his objections.

in *United States v. Leon*, 468 U.S. 897, 918 (1984). The Court denies Defendant Jenkins's motion to suppress the search warrants.

**B.    Motions to Suppress Statements**

Next, the Magistrate Judge carefully considered Defendant Jenkins's motions to suppress both of his statements and recommended denying both. Defendant Jenkins objected to that recommendation. He claims he was in custody during the February 2017 interview in the basement of his house. Because SA Greene did not advise him of his *Miranda* rights, he claims the Court should suppress that statement. He also claims SA Greene's surreptitious recording of his May 2018 conversation with his mother after he had invoked his *Miranda* rights was the functional equivalent of an interrogation and subject to suppression. The Court disagrees and denies both motions. (Dkts. 21, 28.)

**1.    February 2017 Statements – "In Custody"**

Because SA Greene admits he did not *Mirandize* Defendant Jenkins before the February 2017 interview, the admissibility of Defendant Jenkins's statement on that day turns on a single legal question: whether he was in custody. (Dkt. 38 at 1.) The Eleventh Circuit

has articulated the guiding standard for determining when an individual

is in custody:

> It is by now undisputed that the right to *Miranda* warnings
> attaches when custodial interrogation begins. A defendant is
> in custody for the purposes of *Miranda* when there has been
> a formal arrest or restraint on freedom of movement of the
> degree associated with a formal arrest. Whether [a defendant]
> was in custody prior to his formal arrest depends on whether
> under the totality of the circumstances, a reasonable man in
> his position would feel a restraint on his freedom of movement
> to such extent that he would not feel free to leave. The test is
> objective: the actual, subjective beliefs of the defendant and
> the interviewing officer on whether the defendant was free to
> leave are irrelevant. Under the objective standard, the
> reasonable person from whose perspective "custody" is
> defined is a reasonable *innocent* person.

*United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (internal

quotation marks and citations omitted) (alterations adopted).

A court may consider many factors in assessing the totality of the

circumstances, including (1) the location and duration of the questioning,

(2) the presence of physical restraints, (3) the release of the individual at

the end of the interrogation, (4) whether officers brandished weapons,

(5) whether officers used language or a tone suggesting compliance could

be compelled, and (6) if the officer told the suspect he was not in custody

and that he was not going to arrest the suspect. *See Howes v. Fields*, 565

U.S. 499, 508–509 (2012); *United States v. Street*, 472 F.3d 1298, 1309

(11th Cir. 2006); *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006). Because the test is objective, the subjective beliefs of the defendant and the interviewing officers about whether the defendant was free to leave are irrelevant. *See Berkemer v. McCarty*, 468 U.S. 420, 442 n.35 (1984). The defendant bears the burden of establishing that he was in custody. *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).

The Court has carefully considered the record, including those facts discussed during the evidentiary hearing and specifically outlined by Defendant Jenkins in his objections to the Magistrate Judge's recommendation. The Court agrees with the Magistrate Judge: Defendant Jenkins was not in custody when he made the February 2017 statements and wrote the apology letter.

The restraint on Defendant Jenkins's freedom of movement was not "of the degree associated with a formal arrest." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984). As the Eleventh Circuit has repeatedly explained, "although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment — and thus may be deemed to have been 'seized' by law

enforcement — he will not necessarily be considered in 'custody' for Fifth Amendment purposes." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) (citing *Street*, 472 F.3d at 1310). Defendant Jenkins was in "the familiar and comfortable surroundings" of his home. *See Brown*, 441 F.3d at 1349. Although he claims the "unfinished" nature of the basement made it less like home, it still had a couch, television, table, a desk, and chairs. (Dkt. 34 at 27:20–28:7.) The lack of drywall or additional furnishings is irrelevant. Defendant Jenkins was, as a matter of fact, in his home, steps away from his parents. It was a familiar setting. He was neither physically restrained nor otherwise touched by the officers, but rather sat in a chair at a desk, closest to the stairway exit. *See Howes*, 565 U.S. at 515; *Street*, 472 F.3d at 1309.

While SA Greene may have had his weapon in his waistband, he never brandished it or pointed it at Defendant Jenkins. *See Luna-Encinas*, 603 F.3d at 881. No evidence suggests SA Greene's language or tone was coercive, threatening, or suggested Defendant Jenkins's compliance could be compelled. *See Street*, 472 F.3d at 1309. The duration of the interviews was not so lengthy as to convert the encounter into a custodial one. *See United States v. McDowell*, 250 F.3d 1354, 1363

(11th Cir. 2001) (holding interrogation lasting "approximately four hours" was non-custodial). After the initial interview, Defendant Jenkins asked to speak with SA Greene a second time. That he felt comfortable enough to do so further buttresses the noncustodial nature of the interview.

