```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3   UNITED STATES OF AMERICA,      )
                                    )
 4                 Plaintiff,       )   CRIMINAL ACTION FILE
              v.                    )   NO. 1:18-CR-00181-MLB
 5                                  )
     BENJAMIN JENKINS,              )
 6                                  )
                   Defendant.       )
 7   _____)

 8

 9
     ------------------------------------------------------------
10
               BEFORE THE HONORABLE MICHAEL L. BROWN
11                   TRANSCRIPT OF PROCEEDINGS
                        SEPTEMBER 17, 2019
12
     ------------------------------------------------------------
13
     APPEARANCES:
14
     For the Plaintiff:        OFFICE OF THE U.S. ATTORNEY
15                             (By:  Paul Jones and
                                     Libby Skye Davis)
16
     For the Defendant:        FEDERAL DEFENDER PROGRAM, INC.
17                             (By:  Sarah M. Timmers)

18

19
             Proceedings recorded by mechanical stenography
20             and computer-aided transcript produced by

21
                 JANA B. COLTER, RMR, CRR, CRC
22                   Official Court Reporter
                     2394 U.S. Courthouse
23                   75 Ted Turner Drive, SW
                     Atlanta, Georgia  30303
24                      (404) 215-1456

25
```

1                          _  _  _

2                    P R O C E E D I N G S

3        (Atlanta, Fulton County, Georgia, September 17, 2019, in

4    open court.)

5

6        THE COURT:  Okay.  We are here in *United States v.*

7    *Benjamin Jenkins,* 18-CR-181.  Can I have appearances, please?

8        MR. JONES:  Paul Jones and Skye Davis on behalf of

9    the United States Attorney's Office, Your Honor.  With us also

10   is Special Agent Eric Greene, and in the back our paralegal,

11   Kim Layton.

12       THE COURT:  Tell me his name again.

13       MR. JONES:  Eric Greene.

14       THE COURT:  Greene, okay.

15       MR JONES:  There's an "e" at the end of Greene,

16   G-R-E-E-N-E.

17       THE COURT:  Okay.  And for the defendant.

18       MS. TIMMERS:  Sarah Timmers, the defense counsel for

19   the defendant, Benjamin Jenkins.

20       THE COURT:  Great.  Okay.  There is an outstanding

21   motion in limine by the government.  I have reviewed all of the

22   pleadings on that and we'll talk about that in a moment.  What

23   I'd like to do today is sort of go over what to expect -- I

24   don't think we'll be with each other until the jury trial that

25   is set for a couple of weeks from now.  And so I thought we

1   would talk about the way that would proceed.  We can talk about

2   anything else anybody wants talk to about, too.

3          Any pressing issues that either party wants to bring

4   up?

5          MR. JONES:  Not a pressing issue, Your Honor, but

6   just to make a record for it, so there is a written record of

7   it.  The government had extended a plea offer to Mr. Jenkins,

8   he rejected the offer, so -- which is why we're going to trial.

9   That's all I just wanted to get on the record, Your Honor.

10         THE COURT:  Anything you want to say about that,

11  Ms. Timmers?

12         MS. TIMMERS:  No, Your Honor.

13         THE COURT:  Is there still any chance of this case

14  being resolved?

15         MR. JONES:  Our plea offer expired a few weeks ago,

16  Your Honor, so not under -- not what was previously offered.  I

17  don't -- I don't anticipate this being resolved without a

18  trial, Your Honor.

19         MS. TIMMERS:  Well, hope springs eternal for defense

20  counsel.

21         THE COURT:  Okay.  All right.  All right.  So let's

22  just get maybe started with the nuts and bolts and then we'll

23  get to the more substantive information.

24         I plan on seating a jury of 14, which gives us two

25  alternates to be released during the deliberation.  To get

1 │ there, I plan on bringing in 40 jurors.  Does anybody think

2 │ that will not be enough?

3 │          MR. JONES:  This, Your Honor, will be I think my

4 │ fifth trial, fourth or fifth trial involving a charge of child

5 │ sexual exploitation, the first one involving producing the

6 │ child pornography.  The last one I had, I think Judge Batten

7 │ brought in that same number of jurors.  We were able to select

8 │ a jury from that.  I bring that up because previously, my first

9 │ trial was 12 years ago.  Judge Thrash had a very large number

10 │ of jurors and so many of them said that there's no way they

11 │ could ever sit on this type -- on that type of trial, but as

12 │ the years have gone by and since I've had more trials, it seems

13 │ that the number of people who just adamantly say because of for

14 │ whatever reason that there is no way they could ever sit on

15 │ that type of trial has shrunk.  I think 40 should be enough, if

16 │ it's possible to bring in maybe just a few more just to be

17 │ safe, that might be good in case we do have some extra jurors

18 │ who say they do not want to deal with this type of subject

19 │ matter.

20 │          THE COURT:  So we have six strikes and ten strikes,

21 │ right?

22 │          MR. JONES:  Yes, Your Honor.

23 │          THE COURT:  We need 14, that gets us to 30.  And that

24 │ gives us 30 people to be excused for cause.  I think he's

25 │ probably right.

1          COURTROOM DEPUTY:  You need two additional for the

2   alternates, so it would be 16 plus 12, which is 28.

3          THE COURT:  Right.

4          COURTROOM DEPUTY:  Plus two alternates plus two

5   strikes, which is 32.

6          THE COURT:  32.  You're right.  So that only gives us

7   a cushion of eight.  We'll bring in more jurors than that.

8          We will seat the jurors on these rows starting here

9   (indicating) and then going over there (indicating).  The way

10  that I typically do it is I will read out to the jury or the

11  panel some introductory information, then I provide to them

12  basic qualifying questions.  I think they're on the website.

13  Have y'all seen our qualifying questions?

14          MR. JONES:  Yes, Your Honor.

15          MS. TIMMERS:  Yes.

16          THE COURT:  Okay.  There's nothing special about

17  them.  If anybody wants something added to it, let me know and

18  I will do so.  Of course, that means I have to have a witness

19  list at least by that morning of all potential witnesses so we

20  can qualify the jury against the witness list.  I know you-all

21  will be giving it earlier than that, but I need to make sure

22  I've got a very comprehensive witness list to qualify the jury

23  against.  If you want to add anything to the qualifying

24  questions, I'm happy to do so, just let me know.

25          Before I do the qualifying questions, I typically

1   read to them some background information about the case.

2              Have we provided that to them?

3              COURTROOM DEPUTY:  Yes, sir.

4              THE COURT:  Have you-all seen the case summary?

5              MR. JONES:  Yes, Your Honor.

6              THE COURT:  Does anybody have any objections to that?

7              MR. JONES:  The government doesn't, Your Honor.

8              THE COURT:  I just think it's important to provide

9   them that context so that when they're asking the background

10  questions or what I call the qualifying questions, they will

11  get it.

12             Then we will have each person, going down the row,

13  will stand up and will go through the background questions

14  question by question.  Okay?  They each have a copy of it.  The

15  purpose of that is it loosens them up a little bit for talking

16  with you-all if just each one of them stands up and says a

17  little bit about themselves.  If there's something you don't

18  want on here, let me know, and I'll take that question off.  If

19  there's something you want me to put on so that you don't have

20  to ask it, let me know that as well and I'll add that.  It's

21  just it really gets the jurors a little bit loosened up to when

22  you-all ask them questions, you might actually get responses

23  rather than blank stares.  Okay?

24             After that, I will allow you-all the time you want to

25  ask your questions.  I don't really review the questions that

1  you-all want to ask.  Just keep in mind it's a time to

2  determine whether these folks are qualified for the jurors, not

3  to test out themes, preview or get people to agree to

4  something.  I've had a case recently, a civil case, where

5  somebody tried to get people to agree to what a contract would

6  be, and, you know, that's not the time for that.  But I think

7  y'all probably know what to do.

8           I don't put time limits on how long you want to spend

9  on doing it.  You now, you-all kind of know better than I do.

10  And you might have a reason to go longer than you think you

11  will.  So I don't put any time limits on that.

12          At some point during the morning, we will have the

13  jury go out and we will do for-cause challenges.  I'll also of

14  course offer them the opportunity of giving us information more

15  privately, so that will be an opportunity.

16          So at that break, what I typically do is I have the

17  people who have said they'd like to speak private stay right

18  out front and then bring them back in one at a time, finish up

19  with what we've got to get from them, let them go back out and

20  then we'll do for-cause challenges.  Okay?

21          Then I'll give y'all time to talk amongst yourselves

22  about how you want to exercise your strikes.  I will bring the

23  jury back in and I will probably give you another couple

24  minutes now that you can actually see them face-to-face.  I

25  always find that if you do it on paper, it's harder than if you

1  see them and you can really get a feeling for what you want, so

2  I'll probably give you a couple more minutes, five or six more

3  minutes with them in the courtroom before you start exercising

4  your strikes.

5          The exercising of strikes, I would anticipate we

6  start with the government and go back and forth.  You can

7  strike forward, you can strike backwards, you can strike in any

8  order you want, it makes no difference to me.  You don't have

9  to use all of your strikes.  The first 12 jurors will be our

10 jury, and then we'll pick from the next four for our alternates

11 or six for alternates?

12          COURTROOM DEPUTY:  Four.

13          THE COURT:  Four for alternates okay?  Make sense?

14          MR. JONES:  It does, Your Honor.

15          THE COURT:  Any questions about that process?

16 Request to do it a different way, anything like that?  I'm not

17 wedded to it, it's just the way I like doing it.  I'll do it

18 any way y'all want.  Well, most any way you want.

19          MR. JONES:  No issues from the government,

20 Your Honor.

21          THE COURT:  Okay.  That's kind of what I wanted to

22 talk about that.  How many days do we expect this case to go?

23          MR. JONES:  We declared it a medium case, Your Honor,

24 I think, but it's definitely not going to go a full two weeks.

25 We think it's probably going to spill a little bit into the

1    second week, especially now that we're starting on Tuesday, but

2    just out of an abundance of caution, I'm going to say that we

3    would expect that it's at least going to go to the jury by the

4    end of that Tuesday, October 8th.

5          I have had issues with underestimating trials in the

6    past, which I know is a dangerous part of the Court, but I

7    would think with six trial days, we're definitely going to get

8    it done then, or at least have it to the jury by then.

9          THE COURT:  Yes.  I also don't, by the way, put time

10   limits on openings and closings.  She's looking at me now

11   because the last time I didn't do that, last week somebody went

12   on for 89 minutes, I think it was.  I don't know what he was

13   looking at when he was talking, because the jury was clearly

14   done listening after about 45 minutes.  I don't think y'all

15   would do that.  I mean, this is a big issue, it's a very

16   serious case.  If you want to take five more minutes or talk

17   slower, it makes no difference to me.  We ought to just take

18   the time we need to do it.  So I don't put time limits on it,

19   everybody is telling me to put time limits on it, and maybe

20   some day I'll put time limits on it.  If that guy is ever back

21   in court, there's going to be time limits, but other than that.

22   Okay?  Any questions or thoughts about the process?  Yes?

23         MS. TIMMERS:  Your Honor, this is just kind of a

24   scheduling thing.  I know that Mr. Jones said he expected the

25   trial to go over into the next week.  I do have -- it's a small

1  hearing that's scheduled in front of Judge Walker at 10:00 on

2  the 7th that was just scheduled today, it was just a bond

3  revocation hearing.  Anyway, I just wanted to know if this

4  Court would allow me to do that hearing if this trial does --

5            THE COURT:  Why don't we see how it is.  We'll work

6  it out.  It's a bond hearing for somebody?

7            MS. TIMMERS:  A revocation hearing in front of

8  Judge Walker.

9            THE COURT:  It's not one of my cases, by chance?

10           MS. TIMMERS:  Okay.

11           THE COURT:  We'll work it out with Judge Walker.  If

12  we have to have a short recess, we'll do that.  It makes no

13  difference.  Okay?

14           You know, I try not to have a lot of bench

15  conferences, if we can avoid it.  I think the jury wants to

16  have testimony most of the time.  I typically start around

17  9:00, and we take a break halfway through the morning for 15

18  minutes or so and then we take a lunch break and then the same

19  thing in the afternoon.

20           You know, we can start at 9:30, if you'd prefer, but

21  end around 5:00 or 5:30.  What I typically ask is that you

22  anticipate issues.  It's real easy for us to come in earlier in

23  the morning or stay later at night, that's not a big deal.

24           Where are we on jury instructions?

25           MR. JONES:  We have not filed any, Your Honor.  And

1  does the Court prefer we get together and file joint and if

2  there is any issue that we don't agree on, then direct that to

3  the Court?

4           THE COURT:  I think the way to do it is to redline

5  them.  Right?  I think that if you can provide -- if one party

6  wants to provide their requested instructions to the other side

7  and then the other side can then in a redline either object and

8  strike out or insert what they want instead, if we're all

9  working off the same document, it just makes it so much easier.

10  Does that make sense?

11           MR. JONES:  That does, Your Honor.

12           MS. TIMMERS:  Redlining meaning as in cross out and

13  italicize?

14           THE COURT:  Yeah, like, you know, the function on

15  Word that's -- it's just track changes I guess it's called.

16           MS. TIMMERS:  Okay.

17           THE COURT:  So that way, you know, it's real easy for

18  to us see what the disputes are, and we're all then working

19  from one document.  Does that make sense?

20           MS. TIMMERS:  Yes.

21           MR. JONES:  Yes.

22           THE COURT:  And if we file, if whoever does it, the

23  first drafter files their draft and then whoever puts their

24  objections files their draft, we have a record of what the

25  objections were, and we can just keep filing those as we go

1  along.  Does that make sense?

2          MR. JONES:  Yes, Your Honor.

3          MS. TIMMERS:  I think so.

4          THE COURT:  What's the problem?

5          MS. TIMMERS:  No.  No.  I'm just -- you're saying

6  redlining so, for example, Mr. Jones would send me what he

7  thinks and then I redline and then we send it back to him?

8          THE COURT:  Yes.

9          MR. JONES:  To see if I object to any of her changes?

10         THE COURT:  Yes.

11         MS. TIMMERS:  And then the redlining gets filed?

12         THE COURT:  Yes.

13         MS. TIMMERS:  Okay.

14         THE COURT:  So he would start off with probably the

15  pattern charges and then you would add the charges that you

16  want to his and it would show up, if you did the track changes

17  as you add them.  And then you would cross off whatever you

18  don't want in provisions and you would change it and we'd have

19  a record of that, right?  And then you would send it back to

20  him and he might be like yeah, that's fine with me and accept

21  it.  And then it would be very clear where the disputes are.

22  Does that make sense?

23         MS. TIMMERS:  Yes.  Yes.

24         THE COURT:  It's, you know, a long time in private

25  practice, it's how almost every brief was done so you can

1   figure out what everybody thinks should be said.  So I find it

2   just easier than having two totally separate documents that I'm

3   trying to figure out where they're the same and where they're

4   different, it's just a lot harder doing it that way.  Okay?

5          And what I would suggest is that we have that done by

6   like the second day of trial, maybe the third day of trial, but

7   well before so that we can address these at a term I coined

8   several years called convenient time.  Convenient time means

9   that there is time in the workday for us all to work on things,

10  not that you-all get to work at during the workday and I have

11  to work at after hours, okay?  That's a copyright 2005 by me

12  term.

13         All right.  Anything else in that regard?

14         MR JONES:  No, Your Honor.

15         THE COURT:  All right.  So y'all want to turn to the

16  motions in limine?  The first one that we can get out of the

17  way, the way you-all want to divide up the witness so that

18  Special Agent Greene, I suppose, will be publishing the items

19  at the end of the case is fine or at two different times is

20  fine with me.

21         MR. JONES:  Thank you, Your Honor.

22         THE COURT:  Ms. Timmers said that you're not going to

23  put the -- she was suggesting that that would somehow limit her

24  ability to use the text messages back and forth that was in her

25  sur-reply; is that right?

1          MR. JONES:  I don't -- I'm not quite sure actually

2  how that would limit it, Your Honor.  With the victims who will

3  be testifying, they'll probably be testifying a lot about the

4  text messages, Kik messages, Facebook, whatever platform is

5  being used to communicate, so I think there would be that

6  ability to question the witnesses about that.

7          The witnesses have -- we have met with -- spent a

8  good chunk of the country traveling around the country meeting

9  with the victims.  They have all reviewed separately each one.

10 The pornographic images were copied on to a separate disk for

11 each victim.

12          THE COURT:  Right.

13          MR JONES:  And they've reviewed that disk in advance

14 and so they've initialed it.  So we anticipate at trial that

15 they would just verify I've viewed this, I recognize it by my

16 initials and I know this contains images that I sent via Kik,

17 Facebook, whatever.

18          THE COURT:  But they would be talking about the text?

19          MR. JONES:  They would be testifying about that.

20          THE COURT:  The text would be displayed, just not the

21 photos.

22          MR. JONES:  That's correct, Your Honor.

23          THE COURT:  I think that in large part addresses your

24 concern, Ms. Timmers, doesn't it?

25          MS. TIMMERS:  I don't know.  Well, what if I want to

1  talk about the sexts themselves, you know, the photos?

2          THE COURT:  Okay.  We're going to get to that in a

3  minute.  Okay?

4          MS. TIMMERS:  Okay.

5          THE COURT:  But I think that the way you want to do

6  it by recalling the agent at the end is totally fine and I

7  don't think it was objected to.  Is that right, Ms. Timmers?

8          MS. TIMMERS:  That's correct.

9          THE COURT:  Okay.  And the other one that was not

10 objected to was closing the courtroom.  I suppose that's fine

11 with me.  Has anybody looked to make sure that it's okay to do?

12 I mean, we can certainly turn those big TVs that face outward,

13 we can certainly turn them this way so that nobody sees any of

14 the images, that's absolutely required.  Does that accomplish

15 it?  There's something about locking the courtroom door that

16 bothers me.

17          MR. JONES:  I understand, and we have -- and it's

18 very rare, usually it's done if there are like sensitive

19 national security matters, terrorism, things like that.

20          THE COURT:  Yes.

21          MR. JONES:  I've had some judges do it, agree to it,

22 and I've had some -- one judge comes to mind who did not want

23 to do it, his response was nobody wants to see it anyway, and

24 it turned out that there was nobody in the courtroom.  And this

25 might very well be the same situation, it might be a moot

1   point, because there will be nobody here.

2          It's possible that just, you know, turning off the

3   screens in the back would be -- would take care of it.  We

4   would turn off our screen here.  The defendant though would

5   have a right to see it, and we can't say that screen gets

6   turned off.  And I kind of doubt if anybody's sitting around --

7   if there was -- if there were people here, if they could see it

8   from that screen.

9          THE COURT:  Well, let's decide that we will figure

10  out how to do it then, whether it means kicking everybody out

11  or whether it just means turning around the screens that need

12  to be turned around, but certainly those images will not be

13  displayed in court other than what they have to be to meet the

14  Constitutional requirements.  And nobody that's not involved in

15  this case will have any access to them in any way.  Okay?

16         That's fine with me if there are people in here, we

17  just ask them to leave.  I don't think that anybody would

18  object to that.  It's just that something seems odd to me about

19  ahead of time deciding to do that.

20         MR. JONES:  I understand.  And I was kind of hoping

21  that Congress would have made it easy by passing the statute

22  giving the judges authority to do that.

23         THE COURT:  Yes.

24         MR. JONES:  But that hasn't happened.  And as a

25  corollary, Your Honor, in order to make a record, the --

1    normally what I do is I have the agent describe what the image

2    is so that on appeal --

3           THE COURT:  I know.

4           MR. JONES:  -- there is -- the appellate court --

5    assuming there is a conviction, the appellate court knows

6    exactly what the images consist of.  It's not a very graphic

7    description, but at least some description, so that would be

8    another factor that would go -- that the government brings up

9    just in case there are more people here than we anticipate when

10   that testimony occurs.  But I'm definitely fine with waiting to

11   see what happens at the moment and we would alert the Court

12   before that happens.

13          THE COURT:  I'll bet you anybody sitting in the

14   courtroom will take our hint that they ought to leave.  And if

15   not, we'll make sure that they do.

16          MR. JONES:  I'm sure they would.  Thank you,

17   Your Honor.

18          THE COURT:  Okay.  All right.  So the other ones, I

19   think that leaves maybe two --

20          Bennie, I left my black notebook on my desk again.

21   Thanks.

22          Where are we on -- the government filed something

23   back in August to make sure there was not going to be expert

24   testimony as to any mental illness.  There was a response and

25   then there was a sur-reply that sort of didn't address the

1   issue.  Where are we on that issue?  Is this something we're

2   going to have to decide?

3          MS. TIMMERS:  So our -- the forensic psychologist who

4   we hired, we are using her for sentencing, not for guilt or

5   innocence, so we don't need to give any notice under --

6          THE COURT:  Right.  Okay.  Is that new to me?  Did we

7   know that before?

8          MS. TIMMERS:  Well, that's the reason -- I don't know

9   if you recall, but that was the reason why I asked for the case

10  to be continued out to this date.

11         THE COURT:  Right.  No, I saw in your pleading that

12  you said you could use it at trial or you could use it

13  sentencing only.  But I didn't know if that decision had been

14  announced until now.

15         Did you know that before now, Mr. Jones?

16         MR. JONES:  No, I think when the motions in limine

17  were due, Your Honor, she -- in fact, we had spoken about that,

18  the psychologist at least at that time had not at least

19  prepared a report.  I'm not sure when the psychologist met with

20  Mr. Jenkins.  But I wasn't aware that that was the route they

21  were going to take.

22         THE COURT:  Okay.  So that issue is not one that we

23  have to address.

24         So I think the one that we then have to address is

25  really just one, is that's right?

1          MR. JONES:  I think there are two, Your Honor.

2          THE COURT:  Oh, right.  The 404(b).  All right.

3   Let's talk about the victim's sexual history and what that

4   means in this case.  Can somebody help me understand in this

5   case what we're talking about?  Are we talking about photos

6   that these people sent to other people at other times?

7          MR. JONES:  We, Your Honor, are talking about photos

8   that the victims made and the government's contention is that

9   these were made at the direction of Mr. Jenkins and sent only

10  to Mr. Jenkins.  And we anticipate that there will be testimony

11  that if the photo or the video did not meet his specifications,

12  the victim would have had to redo it.

13          So this is not a case where they just have a lot of

14  photos and shipped them out and that there were multiple

15  persons.  Our -- we anticipate the evidence is going to show

16  that Mr. Jenkins was the only person in contact with the

17  victims and directing them on what to do.

18          THE COURT:  So what is it that you anticipate the

19  defendant might try to elicit that you want to exclude?

20          MR. JONES:  That the -- if the defendant -- if the

21  victims -- I think honestly, Your Honor, what I want to

22  exclude, because I think it -- I don't know if there's a good

23  faith foundation for it and if there's relevance, any questions

24  to the victim about any -- whether they had ever sent sexually

25  explicit photos to anybody else and whether that was -- and

1 anything that related to that, like if they were in a

2 relationship and had they ever exchanged such photos when they

3 were in a relationship with, say, you know, some high school

4 boyfriend or something like that.  I don't think that would be

5 relevant to the charges here.

6          Mr. Jenkins is charged with producing child

7 pornography by means of coercion.  And the -- whatever else the

8 victim may or may not have done is just not relevant to his

9 guilt.  So that's what the government is trying to exclude, any

10 questions asking the victims about anything similar that they

11 might have done, and including also any type of sexual activity

12 that they -- you know, whether they're sexually active with --

13 with anybody either around the time that they were in contact

14 with Mr. Jenkins, either before or after, the government just

15 does not believe that that's relevant to the charges that Mr.

16 Jenkins is facing.

17          MS. TIMMERS:  Well, Mr. Jenkins sees it a little bit

18 differently.  Mr. Jenkins would -- we don't know, we haven't

19 seen the victims, we haven't had a chance to cross-examine

20 them, but we don't know if they've only sent these sexting

21 photos or these sexting videos to other people or not.

22          They may have sent them to Mr. Jenkins and they may

23 have sent them to others.  Mr. Jenkins should be allowed to ask

24 them about that.

25          Also since the government is alleging that

1    Mr. Jenkins coerced these young women, we should be allowed to

2    ask them about what -- how they felt that they were coerced

3    virtually into sexting, into taking a photo of themselves or a

4    video of themselves and then sharing that over the Internet.

5    That is necessary to Mr. Jenkins' defense.  And Mr. Jenkins

6    does have the Sixth Amendment right to cross-examine his

7    accusers.

8            I mean, his accusers are claiming that he coerced

9    them into having them send him sexting videos and photos.

10   Well, Mr. Jenkins should be allowed to cross-examine them on

11   what coercion are they speaking of and exactly how did this

12   sexting take place and did you send these sexts to someplace

13   else.  As I've stated in my briefing, this is relatively new

14   adolescent flirting and Mr. Jenkins would like to cross-examine

15   about the flirting.

16           MR JONES:  And, Your Honor, to clarify one point that

17   she brought up, we anticipate -- this is something that we

18   covered with the victims.  We anticipate that every victim will

19   say that they produced all the photographs and videos that will

20   come into evidence.  We anticipate that they will say that they

21   were produced at the direction of Mr. Jenkins and that they

22   sent them to Mr. Jenkins and not to -- you know, our focus has

23   been on the crime, the crime alleged here, so I'm not -- and we

24   see this differently.

25           Ms. Timmers calls it sexting, we call it the case

1  extortion, and so -- I think there is still relevance to the

2  charges that he's facing.  He has a right to cross-examine his

3  accusers, but it's not an unfettered right, it is circumscribed

4  by the rules of evidence and one of the rules of evidence is

5  that people cannot basically go on a fishing expedition asking

6  about -- in a case involving sexual exploitation cannot just

7  start asking all about their sexual history and anything else

8  that they may have done.

9           As long as the testimony comes out saying that they

10 produced the images at Mr. Jenkins' direction and sent those to

11 him, then I don't think that opens the door to now let's talk

12 about how many boyfriends you've had and your sexual history

13 with them and whether you've done this for any other -- anybody

14 other than Mr. Jenkins.

15          THE COURT:  Let's take it a bite at a time.  Things

16 like their sexual history, is that something you would want to

17 get into?

18          MS. TIMMERS:  No.

19          THE COURT:  Okay.  There's no way that can be

20 relevant.  Do we all agree?

21          MS. TIMMERS:  Yes.

22          THE COURT:  So then I think what it comes down to is

23 whether or not they sent photos to other people such that it

24 undermines the claim that he coerced them.

25          MS. TIMMERS:  Correct.

1          THE COURT:  The crime charged is inducing, enticing

2    and coercing, right?

3          MR JONES:  Yes, Your Honor.

4          THE COURT:  I mean if the government is going with a

5    coercion allegation -- because otherwise it seems kind of

6    irrelevant to me.  If a victim is sending -- is victimized by

7    somebody else, it really makes no difference and it's not a

8    defense to a defendant that somebody else also victimized the

9    victim, it seems to me.

10          MS. TIMMERS:  Mr. Jenkins isn't trying to go into

11    other victimization, it's more that Mr. Jenkins would like to

12    cross-examine these girls on how they claim to have been

13    coerced and these sexting videos or these sexting photos or

14    these sexting images, was he, in fact, the only person they

15    sent them to?  Did they send them to others?  Did they -- you

16    know, we don't know until we cross-examine them.  We just don't

17    know.  But that's certainly relevant for a jury if we have

18    complaining witnesses who sent sexts to Mr. Jenkins but then

19    also sent those same sexts elsewhere or had --

20          THE COURT:  Can we call them photos or messages?  I

21    don't know that the word sext is the right word.  I guess you

22    could call it whatever you want in front of the jury.

23          MS. TIMMERS:  Okay.

24          THE COURT:  Are you talking about the same photos?

25          MS. TIMMERS:  Any photos or any videos.

1          THE COURT:  All right.  Let's cut that in two pieces.

2          MS. TIMMERS:  Oh, let me finish my thought first.

3          THE COURT:  Sure.

4          MS. TIMMERS:  So any photos or any videos that these

5   complaining witnesses are saying that we were coerced into

6   sending Benjamin Jenkins, we would like -- Mr. Jenkins would

7   like to cross-examine them on that, on how they claim to have

8   been coerced and where else they may have ended up, and how

9   they've been familiar with -- and also, I might as well bring

10  this up too is Mr. Jenkins --

11         THE COURT:  I'm not ready for that yet.  I'm trying

12  to take this a piece at a time.  Okay?

13         MS. TIMMERS:  Okay.

14         THE COURT:  Because when you talk specific, we can

15  reach agreements or we can make a ruling.  When we talk

16  generally, it's a little bit harder.

17         Mr. Jones, are we talking about instances where they

18  sent the same photo to the defendant that they sent to other

19  people?

20         MR JONES:  I think that is her allegation.  I have no

21  evidence, Your Honor, that the photos that we're going to be

22  putting into -- the photos and video, those files, I have no

23  evidence that those files were ever sent to anybody else after

24  they were sent to Mr. Jenkins.  Now, he --

25         THE COURT:  Or before.

1          MR JONES:  Pardon me?

2          THE COURT:  Or before.

3          MR JONES:  Right.  I think the testimony is going to

4    be that they produced them at his direction, so they could not

5    have been sent -- to anybody else before.  And I have no

6    evidence that they were sent to anybody else afterwards.  The

7    first part where she wants to question the witnesses about how

8    they were coerced, I think that's part of the -- that's one of

9    the elements, so I think that's definitely fine.

10         THE COURT:  Yes.

11         MR JONES:  But I think what happened afterwards, if

12   anything, it just seems like a fishing expedition and it does

13   open up the victims to -- well, really to being -- it's kind

14   of, you know, questioning their sexual morays and their

15   morality.  We have -- we know that one of the persons that

16   Mr. Jenkins contacted and there were -- we're working with nine

17   victims at trial, but there were in excess -- well in excess of

18   100, and we know that one of those one hundred-plus victims was

19   later also subsequently a victim of human trafficking.  And it

20   would not be appropriate, I think for -- for defense counsel to

21   ask a person in that situation, so let's talk about human

22   trafficking, so after this you just like to go out and have sex

23   with other men for money, because it would have to have

24   relevance to what he's charged with.

25         THE COURT:  You're right.  It has no relevance to

1  that.

2          MR JONES:  And so I think that's the same thing,

3  Your Honor, anything -- you know, whether they even kept the

4  pictures and anything right now that they may have done with

5  it, I just don't think it's relevant to the charges that he's

6  facing.

7          THE COURT:  Let me give you a hypothetical.  If what

8  we have is only these images -- if what we have is that none of

9  these images were sent to other people --

10          MR JONES:  By the victim.

11          THE COURT:  -- by the victim, right, by the victim,

12  then the only question then becomes were there other photos

13  they took at another time, and if so, under what circumstances.

14  Because I think what Ms. Timmers is saying is that if somebody

15  else was not coercing to get it, that might be relevant to her

16  claim that there was no coercion here.

17          Is that right, Ms. Timmers?

18          MS. TIMMERS:  Yes, Your Honor.

19          MR JONES:  But I don't know if Ms. Davis wants to

20  interject her point.

21          THE COURT:  Go ahead.  You can argue too.  I'd like

22  to hear it.  I don't abide that only one person can talk rule.

23          MS. DAVIS:  That's good to know, Your Honor.  You

24  know, I think Ms. Timmers is going to have an opportunity at

25  least to really drill down into this idea of coercion with

1  respect to each victim's interaction with Mr. Jenkins because

2  each one has a different story.

3          THE COURT:  Right.

4          MS. DAVIS:  And not every relationship began

5  coercive, Your Honor.  And I call -- and I use the word

6  relationship loosely here.  Each one of their interactions with

7  Mr. Jenkins, some of them began in ways where it was an online

8  flirting situation.

9          So Ms. Timmers is going to have plenty of opportunity

10 to truly drill down about what made you feel like you had to do

11 this or what made you feel like Mr. Jenkins was telling you how

12 to pose or what to use during masturbation.  That is absolutely

13 something that she's going to have every opportunity to go

14 into.  And I think that the victims are going to be very

15 forthcoming about, in some instances, where there was an arc of

16 this interaction.

17         THE COURT:  So it just seems to me if these women

18 were coerced by the defendant in this case and then a couple

19 days later, they sent something to a boyfriend without

20 coercion, is that relevant?  It doesn't seem relevant to me.

21         MS. TIMMERS:  It seems relevant to me, if I may

22 interject.

23         THE COURT:  Okay.  But why does that seem relevant?

24 A person they don't know who is saying whatever he is saying to

25 them versus a person with whom they're in a relationship.

```
 1              MS. TIMMERS:  All of this was done virtually and --
 2              THE COURT:  I agree.  I understand.
 3              MS. TIMMERS:  And so it's -- and so Mr. Jenkins would
 4    like to explore with these -- with these complaining witnesses
 5    primarily -- he would like to explore, yes, how that they were
 6    coerced and what made this different than all the other times
 7    they may have sexts.  I'm sorry, sent videos or sent videos.
 8    Because particularly if some of these young women had been
 9    sending sexually explicit photos or sexually explicit videos
10    previously, what made this time different that they felt
11    coerced this time and before they didn't.  What was so coercive
12    about it --
13              THE COURT:  Isn't that almost exactly the idea that
14    when a woman is raped, the fact that she might have had
15    consensual sex with somebody at another time is totally
16    irrelevant?  Isn't that what that is?
17              MS. TIMMERS:  But here's -- here is where,
18    unfortunately the rape shield law hasn't caught up with modern
19    technology.  Is sexting or the sending of explicit photos or
20    explicit videos, what a lot of -- a lot of sociologists have
21    deemed modern-day adolescent flirting, is that sexual behavior
22    or is that flirting?
23              And, you know, if we're in the context of flirting,
24    or as Ms. Davis said, that originally some of these girls
25    entered into a consensual loose-termed relationship with
```

1   Mr. Jenkins, we have to explore to be able to differentiate --

2   differentiate if there was actual coercion or if they're saying

3   now that there is coercion because they are embarrassed.

4   There's a difference there.  And Mr. Jenkins would like to

5   explore that.

6           THE COURT:  I mean, I don't know.  I will read the

7   cases I suppose, more details on the facts would be helpful.

8   But it seems to me the corollary is abusing somebody you're not

9   allowed -- I think what the rape shield law would say here is

10  you cannot defend your response to abusing somebody by showing

11  that on another occasion they did something intentionally.  It

12  just seems like what it breaks down to.

13          MS. TIMMERS:  But here we've got -- oh, sorry, may I?

14          THE COURT:  No, that's okay.  That's okay.

15          MS. TIMMERS:  Here is -- so we look at -- Mr. Jenkins

16  looks at this a little bit differently, rape versus this

17  instance of technological flirting.  So with rape, that was an

18  actual physical contact, contact that was happening.  And so

19  when Rule 412 was passed by Congress, it was -- yes, the entire

20  purpose was to prevent the alleged rape victim from having to

21  expose her sexual history or even her past sexual dalliances

22  with the alleged sexual perpetrator to the jury and embarrass

23  herself.

24          In this sense, we are talking about -- it's not --

25  we're not in real life, we're in virtuality, so to speak, and

1  in this virtual world, Mr. Jenkins would like this opportunity

2  to -- let me back up.  Because you're in a virtual world and

3  you're not -- there's no physical -- you know, there's no gun

4  pointed to your head, there's no knife held to your neck, there

5  isn't, you know -- you know, there isn't any physical threat.

6  It's what makes this different, if you sent sexts last time,

7  you know, previously, what makes this different with the -- I'm

8  sorry, the sexual videos you sent this time.  Mr. Jenkins wants

9  to explore that with these --

10         THE COURT:  It's a different relationship, I guess.

11         MS. TIMMERS:  We don't know.  We don't know.  We

12  don't know.  We won't know until these young women take the

13  stand.  Is this just common flirting or are they deeply

14  involved with someone and they're sending these sexually

15  explicit videos and photographs.  We just -- we don't know

16  until they tell us.

17         THE COURT:  Is coercion an element of the offense?

18         MR JONES:  Your Honor, it's -- and the way the

19  indictment is drafted is the defendant did knowing -- knowingly

20  employ, use, persuade, induce, entice or coerce a minor female,

21  so there are multiple ways --

22         THE COURT:  Take out the coercion, let's just take

23  out the coercion for a minute.

24         MR JONES:  Employ and using --

25         THE COURT:  Employ and using makes all of that

1   irrelevant because then the mere fact that he used a minor to

2   produce an image is enough for the conviction, whether or not

3   the minor did it through coercion or whether the minor did it

4   voluntarily, it is really irrelevant to the charge.

5          MS. TIMMERS:  But to use a minor, you know, if -- if

6   the minor voluntarily sent the sexually explicit message, how

7   did he use?

8          THE COURT:  Because he used the minor to get the

9   photo.

10         MS. TIMMERS:  That's what I'm saying, though, but if

11  this --

12         THE COURT:  I don't think it means --

13         MR JONES:  But that's not a --

14         (Multiple voices overlapping)

15         THE COURT:  You're trying to throw force into that.

16  To use the minor or to employ the minor just means that you

17  have the minor who is photographed.  I don't think there is any

18  coercion in there.  And I would think that if the minor did it

19  with a boyfriend, it's largely the same thing and irrelevant,

20  any difference there.

21         MS. TIMMERS:  But what if it wasn't a boyfriend?

22  What if it's just somebody --

23         THE COURT:  It's still that guy's -- it's not a

24  defense to him that somebody else victimized her in a different

25  situation.  I get your point on coercion, if coercion --

1   because that puts into it the overbearing of what the victim

2   might otherwise want to do, then maybe, therefore, whether or

3   not she does it without a coercive environment could be

4   relevant.  But I don't see how, if the charge is simply

5   employing a minor to send you a photo of herself, how the fact

6   that she does that anywhere else, to anybody else at any other

7   time is relevant to your client's defense.  What would your

8   argument be later?

9          MS. TIMMERS:  Well, I just want to go back to the

10  coercion --

11         THE COURT:  No, no, no, no.  Let's talk about this.

12  What would your argument be then?

13         MS. TIMMERS:  For the use or the employment, you

14  said?

15         THE COURT:  Yes.  What would you say if you knew that

16  a month later or a month before, this victim sent a photo of

17  herself, a similar photo of herself to somebody else?  Every

18  time one of these children is photographed, it's the same

19  victimization.  It doesn't matter who takes the picture or who

20  asks for the picture.

21         MS. TIMMERS:  Well, if the minor is taking the

22  picture of herself, the minor hasn't victimized themself.  The

23  victimization only occurs when the minor hits send.

24         THE COURT:  Well, of course.  But that's what he's

25  employing her to do, that's what he's getting her to do, that's

1    what he's inducing her to do.  Otherwise --

2            MR JONES:  And, Your Honor --

3            THE COURT:  -- is she just sending it out randomly,

4    just spamming it out?  No.  As soon as he asks for it, as soon

5    as he asks for it, you've hit enough, I think at that point, to

6    have using, inducing a minor to do it.  I don't think it

7    requires anything more than that.

8            MR JONES:  And, Your Honor --

9            THE COURT:  Coercion is the extreme.

10           MR JONES:  It's not a defense -- that if the victim

11   voluntarily sends something, that is not a defense to the

12   charge.  Because it's still using a minor -- I agree with the

13   Court.  As soon as he asks for the image, then that's the

14   crime, because he has used a minor to produce a sexually

15   explicit photo.

16           And it's not a defense whether -- how willing the

17   victim might have been to send it, which is I think where

18   Ms. Timmers wants to go with cross-examination.

19           MS. TIMMERS:  We want to just explore -- Mr. Jenkins

20   would just like to explore the girls' usage of sending their

21   sexually explicit photos and videos.  They were obviously

22   familiar enough with it that when they were interacting with

23   Mr. Jenkins, they were able to be do it.  You know, otherwise,

24   Mr. Jenkins can't cross-examine anybody about anything, you

25   know.

```
1              THE COURT:  Sure, he can.  He can cross-examine all
2   he wants about why they did what they did with him.  All over
3   that, right?  Can't he?
4              MS. TIMMERS:  Yes.
5              THE COURT:  Okay.  I mean, he certainly can ask all
6   of those questions.  I will look at -- I will look at these
7   cases.  I think that Ms. Timmers' strongest argument is on the
8   side of the coercion, because that includes some level of
9   overbearing of will, I think is what coercion is.
10             MS. TIMMERS:  And if I may, Your Honor, the summary
11  you're going to be reading to the jury uses the word
12  "coercion," so the jury is going to be thinking coercion.
13             THE COURT:  Well, we can change that.  That need not
14  guide everything else.  I mean, the government -- the
15  government alleged a number of things, and I think they have
16  the right to plead it in the conjunctive and prove it in the
17  disjunctive, so we can change that.
18             I will have to think about this some more and we'll
19  let you know.  It troubles me that -- it just seems to me that
20  minors are the victims of this crime.  And that trying to put
21  in other evidence of when they were also victimized is really
22  not relevant.
23             But I understand your point, Ms. Timmers, that if his
24  claim is -- is it a defense to this case that they wanted to
25  send him the photos?  If they volunteered them, is that a
```

1   defense?  If he said, Hey, do you want to do this?  Or they

2   said, Would you like a photo?  And he said, Sure.  Is that a

3   defense in this case?

4            MR JONES:  We have prosecuted those cases,

5   Your Honor, for production of child pornography.

6            THE COURT:  Right.  I would think every time.  Is it

7   the same crime here?

8            MR JONES:  It would be the same charge, the same

9   pleading language.  It's not a defense that the -- that the

10  minor was willing to send the photograph, that does not relieve

11  a defendant of criminal responsibility.

12           THE COURT:  Then what would you ask the jury, did

13  they really feel coerced?  I mean, I guess if it's an element

14  of the offense, they have to decide that.  But if they had

15  volunteered this and they had brought up the idea, I think it

16  would still be the same crime.  I think the law says that

17  these -- if people -- if these victims send something that you

18  get -- well, I guess you could accidentally get it and not

19  commit a crime.  But I think otherwise -- at any rate, I will

20  look at those cases on the rape shield law.  I do have some

21  difficulty understanding the relevance when we look along the

22  spectrum of employ, use, induce.  And maybe employ and use

23  seems to very much reduce the relevancy of this.

24           But as you move across the spectrum of persuade,

25  induce, entice or coerce, maybe you get more into the --

1  relevance becomes more of a -- becomes easier to see and I

2  think that's Ms. Timmers' point.

3        I'll just have to look and see whether there is a

4  basis for applying the rape shield law, because it seems to me

5  as though the fact that he coerced her into doing it, the

6  fact -- I don't know.  You're telling me there's something

7  relevant that if she actually has a relationship with a person

8  and she sends a photo to that person, that that somehow is

9  relevant to whether or not your client, whom they've never met

10  in person coerced it?  I just don't see the relevance of that.

11        MS. TIMMERS:  Well, because this was done virtually,

12  the relevance is what made this time different.  If you send it

13  willingly --

14        THE COURT:  What makes it different is that it's a

15  different situation.  This is a person in real life that she

16  has a real relationship with.

17        MS. TIMMERS:  Even more so.  And this is a virtual

18  person, so why would you -- or well, virtual person -- I mean,

19  somebody we're talking to virtually, what was the difference?

20  Explain to us why would you send it?  So you said --

21        THE COURT:  I think you're falling right into the

22  rape shield idea, which is the fact that somebody has sexual

23  relations with somebody else is not relevant to whether or not

24  they consented with this person.

25        MS. TIMMERS:  But is this sexual relations?  I mean,

1   is this really sexual --

2           THE COURT:  I don't know. I don't know.

3           MS. TIMMERS:  -- behavior or a sexual predisposition?

4   We argue it's not in our sur-response.

5           THE COURT:  I know.  I know.  Okay.  I'll look at the

6   cases.  Y'all cited a lot of cases.  I will look at those and

7   see what they seem to say.  Let's move on though.

8           How much of this stuff are we talking about,

9   Mr. Jones?

10          MR JONES:  For -- which stuff?

11          THE COURT:  I mean, the --

12          MR JONES:  The 404(b)?

13          THE COURT:  No, the thing we were just talking about.

14  Is there a lot of that?

15          MR JONES:  I'm still unclear about the question.  A

16  lot of?

17          THE COURT:  Yes.  Are there many instances where the

18  victims sent photos at other times to other people?

19          MR JONES:  I don't think so, Your Honor.  And no.

20  And, again, our focus was what happened here in this case.

21          THE COURT:  Yes.

22          MR JONES:  And if we would not have a crime really,

23  honestly, a charge, if any victim had -- had said -- you know,

24  if we identified somebody and they said, well, I just already

25  had these photos already on the shelf, so I just sent those to

1   him, because they would not have been produced at a defendant's

2   direction, so I don't think we really have that in play,

3   Your Honor, here.

4            THE COURT:  So are we just fighting about

5   hypothetical stuff?

6            MS. DAVIS:  Well, I don't think we're fighting about

7   hypotheticals, but I do think that we're actually getting to

8   the heart of what it is the jury is going to be deciding, and

9   that is whether or not Mr. Jenkins participated in the

10  production of these images.  And Ms. Timmers is going to be

11  able to ask these victims over and over and over again, each

12  one of them, about Mr. Jenkins' role in producing these images

13  and I think that gets her to where she needs to get without --

14           THE COURT:  Except she'd like to push it to the side

15  of employ and use rather than coerce.

16           MS. DAVIS:  Or I think we're more on the side of

17  employ and use and she would like to keep it at coercion and

18  sort of get --

19           THE COURT:  Okay.  Right.  Yes.  Yes.

20           MS. TIMMERS:  Yeah.  And I understand that point, but

21  I think she's going to be able to explore with each victim

22  where on the scale their interaction with Mr. Jenkins was.

23           THE COURT:  What about their interaction with others?

24  Do we know if there -- it would be helpful to know -- like, for

25  example, I think when you can -- in most other instances when

1    we are ruling about the admissibility of evidence, we kind of

2    know what it is, right?

3           MS. DAVIS:  Right.

4           THE COURT:  Here we're sort of talking

5    hypothetically, and it might make a difference if it's somebody

6    that a person just met online and had a virtual relationship

7    with and then quickly took photos and shared it, maybe that

8    would be different than somebody that had a relationship with

9    someone, a real relationship, not a virtual relationship.

10          MS. DAVIS:  But I think that gets back to what

11   Your Honor was saying before and that is that it doesn't negate

12   Mr. Jenkins' guilt in the production count.

13          THE COURT:  It only does insofar as she wants to

14   argue there wasn't coercion.

15          MR JONES:  But it doesn't go back to did he employ or

16   use a minor to produce.

17          THE COURT:  Right.

18          MR JONES:  And that's one what the government -- one

19   of the methods that the government can still use to still

20   employ it, which means that the -- anything else that the

21   victim did doesn't really -- as Ms. Davis was saying doesn't

22   reflect on the defendant's guilt.

23          MS. DAVIS:  And we do know that some of these images,

24   you know, were taken under the employ and use, you know, when

25   there was, you know, a way -- what one of our victims would

1   have thought was more of a consensual relationship so we do

2   know that.  I mean, Mr. Jones and I, you know, have undergone

3   the different arcs of these interactions with Mr. Jenkins with

4   each one of these victims, and so each one tells a different

5   story, each one had a different sort of interaction with him,

6   and there are multiple ways that each one of these words were

7   used, frankly.

8           THE COURT:  Right.  But I guess my question, though,

9   is amongst the victims that you anticipate testifying, do we

10  know how many other instances there were with other people that

11  Ms. Timmers might be able to explore?

12          MS. DAVIS:  No, at this time Mr. Jones and I do not

13  know that, Your Honor.  We did not explore that with the minor

14  victims.

15          MR JONES:  I think there was -- just to be clear,

16  there's a possibility with one victim where she doesn't know

17  how after she cut off communications with Mr. Jenkins her --

18  some photos started circulating in her -- like I think among

19  some of her classmates, and that was an area that was unclear

20  whether -- how those photos got out there to her classmates, so

21  if it's possible then that there were others that this one

22  victim took.

23          THE COURT:  But she doesn't know how they got out

24  there?

25          MR JONES:  She doesn't.

 1            THE COURT:  Well, that doesn't seem relevant to me if

 2   she doesn't know how they got out there.

 3            Well, I think maybe it would be helpful if you-all --

 4   are you going to explore this with these folks or is this an

 5   area that you don't intend to explore with them?  I mean, the

 6   only reason I ask is because it seems like the defendant should

 7   have an opportunity to make a record for appeal at least as

 8   to -- and sort of knowing what the depth of it is or the

 9   specifics of it might be relevant not only to my decision but

10   to the appeal.

11            MR JONES:  Well, we hadn't explored it, Your Honor,

12   because -- for the reason that we were focused on what happened

13   with the charged conduct and we did not want to pry into the

14   victims' -- other aspects of the victims' life.

15            THE COURT:  I understand.

16            MR JONES:  It was, you know, I think enough for --

17   traumatized -- it was honestly traumatizing for many of them

18   just to have the federal government reach out and contact them

19   and start talking about all of this.  We talk about there were

20   more than 100 girls.  Agent Greene and a victim assistance

21   specialist at HSI contacted dozens and dozens of girls, and

22   many of them, they were able to confirm this has been their

23   phone number for the last five years, this -- they had been on

24   Kik, this is their Kik user name, screen name, they had been on

25   Facebook, this is their Facebook name, and they had been using

1   all of those like, you know, for four or five years.

2            And then it got to the question of are you aware of

3   Benjamin Jenkins or some of the aliases he used and a lot of

4   them are like no, never heard of him, I have no idea, I can't

5   help you anymore.  If denial is their best -- is their best

6   form of dealing with these charges, then we cannot intrude on

7   that.  And the -- not with these charges, excuse me, with the

8   incidents that happened, their dealings with Mr. Jenkins, we

9   just can't intrude on that.

10           And that informed our approach of how we dealt with

11  the victims, because we wanted to -- they were cooperating, we

12  wanted to focus on their cooperation for their interactions

13  with Mr. Jenkins.  We were not going to go exploring other

14  aspects of their personal life.  It's enough that we show up

15  there with -- you know, asking them questions, showing them

16  photos, we did not want to go into other parts of that.

17           So to answer the Court's question, is this something

18  that we planned to explore with the victims before trial, I

19  don't think so.  It's -- there's a lot of -- it's victim

20  dignity that we're focused on here, Your Honor.

21           THE COURT:  Okay.  All right.  Thank you.  Anything

22  else anybody wants to say about this before we move on?

23           MR JONES:  No, Your Honor.

24           THE COURT:  Okay.  Thank you.  The other one is the

25  other 404(b), is that the other issue that we have to talk

1  about?

2      MR JONES:  That is.  And, Your Honor, I think it's

3  highly unlikely the government would use it.  If we could, we

4  would just ask the Court to defer ruling on this for now.  If

5  we feel a need that we might need to go into it at trial,

6  depending upon the way the direction of the trial -- how

7  testimony comes in, then we would alert the Court in advance.

8  But I think right now, it's -- as I said, I think it's

9  extremely unlikely that we are going to go into this.

10      We do believe, though, that if Mr. Jenkins testifies,

11  this does present an area where we could cross-examine him

12  about some of the -- what we allege is 404(b) evidence.

13  Whether he was the person who was actually in contact with the

14  minor girl up in Massachusetts, all of that information was

15  turned over, you know, in discovery, with the initial

16  discoveries, that -- the defendant has had all of that

17  information, the police reports and the summary of the chats

18  for over a year now.

19      THE COURT:  Ms. Timmers?

20      MS. TIMMERS:  Well, defense counsel agrees with

21  Mr. Jones that if Mr. Jenkins should take the stand, then yes,

22  Mr. Jones should be allowed to use the 404(b) evidence, but

23  other than that, Mr. Jenkins would state to this Court is that

24  this particular evidence from Massachusetts, it's cumulative

25  and repetitive and it doesn't prove any additional fact that

1  hasn't already been shown at trial and there wasn't any -- I

2  mean, that's pretty much what he would say, is it's just

3  cumulative and repetitive, everything that's been shown to the

4  jury before, what does this add?  It doesn't add anything.

5         THE COURT:  Okay.  Well, maybe that's why Mr. Jones

6  may decide not to use it.  But I will tell you, I found their

7  statement, the government's statement in their pleading on

8  this, which was Document 63, Page 7, it's pretty compelling as

9  to the relevance of it.  And so that is the framework that I

10 will be thinking about it in the event this issue comes up at

11 trial.  Okay?

12        It does seem to me to show a pattern, it does seem to

13 me that it would show intent, or motive, or preparation if this

14 is a way that he is sort of bringing these girls along, and

15 what you're catching is the early part of the relationship,

16 it's like a river, and what you're catching is just this --

17 before you get all the way downstream to where they're being

18 victimized, I think it would be relevant for all of those

19 purposes that the government cited in its pleading, but we'll

20 see whether -- and that's actually, in fact, a different

21 argument than the cumulative and repetitive.  The cumulative

22 and repetitive maybe goes a little bit to 404(b), but it's not

23 a relevancy argument or -- I'm sorry, it maybe goes to

24 prejudice, but it doesn't seem to go to the core of the 404(b).

25 So, at any rate, maybe we won't have to address that issue.

1          Is that the only other pretrial issue that's hanging

2   out there?

3          MR JONES:  I believe it is, Your Honor.

4          MS. TIMMERS:  Yes, Your Honor.

5          THE COURT:  All right.  I will look over the next

6   couple of days at this issue of the admissibility or the

7   ability of the defendant to cross-examine these victims as to

8   other times that they might have shared photos.

9          That will be the extent of it.  I think that that's

10  the only area of relevance, no matter what happens, no matter

11  what the ruling was, I think that's the only relevance that's

12  been put forward by Ms. Timmers is the idea that if there is

13  evidence that on another occasion with a different person, they

14  provided photos, and there's an allegation that these people

15  were somehow enticed, this particular person, was somehow

16  enticed, induced or something like that to provide them to this

17  defendant, it might possibly be relevant.  But anything else

18  about their sexual activity is wholly irrelevant.  Anything

19  about other texts they sent that did not involve photos or

20  things that they talked about, any argument that that's

21  relevant, Ms. Timmers?

22         MS. TIMMERS:  No.

23         THE COURT:  Okay.  So I want to make sure that what

24  we're talking about is -- what about it is relevant if the

25  victim does not allege coercion or enticing, just he asked me

1   for them and I did it?  Is the fact that she did it somewhere
2   else then relevant?
3            MS. TIMMERS:  Well, I would like to explore that
4   issue.
5            THE COURT:  Why?
6            MS. TIMMERS:  I would.
7            THE COURT:  What would it help?
8            MS. TIMMERS:  The jury may have -- it may have some
9   bearing on how the jury feels about it.
10           THE COURT:  But the jury would be told that what they
11  have to decide is if on this instance with that victim he
12  either used or -- what's the other language?  Something before
13  you get down the spectrum, he employed or used.
14           MS. TIMMERS:  Well, I understand that, but the jury
15  would have to decide if there was, in fact, use or if there
16  was, in fact -- you know, if he did, in fact, employ.  So
17  that's what Mr. Jenkins would like to at least cross-examine on
18  that.  You know, what do you mean that I employed you, you
19  know, just --
20           THE COURT:  That's not the word they're going to use.
21           MS. TIMMERS:  I know.  I know.
22           THE COURT:  Go ahead.
23           MS. DAVIS:  Well, and I think here importantly,
24  Your Honor, you know, Your Honor and the jury, they're going to
25  hear that Mr. Jenkins went about this in multiple different

1   ways.  And it wasn't always, you know, coercive in sort of a
2   classic sense of threatening of force or threats.  There were
3   times where he was approaching some of these young women as a
4   young woman himself, and so in our argument that the government
5   could make to that, Your Honor, was a way of enticing these
6   girls, pretending to be, you know, 14 like them, pretending to
7   be questioning their sexuality as a young 14-year-old female,
8   the same way maybe they were.
9          There's a lot of different ways of sort of looking at
10  each one of those words, and we shouldn't just be thinking
11  about any sort of violence, a use of knife or whatever
12  Ms. Timmers was talking about before, drawing sort of a
13  distinction between, you know, the rape and what we have here.
14  I don't think that that is really the distinction that we
15  should be looking at.
16         THE COURT:  Yes.  I understand what you're saying.  I
17  appreciate that.  Okay.  Do you want to say something else?
18         MS. TIMMERS:  No.
19         THE COURT:  Okay.  It's just hard not knowing what
20  else is out there how you can make a decision about the
21  relevance of it, because what you're asking then is to say
22  that -- or maybe I'm just right back to exactly why you bring
23  up the rule you did, that somebody being coerced today with
24  this defendant, the fact that they might have done the same
25  thing without being coerced on another day with another person

1  is not relevant.

2          MS. TIMMERS:  I'm saying it is relevant.

3          THE COURT:  I know.

4          MS. TIMMERS:  Oh, okay.

5          THE COURT:  What the government is saying is if

6  that's the basis for the ruling then, it has to be that -- in

7  other words, the government has to essentially take the

8  position that if somebody is claiming that Mr. Jenkins coerced

9  her to send a photo, that the fact that a couple of days later,

10  she sent a similar photo to a friend without any coercion is

11  irrelevant or inadmissible for some other reason.

12          MR JONES:  That's correct, Your Honor, we believe it

13  is irrelevant.  I mean, just going through the classic -- to

14  the definition of relevance in the rules of evidence, that it

15  puts a fact in dispute more likely or less likely, and I don't

16  think the -- that's the government's position, those types of

17  questions by the defendant about any other type of photos sent

18  do not make the fact undisputed whether he did it more or less

19  likely.

20          THE COURT:  Well, except for she would say when it

21  comes to coercion, which is not focused on him, it's focused on

22  how the victim responded or why the victim responded.  She

23  would say that that's the relevant part.  The person wasn't

24  coerced or threatened or enticed, she just did it freely and

25  voluntarily three days later would be relevant, she says, as to

1  whether they were coerced this time.

2          MR JONES:  But that's not where the government is

3  only confined to proving coercion.

4          THE COURT:  I know.  I get it.  Okay.

5          MS. DAVIS:  Is Your Honor going to be revisiting the

6  case summary also and the use of the word "coercion"?

7          THE COURT:  Yes.  I mean, I will change the case

8  summary.  That's why we're doing this kind of now.  I will

9  revise the case summary and any of it up until the last minute.

10 So I want to make sure that we have -- that the last time we

11 look at it that the case summary is what we want it to say.

12 The only reason to give that to the jury is to let them know

13 what this case is about.  I mean, there may be people that when

14 they hear it, they say this is not a case for me.  So that's

15 the only reason.  So we'll revisit that at any time, same thing

16 with the background and the qualifying questions.  Okay?

17         MS. DAVIS:  Thank you.

18         THE COURT:  All right.  If nothing else, we will see

19 you-all on that date for the start of the trial.  Thank you.

20         COURTROOM DEPUTY:  All rise.  Court is adjourned.

21

22         (Whereupon, the proceedings were adjourned at 5:44

23 p.m.)

24

25

1                    REPORTERS CERTIFICATE

2

3

4         I, Jana B. Colter, Official Court Reporter for the

5   United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7         That I reported on the Stenograph machine the

8   proceedings held in open court on September 17, 2019, in the

9   matter of UNITED STATES OF AMERICA V. BENJAMIN JENKINS, Case

10  No. 1:18-CR-00181-MLB; that said proceedings in connection with

11  the hearing were reduced to typewritten form by me; and that

12  the foregoing transcript (49 Pages) is a true and accurate

13  record of the proceedings.

14        This the 22nd day of November, 2019.

15

16

17

18                        _____

                            /s/ Jana B. Colter, FAPR, RMR, CRR, CRC
19                               Official Court Reporter

20

21

22

23

24

25