IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>BENJAMIN JENKINS | Criminal Action No.<br><br>1:18-CR-181-MLB-CMS |

**Sentencing Memorandum**



    The above is a screenshot that was found on Benjamin Jenkins' computer. It aptly describes what Jenkins did. Using deception, intimidation, persuasion, coercion, threats, cruelty, and emotional blackmail, Jenkins preyed on dozens upon dozens of teenage girls. He forced them to take photos of themselves and make videos where they showed their genitals, masturbated with hairbrushes and other objects, and performed simulated oral sex on various objects. He made

some perform humiliating acts, such as licking the toilet and drinking their own urine. He degraded others by making them watch him masturbate on webcam. And when they summoned up the courage to break away from him, to put an end to the control he had on them, he controlled how others saw them. Jenkins sent photos and videos to the girls' families and friends. He posted their photos and their phone numbers on Pornhub, Twitter, and Craigslist. Jenkins would add a message for men to contact the girls for more photos or, in at least one case, to contact the girl so they could engage in a violent gang rape fantasy with her.

For all the harm that Jenkins caused, for the cold depravity that he displayed towards the girls and their families, and for the pain that he inflicted on the victims, he deserves a significant sentence. He should be sentenced to 80 years in prison, followed by a lifetime of supervised release.

**A. Procedural History**

Benjamin Jenkins, the defendant, was charged in a second superseding indictment with nine counts of using, employing persuading, inducing, enticing, or coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, in violation of 18 U.S.C. §§ 2251(a) and 2251(e). (Doc. 80-1.) He was also charged with three counts of distributing at least one visual depiction of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1). (*Id.*) The nine production counts were based on Jenkins' contacting at least nine female minors for the purpose of persuading, enticing, and coercing them to produce child pornography of themselves to satisfy his prurient and sadistic interests. The

distribution counts were based on Jenkins punishing girls who cut off contact with him by posting of many of those images in online public forums, often with the victim girl's contact information. The indictment reflects how Jenkins engaged in a long-lasting and pervasive scheme of "sextortion."

Jenkins elected to go to trial, which began on January 13, 2020. (Doc. 117.) After four days of testimony, the jury returned a verdict finding the Defendant guilty on all 12 counts of the indictment. (Doc. 124.) The sentencing hearing is scheduled for September 22, 2020.

### B. The Sentencing Guidelines

The Presentence Investigation Report ("PSR") determined that the base offense level for each count of production was 32, pursuant to USSG §2G2.1(a). (PSR ¶¶ 111, 120, 129, 137, 146, 153, 162, 169, 177.) Because each of the victims was at least 12 years old but less than 16 years of age, 2 levels were added under USSG §2G2.1(b)(1)(B). (PSR ¶¶ 112, 121, 130, 138, 147, 153, 163, 178.) Pursuant to USSG §2G2.1(b)(2)(A), 2 levels were added because the offense involved a sexual act. (PSR ¶¶ 113, 122, 131, 139, 147a, 155, 163a, 170, 178a.) For the victims whose images Jenkins distributed, 2 levels were added to the offense level. (PSR ¶¶ 114, 123, 140, 156, 171.) The use of a computer added 2 levels under USSG §2G2.1(b0(6)(B)(ii). (PSR ¶¶ 115, 124, 132, 141, 148, 157, 172, 179.) The adjusted offense level for each count of production was either 38 (PSR ¶¶ 136, 152, 168, 176, 183) or 40. (PSR ¶¶ 119, 128, 145, 161.)

For the three counts of distribution, the base offense level was 22 under USSG §2G2.2(a)(2). (PSR ¶ 184.) Pursuant to USSG §2G2.2(b)(3)(D), 6 levels were added

3

because Jenkins distributed images to persuade, induce or coerce a minor to engage in illegal activity. (PSR ¶ 185.) Because Jenkins engaged in a pattern of activity that involved the sexual abuse or exploitation of a minor, USSG §2G2.2(b)(5) mandated that 5 levels be added. (PSR ¶ 186.) The use of a computer to commit the offense led to the addition of 2 levels under USSG §2G2.2(b)(6). (PSR ¶ 187.) He also had more than 600 images, which added 5 levels to the offense level according to USSG §2G2.2(b)(7)(D). (PSR ¶ 188.) His total offense level for distribution was 40. (PSR ¶ 192.)

The PSR made the adjustment for multiple counts under USSG §3D1.4. A total of 12 units were added. (PSR ¶ 193.) However, the maximum increase allowed under the Guidelines is 5 levels. (PSR ¶ 195.) The Defendant's combined offense level was 45. (PSR ¶ 196.) Based on Jenkins' conduct and convictions for multiple counts of production, the Guidelines deems him to be a dangerous sex offender under USSG §4B1.5. Under §4B1.5(b), 5 levels were added. (PSR ¶ 197.) Although this adds up to 50 offense levels, under USSG ch. 5, pt. A, n.2, the total offense level is 43. (PSR ¶ 199.)

Jenkins is in criminal history category I. (PSR ¶ 203.) His custody Guidelines range is life. (PSR p. 49.) Because no count of conviction authorizes a life sentence, the maximum sentence that the Court may impose is 330 years. *See United States v. Kirby*, 928 F.3d 1254, 1257-58 (11th Cir. 2019) ("the district court correctly combined the statutory maximum for each count of conviction to set Kirby's guideline sentence at 1440 months of imprisonment, the closest available sentence to indefinite incarceration").

### C. Determining a Reasonable Sentence

In determining a reasonable sentence, the Court should begin by correctly calculating the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Pugh*, 515 F.3d 1179, 1189 (11th Cir. 2008). From there, the Court should assess the factors set forth in 18 U.S.C. § 3553(a) to determine a reasonable sentence. *Gall*, 552 U.S. at 49-50; *Pugh*, 515 F.3d at 1189-90. The § 3353(a) factors include the nature and circumstances of the offense, the need for the sentence imposed to reflect the seriousness of the offense, deterrence of criminal conduct, the need to protect the public from future crimes of the defendant, and the need to avoid unwarranted sentence disparities. These factors support the imposition of a sentence of 80 years, to be followed by a lifetime term of supervised release.

#### 1. Nature and Circumstances of the Offense

The indictment—with its nine counts of production of child pornography and three counts of distribution—is disturbing, to say the least. But the constituent parts that led to Jenkins' indictment shows how truly horrid and pervasive his crime was.

**Setting the Trap**

Like a skillful predator, Jenkins knew how to choose his victims. He identified girls who were navigating the often difficult transition from being a child to becoming an adult. That's the time when the teenager becomes aware of her sexuality and sometimes questions her orientation. And that is where Jenkins saw his chance to wedge his way into each girl's world. He used Kik Messenger

to reach out to each girl. Jenkins rarely used his own name and photo when he first began chatting with them. Instead, he sometimes used an identity that he created. It could be either a teenage boy or girl. Oftentimes, he used the identity of one of his prior victims. In fact, one frequent identity that he used online combined the name of one victim with the photo of another victim.

Typically, the online conversations started out with mild flirtation and flattery. Jenkins, under his various persona, would compliment the girl on her looks or her body. Shortly after that—sometimes just a few minutes later—he would transition to a more sexually explicit discussion. If he was portraying himself as a girl, he would often send a photo of a girl in various stages of undress. He was recycling photos that he had sextorted from one girl to lure another girl. After sending the phone, he would ask for one in exchange. Jenkins' pursuit was relentless. If a girl rebuffed one persona, he would switch to a different one. Sometimes he would forego the use of different identities and start threatening the girl. One victim testified that he threatened to Photoshop her face onto pornographic images and to post those images online unless she provided him with images of herself. Jenkins' short-term goal was to obtain photos or videos from the girl. His long-term goal was to control her.

As soon as Jenkins had a photo, the trap was sprung. Soon afterwards, the threats would start. He told each girl that he would post online what she had already sent unless she gave him more. His threats appeared very convincing. In several instances, he used an IP address tracker to determine where the girl lived. He then told the victims what their street address was, which removed any shred

of security that they might have still had. Disclosing that information was enough to keep this girl living in fear. He would also use other methods to keep his victims under his control. Another girl testified that Jenkins said he would come to her school, check her out of class, and then rape her. Once he had forced his way into their lives, they lost all sense of safety and security. He constantly exerted control by keeping them in a heightened state of fear. They had to submit to his bullying and provide him with more pornographic videos and photos just to prevent him from sending out what they had already given him.

Usually once he started extorting photos and videos from a girl, he would reveal his true identity. He would demand more photos and videos from the girl. He would tell each girl exactly what he wanted to see. This included telling the girl what part of her genitals to show, what object she had to insert into her vagina, and how she was supposed to masturbate. If what she produced did not meet his instructions, he would become irate and make her do it over again. This often involved Jenkins screaming at her, and sometimes he would start a countdown where he threatened to post images of her online if she did not send a photo or video more to his liking before the clock ran out. His demand for new content seemed insatiable. It did not matter whether the girl had already sent him a photo where she was inserting an object into her vagina or a video in which she was masturbating. He wanted another photo and yet another video to add to his collection. In the process, the girls learned that they were not in control of their own bodies but that he was.

Jenkins would also keep the girls under his control by manipulating their emotions. With many of the victims, he threatened to commit suicide. He told one girl that he would record his suicide and broadcast it over the Internet, laying his death at her feet. While some might think that his death would end their bondage, the reality is that no teenage girl would want to feel responsible for someone else's death. So Jenkins' threat had its desired effect: the girls maintained contact with him so that they would not have to bear the guilt of his suicide. And maintaining contact with Jenkins meant that the girls had to send him more photos and videos of themselves. Emotional manipulation was another way that he maintained control over his victims.

**Degrading His Victims**

While Jenkins did indeed continue to increase his collection of child pornography, his interests extended beyond being just a mere collector. As mentioned above, Jenkins' goal was to control the girls—physically as well as emotionally. He exercised control by forcing them to engage in degrading behavior. He ordered one girl to lick a toilet, and he made another girl drink her own urine. One victim testified that she had to stay on the phone with him all night. Even though they did not talk much, she stayed on the phone until sunrise because she was afraid he would send out one of her photos if she went to sleep. Jenkins humiliated many of the girls by forcing them to watch him masturbate on webcam. One victim testified that she cried while watching him. Another girl was humiliated when he told her to make a video where she called him "daddy." Forcing someone to address him as "daddy" was domineering and demeaning.

Jenkins even stooped to body-shaming, asking one girl, "Why you so fat?" In a humiliating yet typical example, one girl tried to stop sending photos to Jenkins. While she was playing in her high-school volleyball tournament, her friend received a sexually explicit photo that she had sent to Jenkins. He told her friend that the victim had to resume contacting him online or he would send all of her photos to her friends and family. In sum, Jenkins' treatment of his victims was abusive, vindictive and degrading. Keeping with the Facebook posting at the beginning of this sentencing memo, he maintained control of the victims, and in the process he destroyed their self-esteem and sense of worth.

**Jenkins Exacts Revenge**

Not much imagination is needed to realize how difficult daily life was for each victim. They were living on an exhausting roller coaster: they had to deal with his anger and outrage if they did not produce child pornography to his exact specifications, or they had to deal with the bathos of his suicide threats. Once they summoned the courage to cut him off—to stop all communications with him, to block him on all their social media accounts—Jenkins would make them pay. All of his previous threats were not empty. Looking at the girls' Facebook and Instagram accounts, he was able to find their family members and their online accounts. Using a different identity, he contacted many of the girls' parents. To some he sent pornographic images of their daughters. To others, he repeated the threat to post photos online if their daughter did not resume communications with Dani Domo, Rei, or any of the other identities Jenkins used. When one girl cut off all communications by deleting all her social media

9

accounts, Jenkins posted child erotica photos of her on her high school Twitter page. He told all these family members that the girl was a slut and accused them of having sex with multiple men (although he used more vulgar terms).

Jenkins posted many girls' images on Twitter and Pornhub. They usually came with the girl's Kik address or cell phone number with a message along the lines of "Kik her for some fun", "Text XXXXXXXX for nudes/sex", and "Kik and Skype this slut @ xxxxx. DM me for her pics, Insta, SC, and Facebook."[1] This was his final revenge against the girl for cutting him off. If she would not communicate with him, he would make sure that other men communicated with her. Some of the victims would contact him at this point and plead with him to leave them alone. One wrote, "I'm begging you to leave me alone. I will see that the police are not involved if you leave me and my father alone now. this is your last chance." One girl wrote him, "People are texting me through my number". Their pleas for mercy were met with hostility.

Jenkins was persistent in seeking revenge. After one girl cut him off, he sent images to her grandmother on Facebook. The girl intercepted and deleted the messages and images before her grandmother could see them. Undeterred, Jenkins reached out to her stepsister. Using several aliases in the same set of communications, Jenkins sent child pornography to the stepsister. He referred to the victim, a 13-year-old girl, as "that slut." When the stepsister refused to have the girl get back in touch with Jenkins, he said that he was going to send the

---

[1] "DM" is the abbreviation for "direct message," "Insta" is short for Instagram, and "SC" stands for Snapchat.

10

images of child pornography to the stepsister's husband, call the police so that her husband would be arrested, and then kill the stepsister's infant son. He also said that the victim would kill herself. This is how Jenkins ended the communications with the stepsister:



When dealing with an adult who would not buckle under Jenkins' pressure, he resorts to threatening to have her husband arrested for having child pornography. Then he would murder her infant son and get her stepsister to commit suicide. His depravity was unbounded.

**Consequences of Abuse**

After suffering through all the abuse that Jenkins inflicted on them, the victims have not emerged unscathed. They will describe their ordeal much more

powerfully than can be depicted here, but suffice it to say that they have suffered many of the symptoms found in victims of child pornography: low self-esteem, thoughts of suicide, actual suicide attempts, self-harming behaviors such as cutting, and more. Jenkins subjected the girls to ongoing and brutal cruelty, so intense and persistent that their self-worth was diminished. As an example, one girl later became a victim of sex trafficking. As she explained to the prosecution team, after dealing with Jenkins she thought that men would only ever value her for her body. When Jenkins reached the point where he could no longer control what the girls did, he still succeeded in controlling how they saw themselves. He made sure that they were worse off for having come in contact with him.

The nature and circumstances of Jenkins' crimes and the seriousness of the offense illuminate that he is deserving of a lengthy sentence. A custodial sentence of 80 years reflects the nature and circumstances of his crime and shows along with the seriousness of the offense.

### 2. Promote Deterrence to Criminal Conduct and Protect the Public from Future Crimes of the Defendant

Jenkins has already demonstrated that he will squander any opportunity to reform. When given the chance to change his ways, Jenkins chose to continue his online habit of harassing, intimidating and threatening young girls.

The PSR points out that Cobb County Police received a referral from a sheriff's office in North Carolina about someone using the IP address from Jenkins' home who was sending out images of child pornography. (PSR ¶ 47.) Without bothering to obtain a search warrant and with little investigative

activity, the Cobb County Police Department concluded that Jenkins was not involved but that a third party with access to the family's IP address was responsible. (PSR ¶ 48.) It closed its investigation in late August 2016. (*Id.*) As we know now, this conclusion was wrong.

A review of Jenkins' Google searches shows a divide from before and after the Cobb County Police came to talk to him. Many of the searches before the police visited were unremarkable. Typical from someone his age, the searches veered more towards food and professional athletes: "soul vegetarian online order", "coco bread", "jamaican spinach patties", "big sur burrito", "lebron flocka james iv", "jordan shipley", and "isiah lord thomas ii".

The computer searches after the police visit betray the panic that had set in. Many of his searches related to whether he would ever be charged, as seen in these samples:
- girl lied about her age online
- if victim doesn't show up [in] court
- do detective report online threats
- if a fake account is harassing me online and i report it to police, what will they do
- police gave up on my case?
- accused of a crime not charged
- just because i reported something doesn't mean anything will be done
- someone posted pictures of me no charges
- investigated but never charged
- why most crimes aren't prosecuted
- local detective never followed up
- why first offenders are not charged

13

- will my local police investigate someone out of state

Still other searches showed his keen desire to evade charges by destroying evidence of the crime:

- what happens if i deactivate my kik
- erasing computer memory
- free iphone 6s data eraser
- if i destroy my computer will anyone be able to access my files
- overwrite computer files
- delete info on icloud
- how to make a new icloud
- closing old icloud account
- what happens if i sign out of my icloud account on my phone

Jenkins made far in excess of 100 similar searches, all geared towards determining whether he would ever be prosecuted and how he could avoid charges by erasing evidence. He had also installed a file shredder program on his computer.

Anyone having a brush with the police without being arrested or charged would get on his knees, thank God, and reform his ways. Not Jenkins. As mentioned above, Cobb County Police visited Jenkins on August 24, 2016, and confronted him with accusations of distributing child pornography online. (PSR ¶ 48.) Then on February 2, 2017, special agents from Homeland Security Investigations executed a search warrant at his home in Mableton, Georgia. (PSR ¶ 93.) The agents took the computers from the home and interviewed Jenkins about his online harassment of girls and his solicitation of pornographic images from them. (PSR ¶¶ 94-99.) The case agent showed Jenkins the evidence

establishing that he had extorted images and videos from numerous girls between the ages of 12 and 15 years. (*Id.*) Jenkins wrote out a letter apologizing to some of his victims. (PSR ¶ 102.)[2]

The question then was whether Jenkins was remorseful because he had caused harm to other persons or because he had been caught. It appears that the latter was the correct answer. We reach this conclusion because Jenkins started over when he had the chance. In March 2018, the police in Bourne, Massachusetts, investigated allegations that a 13-year-old girl had been targeted and harassed online. The girl said that her friend, whose cell phone had been taken away by her parents, used her phone to text a boy in North Carolina named "Rei." After her friend went home, the girl continued texting with Rei, who she thought was a 17-year-old boy. Their initial conversations were normal and non-sexual. But somehow she hurt Rei's feelings. At this point, a man named "Charles" took over the communications.[3] He threatened her and said that he knew where she lived. He backed up this claim by providing her with her own home address. He made her download Kik, and began communicating with her on that app. "Charles" said that he was going to post ads on Craigslist and

---

[2] In this letter, he behaved like a typical abuser, claiming that he too was a victim: "To all those hurt or traumatized by actions of my 'selves,' I was a victim and made victims of all of you. . . . I have brought shame and dishonor upon all of you, causing you the undeserved pain I was feeling." (*Id.*) This was his naked attempt to steal sympathy from the victims of his criminal actions and to claim an undeserved share of that sympathy.

[3] "Black Charles" was one of the personas that Jenkins admitted using. (Govt. Ex. 12J.)

15

Pornhub saying that she was a slut. He said that if she sent him nudes of herself he would not go through with it. She felt compelled to comply, sending him a photo of her bare chest without her face showing.

A detective with the Bourne Police Department began an investigation. He subpoenaed the IP address associated with the communications. The IP address was assigned to Jenkins' house in Mableton. The same house where the search warrant was executed on February 2, 2017. The same house where Jenkins was arrested on May 25, 2018. Prior to communicating on Kik, the victim and Jenkins were communicating via TextNow, a free texting and calling app. A subpoena to TextNow showed that the account had been created using the email address hachidaime7340@icloud.com. That email address is associated with Jenkins and was also traced to a Facebook account when he was trying to sextort a minor female from West Virginia around the same time.

Jenkins' conduct recalls the line from *The Tempest*: "What's past is prologue." Even after encountering law enforcement on two separate occasions, even after admitting that he had coerced numerous minors into producing child pornography, when left to his own devices he went back online and contacted minor females. He used his various aliases to communicate with them, and he alternated between flattery and threats to keep his victims off balance so that they would eventually comply with his demands. He resorted to using his knowledge of computers and IP address to find a 13-year-old's home address, and then he shared it with her for the sole purpose of intimidating her. Because

the public needs to be protected from Jenkins' future crimes, the Court should impose a custodial sentence of 80 years.

### 3. The Need to Avoid Unwarranted Sentencing Disparities

Another factor that the Court considers in determining a reasonable sentence is the need to avoid sentencing disparities among similarly situated cases. Jenkins' case is a rarity in this district.[4] Although there have been numerous defendants convicted of production of child pornography, they have not engaged in sextortion, as Jenkins did. However, cases around the country provide guidance on how other courts sentence offenders involved in sextorting pornography from minors. A review of those cases show that the sentence that the Government requests is consistent with the sentences imposed in similar cases.

The case of *United States v. Brandt*, 585 F. App'x 754, 755-56 (11th Cir. 2014) is similar to this one. There, a 46-year-old man pretended to be a teenage boy to convince girls to send him sexually explicit photos. After receiving them, he threatened to post them online unless he received more photos. There were seven known victims. The defendant pled guilty to three counts of production and received the maximum sentence of 90 years, which the appellate court found was substantively reasonable. *Id.* at 758. The court stated, "Although Mr. Brandt

---

[4] The case of *United States v. Hutchinson*, 588 F. App'x 894 (11th Cir. 2014), was prosecuted in this district, and it is similar in that the defendant had sextorted images from minor females. But he also committed a contact offense—that is, he raped four of the victims. *Id.* at 896. United States District Judge Timothy Batten sentenced the defendant to life in prison. *Id.* at 898.

17

points out that he had no physical contact with his victims, this fact cannot serve to minimize—much less neutralize—the devastating psychological impact that his offenses left in their wake, as exemplified by the poignant statements of one of his teenage victims and the victims' families at sentencing." *Id.*

In *United States v. Crawford*, No. 1:19CR35, (E.D. W. Va. 2019), the defendant posed as a teenage girl to entice minor boys to provide masturbation videos. There were five identified victims, and the defendant was charged with multiple counts of enticement. The court overruled the defendant's request for a variance and imposed a life sentence.

In *United States v. Phillips*, 757 F. App'x 905, 907 (11th Cir. 2018), the defendant had paid women in the Philippines to abuse and photograph two girls. The defendant pled guilty to two counts of production of child pornography. *Id.* The defendant's Guidelines range was life, and he argued in part that a sentence of 60 years was unreasonable because it deprived him of any benefit of pleading guilty and accepting responsibility. *Id.* The 11th Circuit found that the defendant's 60-year sentence was not substantively unreasonable. *Id.* at 909. The sentence reflected the seriousness of the offense, and it served the purpose of general and specific deterrence. *Id.*

A sentence of 80 years in custody for Jenkins is in line with cases from other districts where the defendant was convicted of production of child pornography, even though he did not abuse the victims in person. Such a sentence avoids unwarranted sentence disparity

## Conclusion

Benjamin Jenkins committed one of the worst crimes imaginable. He put countless minor girls and their families through unimaginable anguish. In the process, he altered the girls' self-image and their outlook on life. When he had the chance to live on the right side of the law, he chose to go back online and to hunt for more victims. A sentence of 80 years in custody followed by a lifetime of supervised release is not only reasonable but is generous given all the harm that Jenkins has caused.

Respectfully submitted,

BYUNG J. PAK
*United States Attorney*

/s/PAUL R. JONES
*Assistant United States Attorney*
Georgia Bar No. 402617
Paul.Jones@usdoj.gov

/s/SKYE DAVIS
*Assistant United States Attorney*
Georgia Bar No. 564709
Skye.Davis@usdoj.gov

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

        Sarah Timmers, Esq.

        Sydney Strickland, Esq.

September 1, 2020

        /s/ PAUL R. JONES

        PAUL R. JONES

        *Assistant United States Attorney*