Defendant Jenkins must show that the restrictions on his freedom of movement rose to the degree associated with a formal arrest. Rather than trying to do so, he focuses on "the show of force" used to execute the warrant. He claims "[t]he show of force when the agents searched his house surely suggests that [Defendant Jenkins] was not free to leave." (Dkt. 47 at 21.) Any "show of force" by law enforcement occurred during the security sweep while officers were securing the home before the execution of the search warrant. That activity did not carry over to the determination of whether Defendant Jenkins was in custody later when the officers interviewed him in the basement. The law permits law enforcement to restrict the movement of people present during the execution of a search warrant to ensure officer safety and to prevent the possible destruction of evidence. *See Luna-Encinas*, 603 F.3d at 881–82 (holding defendant not in custody during or after protective security

sweep). And of course, here, SA Greene spoke with the family in the dining room after the security sweep while the search was being conducted. (Dkt. 34 at 27:23, 28:9–10.) He assured them he was not going to arrest anyone, repeating the same in the basement when the interview began. (*Id.* at 28:1–2.) SA Greene's actions certainly cutoff any initial shock from the so-called "show of force."

The Court overrules Defendant Jenkins's objections to the Magistrate Judge's recommendation and denies the motion to suppress his February 2017 statements.

### 2. May 2018 Statements – "Functional Equivalent"

Defendant Jenkins also objects to the Magistrate Judge's conclusion that his conversation with his mother before his May 2018 arrest was not the functional equivalent of an interrogation. Defendant Jenkins argues that the Court should exclude the statement because — knowing that he had already invoked his *Miranda* rights — agents placed him in a room with his parents for the specific purpose of obtaining an incriminating statement. Indeed, SA Greene went upstairs to offer Defendant Jenkins's mother the opportunity to speak with him. (*Id.* at 48:2–5.) Defendant Jenkins claims that "surely the agent knew that the

Jenkins family would discuss the case" and that placing Defendant Jenkins in the dining room with his family was the functional equivalent of interrogation.  (Dkt. 47 at 24.)

In *Rhode Island v. Innis*, the Supreme Court recognized that the *Miranda* safeguards come into play whenever a person is subject to express questioning or its "functional equivalent."  446 U.S. 291, 300 (1988).  The Court held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Id.* at 301.  In *Innis*, police officers arrested the defendant for armed robbery and murder.  *Id.* at 294. The defendant had no weapon and invoked his *Miranda* rights.  *Id.*  While in the defendant's presence, the arresting officers had a short conversation about their fear that a child might find the defendant's loaded weapon and kill someone by accident.  *Id.* at 294–95.  The defendant interrupted the officers and directed them to where he had hidden his gun.  *Id.* at 295.  The Supreme Court held that the officers' short exchange was not the functional equivalent of an interrogation.  *Id.*

at 302.  The Court held that it was not "reasonably likely" the defendant would respond to the officers' conversation.  *Id.* at 303.  In reaching this conclusion, the Court noted that the officers had not "carried on a lengthy harangue in the presence of the suspect" or used "particularly evocative" comments.  *Id.*

Here, the agents went nowhere near as far as the officers in *Innis*. SA Greene simply allowed Defendant Jenkins to speak with his mother before being arrested and taken to jail.  The agents said nothing to him, nothing to her, and nothing to each other in their presence.  They simply did nothing to evoke an incriminating statement.  A reasonable officer could have assumed they would say goodbye, offer each other reassurance, or engage in some other mother-son conversation appropriate to the situation.  No officer would have thought the opportunity to say goodbye was *reasonably likely* to elicit an incriminating response from Defendant Jenkins — the standard required by *Innis*.  This is particularly true as the officers remained in plain view as the two spoke.  They did not hide behind a corner or door looking to eavesdrop.

Defendant Jenkins cites several cases addressing the "functional equivalent" doctrine.  (Dkt. 38 at 29–30.)  But as the Magistrate Judge properly noted, in each of those cases, the officers said something to the suspect or in the suspect's presence that caused the suspect to make an incriminating statement.  *See United States v. Ramsey*, 992 F.2d 301, 305 (11th Cir. 1993) (holding statement inadmissible when made after defendant invoked right to remain silent and agent continued encouraging cooperation); *United States v. Gomez*, 927 F.2d 1530, 1536–37 (11th Cir. 1991) (holding statement inadmissible because officer continued to talk to defendant after he invoked his right to counsel); *United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir. 1986) (holding statement inadmissible where agent asked suspect if he would like the federal criminal justice process explained after suspect invoked right to counsel).  That did not happen here.  As it was not the functional equivalent of an interrogation, Defendant Jenkins's motion to suppress his statement to his mother is denied.

## IV.  Conclusion

The Court **OVERRULES** Defendant Jenkins's Objections (Dkt. 47), **ADOPTS** the Magistrate Judge's Report and Recommendation (Dkt.

44), and **DENIES** Defendant Jenkins's Motion to Suppress Statements (Dkt. 21), Amended Motion to Suppress Statements (Dkt. 28), and Amended Motion to Suppress Evidence (Second) (Dkt. 29).

    **SO ORDERED** this 11th day of April, 2019.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE